UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

**NIGHT BOX**
**RECEIVED**

**JUN 2 8 2001**

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

ACCESS NOW, INC. and
EDWARD RESNICK,

          Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

          Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendants SOUTH

FLORIDA STADIUM CORPORATION ("SFSC"), the MIAMI DOLPHINS, LTD. ("Dolphins"),

and the FLORIDA MARLINS BASEBALL CLUB, L.L.C. ("Marlins") (all three collectively referred

to as the "Defendants") move for summary judgment on Plaintiffs' action for disability discrimination

under Title III of Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. §§ 12181, et seq.

Plaintiffs' claims must be dismissed with prejudice because (1) they have no standing to bring this

action, (2) they have failed to establish a prima facie case under the ADA, and (3) the Defendants

have complied with their obligations under the ADA. There are no material issues of fact in dispute



MIA: #597.3

with regard to the preceding grounds for dismissal, and therefore, Defendants are entitled to judgment in their favor as a matter of law. Further support for dismissal is presented below.

## STATEMENT OF CASE AND UNDISPUTED FACTS[1]

### A.    THE DEFENDANTS

Defendant SFSC owns and operates Pro Player Stadium (the "Stadium") which is a public accommodation built prior to the enactment of ADA. *DiLuigi Declaration  hereinafter referred to as Exh. "A" at ¶4.* The Dolphins and Marlins own and operate professional sports teams which play their home games at the Stadium. *Schulze Declaration, hereinafter referred to as Exh. "B" at ¶3.*

### B.    THE STADIUM

The Stadium has been host to numerous SuperBowls, a World Series, and countless other events. *Schulze Exh. "B" at ¶3.* Although the Stadium was built prior to the ADA, SFSC has always made efforts to accommodate its disabled guests, and these efforts pre-date the enactment of the ADA. *Schulze Exh. "B" at ¶6.* Since the passage of the ADA, SFSC has spent approximately 19 million dollars on ADA improvements to the Stadium. *Schulze Exh. "B" at ¶6.* As a result, the Stadium can boast the following achievements:

* It provides the number of disabled parking spaces required by the ADA;

* It provides accessible bathrooms as required by the ADA;

* It provides accessible concession stands as required by the ADA;

* It provides dispersal of disabled seating throughout the Stadium as required by the ADA;

---

[1]     The following is a statement of undisputed facts as required by S.D.Fla. L.R.7.5.

* Even though not required by the ADA, the Stadium has a full time ADA Coordinator who addresses any problems or concerns raised by or on behalf of disabled patrons; and

* It has implemented ADA policies that are intended to enhance the experience for the Stadium's guests with disabilities. These policies include: (i) additional food service options; (ii) access to valet parking; (iii) an access service center, and (iv) access to a wide variety of seating locations at different prices.

*Declaration of Kevin McGuire, hereinafter referred to as Exh. "C" at ¶7; see also Schulze Exh. "B" at ¶¶5-6.*

As a result, the Stadium meets and exceeds its obligations under the ADA, and there are no architectural barriers which would prevent the disabled from attending events at the Stadium. *DiLuigi Exh. "A" at ¶6.*

Historically, the Stadium's accessible seating is under-utilized during Dolphins' and Marlins' games even though it has various seating locations for guests with disabilities. *Gray Declaration hereinafter referred to as Exh. "D" at ¶4; see also Schulze Exh. "A" at ¶3; Major Declaration hereinafter referred to as Exh. "E" at ¶5.* In fact, statistical analysis shows that during Marlins' Baseball games the odds are 2500 to 1 that 95 or more of the 190 available wheelchair locations will be occupied. *Gray Exh. "D" at ¶4.* Similarly, during Dolphins' Football games the odds are 3000 to 1 that all the wheelchair locations will be occupied. *Gray Exh. "D" at ¶5.*

Despite the under-utilization, SFSC has implemented ticketing policies which are effective in ensuring that patrons with disabilities always have seating even when the Stadium is sold out. *See Major Exh. "E" at ¶¶ 3-4.* In fact, over the last two football seasons,[2] a substantial amount of

---

[2]There is always wheelchair seating available during baseball games. *See Major Exh. "E" at fn1.*

M1660067;3     3

wheelchair seats have been available even during sold out rivalry games like the Dolphins vs. the

Jets. *See Major Exh. "E" ¶ 3.* Some examples of the ticketing policies follow:

      a.     All wheelchair seats are held exclusively for purchase by guests with disabilities up to and including the day of the event or game.

      b.     Guests with disabilities are permitted to purchase seats in the executive suites on the club level at the same price that the general public pays for less expensive seats located on the Stadium's lower level.

*See Major Exh. "E" ¶ 3.*

The foregoing notwithstanding, Plaintiffs argue that Defendants should install 1% of total seating based on the new construction standards under the ADA. *See Complaint D.E. #1 ¶¶ 13-15.* These standards, however, do not apply to pre-ADA facilities like the Stadium. *See DiLuigi Exh. "A" at ¶4.* As such, the Plaintiffs' demand for 1% of total seating is without merit. Assuming *arguendo* that the Stadium is required to convert 1% of its seating to wheelchair and companion locations, its total seating capacity would drop below 70,000, and as a result, it would no longer be eligible to host SuperBowls. *Gray Exh. "D" at ¶8; see also Schulze Exh. "A" at ¶3.* In addition, the loss of seating plus the cost of revamping the Stadium would result in a loss of approximately $56,000,000 --- a loss that could be increased by an additional $7,000,000 if the new accessible seats were not used by any more than the current number of patrons with disabilities and were not released for general usage. *See Gray Exh. "D" at ¶12.* Such a result would be unjust and absurd in light of the fact that the Stadium's current amount of wheelchair seating is under-utilized. *See Gray Exh. "D" at ¶¶4-5.*

## C.     THE PLAINTIFFS

### 1.     Mr. Resnick and Access Now

Plaintiff Access Now, Inc. ("Access Now") is a disability rights advocacy group which was started by Co-Plaintiff Edward Resnick in 1997. *Transcript of Resnick Deposition hereinafter Exh. "F" at pp. 9, 10.* Since 1997, this group has been responsible for filing over 300 ADA lawsuits. *Resnick Exh. "F" at p. 121.* Mr. Resnick is the President of Access Now, and he is also an attorney licensed to practice law in Florida. *Resnick Exh. "F" at p. 13.* He has been a quadriplegic since 1954, and therefore is disabled within the meaning of the Act. *Resnick Exh. "F" at p. 30.* He has been a disabilities right advocate for many years, and prior to starting Access Now, he served as the President of another disability rights advocacy group called the Association of Disabled Americans. *Resnick Exh. "F" at pp. 11, 14.*

As President of Access Now, Mr. Resnick makes all of the organization's day-to-day decisions, as well as the decision to bring this and other lawsuits. *Resnick Exh. "F" at pp 7,14,15,21.* Moreover, he has admitted that his experiences at the Stadium serve as the sole basis for standing for both himself and Access Now. *Resnick Exh. "F" at pp. 64, 136.*

### 2.     Mr. Resnick's History as a Dolphins' Fan

In 1987 (prior to the ADA) when the stadium was built by Joe Robbie, Mr. Resnick purchased a ten year license for Dolphins' season tickets, and he ultimately sold his license in 1994. *Resnick Exh. "F" at pp. 33, 38-41.* From 1987 (some 4 years prior to the enactment of the ADA) to 1994, Mr. Resnick attended most of the Dolphins home games; however, he has not attended a Dolphins game at the Stadium since the sale of his license. *Resnick Exh. "F" at pp. 92, 108.* Prior to purchasing his license, Mr. Resnick had a discussion with an employee of Robbie Stadium

Corporation[3] ("RSC") regarding potential seating options at the Stadium which at the time had not yet opened to the public. *Resnick Exh. "F" at pp. 42-45.* With the exception of the preceding discussion, Mr. Resnick never raised any disability problems or concerns with any of the Defendants despite the fact that he had been a disabilities rights advocate for many years while he was still a season ticket holder. *Resnick Exh. "F" at p. 49.*

Mr. Resnick alleges discrimination based on his failed attempt to purchase Dolphins' tickets for a game in November of 1999 because the Stadium allegedly lacked sufficient accessible seating. *See Complaint at D.E. #1 ¶4.* However, Mr. Resnick admitted that he did not personally attempt to purchase the tickets and that he had no personal knowledge regarding the availability of accessible seating at the Stadium for the relevant Dolphins' game. *Resnick Exh. "F" at pp. 70-71.*

### 3. Mr. Resnick's History as a Marlins' Fan

It is evident that Mr. Resnick had no issues with the Stadium because he voluntarily purchased season tickets for the Marlins. Mr. Resnick was a Marlins' season ticket holder the first two seasons. *Resnick Exh. "F" at p 31.* However, he made an arrangement with friends to sell them two thirds of the tickets for each season. *Resnick Exh. "F" at p. 32.* As a result, he attended approximately one third of the Marlins' home games during those two seasons. *Resnick Exh. "F" at pp. 32, 34-35.* With respect to any Marlins' game that he attended, Mr. Resnick never raised any accessibility problems with any of the Defendants. *Resnick Exh. "F" at p. 49.* Since the end of the 1993 season, Mr. Resnick claims to have attended only one Marlins home game which was in May, 2000. *Resnick Exh. "F" at p. 51.* At that game, he sat in a wheelchair accessible location adjacent to the first base line. *Resnick Exh. "F" at p. 51.* Mr. Resnick admits that the ticket for this game was

---

[3]RSC is the predecessor entity to SFSC.

6

purchased by either his attorney in this action or the Stadium's former ADA consultant. *Resnick Exh.* *"F" at pp. 64-65.* Despite the fact that the Stadium offers many other wheelchair locations, Mr. Resnick obtained seating at that location based on his personal preference. *Resnick Exh. "F" at pp.* *57, 127.* When he arrived at the game, he had his car parked by the Stadium's valet service and took an elevator to the level where his seat was located. *Resnick Exh. "F" at p. 51.* During the game, he only visited one bathroom, and he did not personally purchase any food from any concession locations. *Resnick Exh. "F" at p. 119.* Ultimately, Mr. Resnick left the game in the seventh inning and has not returned to the Stadium since that time. *Resnick Exh. "F" at pp. 52, 67, 84, 92.*

**D.    THIS LAWSUIT**

Shortly after Mr. Resnick attended the one Marlins game in May, 2000, he filed this lawsuit on behalf of himself and his association which alleges that the Defendants are liable for a whole assortment of alleged ADA violations at the Stadium. *Resnick Exh. "F" at pp. 124-125.* Plaintiffs, however, have no legitimate basis for making these allegations, nor can they prove them. Indeed, Mr. Resnick readily admits that the allegations in the complaint are primarily based on his visual inspection of the Stadium while he sat in one location during one Marlin's game which he attended in May, 2000:

> Q.    Since the sale, since the sale of your season tickets in 1994, how
>        many games or events have you attended at Pro Player Stadium?
>
> A.    Only one. I went to a Marlins baseball game.
>
> Q.    Are you telling me that your statement that the Stadium is not
>        compliant with the ADA's accessibility requirements is based on your
>        visual inspection of the stadium while you were a patron at that
>        game?
>
> A.    Primarily, yes.

*Resnick Exh. "F" at pp 92-93.*

Furthermore, he readily admits that his visual inspection did not encompass most of the alleged ADA

violations set forth in the complaint. *Resnick Exh. "F" at p. 97.* More importantly, he admitted that

he had no personal knowledge of the alleged violations. For example, the complaint alleges that:

1. *The Stadium does not provide the required number of wheelchair locations. See Complaint at D.E.#1 ¶¶ B13-15.* However, Mr. Resnick admits that this allegation is not based on personal knowledge. *See Resnick Exh. "F" at pp 74,76.*

2. *The Stadium fails to integrate wheelchair locations with an unobstructed line of sight into its overall seating plan. See Complaint at D.E.#1 ¶¶ A 8-12 & C 16-18.* However, Mr. Resnick admits that this allegation is not based on personal knowledge. *See Resnick Exh. "F" at pp. 108-109.*

3. *The Stadium fails to offer the disabled a choice of prices and seating locations which is comparable to the general public. See Complaint at D.E.#1 ¶¶ C 16-18.* However, Mr. Resnick admits that this allegation is not based on personal knowledge. *See Resnick Exh. "F" at pp. 122-123.* He further admits that at the last Marlins' game that he attended, he sat at a disabled seating location adjacent to the first base line due to his personal preference. *See Resnick Exh. "F" at p. 127.*

4. *The Stadium fails to provide an unobstructed line of sight for wheelchair locations. See Complaint at D.E.#1 ¶¶ A 8-12.* However, Mr. Resnick admits that he has only observed the line of sight from merely two wheelchair locations at the Stadium. *See Resnick Exh. "F" at pp. 97, 108-109.*

5. *The Stadium fails to provide the appropriate number of accessible parking spaces. See Complaint at D.E.#1 ¶¶ D 19-20.* However, Mr. Resnick admits that he has not visually inspected all of the disabled parking spaces at the Stadium, nor does he know where they are. *See Resnick Exh. "F" at pp 76, 125-126.*

6. *The Stadium fails to provide the appropriate number of accessible seats at the fixed tables in the picnic area and in the food service areas on the club level and in the skyboxes. See Complaint at D.E.#1 ¶¶ E 21-22.* However, Mr. Resnick admits that he did not visit the picnic area or the club level during the last Marlins' game that he attended. *See Resnick Exh. "F" at p. 93.*

8

7.    *The Stadium fails to provide accessible counters in the picnic area and in the food service areas on the club level and in the skyboxes. See Complaint at D.E.#1 ¶¶ E 21-22.* However, Mr. Resnick admits that he did not personally utilize food services in the picnic area, the Club level, and in the skyboxes during the last Marlins' game that he attended.[4] *See Resnick Exh. "F" at p. 93.*

8.    *The Stadium fails to provide accessible restrooms. See Complaint at D.E.#1 ¶¶ E 21-22.* However, Mr. Resnick admits that he only visited one bathroom during the last Marlins' game that he attended. *See Resnick Exh. "F" at p. 119.*

While the preceding demonstrates that there is no basis for Mr. Resnick's allegations of discrimination and purported ADA violations, he also cannot identify any other members of Access Now that have allegedly suffered discrimination based on the allegations set forth in the complaint. *Resnick Exh. "F" at p. 136.* Indeed, Mr. Resnick basically admits that his one experience during the May, 2000 baseball game is the sole basis for this lawsuit. *Resnick Exh. "F" at pp. 64, 85.*

Plaintiffs' allegations of ADA violations are further undermined by their admissions[5] that (1) the Stadium is governed by the readily achievable standard; (2) it is an undue hardship to make the seating modifications specified in their complaint; (3) the Stadium's picnic area is accessible to the disabled; (4) the Stadium's wheelchair seating is integrated, located in various places with various

---

[4] Indeed, Mr. Resnick admits that the Stadium's concession stands were overall compliant with the Act. *See Resnick Exh. "F" at p. 114.*

[5] On January 16, 2001, Defendants served Plaintiffs with a request for admissions to which they have never responded. *Defendants' Requests for Admissions are attached as Exh."G"* As a result, Plaintiffs are deemed to have admitted Defendants' requests pursuant to Rule 36 of the Federal Rules of Civil Procedure. *See United States v. Lane, 960 F.2d 126 (11th Cir. 1992) (holding that the district court properly found that no genuine issue of material fact existed because the defendant had admitted to all relevant facts based on her failure to respond to the government's request for admissions).*

lines of sight and various price categories; and (5) the Stadium has the designated number of disabled parking spaces required by the ADA. *See supra fn 5.*

Moreover, despite the fact that Mr. Resnick has been a disability rights advocate for many years, he had no knowledge of the approximately 19 million dollars in ADA improvements made to the Stadium over the last eight (8) years. *Resnick Exh. "F" at pp. 45, 90.* Similarly, Mr. Resnick had no knowledge of the Stadium's extensive ADA policies, or that it has a full-time ADA Coordinator named Andy Major[6] whose job is to address and solve any disability questions, concerns or issues raised by the Stadium's guests with disabilities. *Resnick Exh. "F" at pp. 45, 48, 90, 141-147.* In fact, Mr. Resnick did not make any effort to learn about the Stadium's accessibility features prior to filing this action. *Resnick Exh. "F" at pp. 50, 78, 110.*

## E.   PRIOR ADA LAWSUITS

### 1.   PVAF Lawsuit

Despite the myriad of ADA improvements that have been made to the Stadium, the Defendants have twice been subject to prior ADA lawsuits. *See Schulze Exh. "B" at ¶7.* In *Paralyzed Veterans Association of Florida, Inc. et al. v. Miami Dolphins, Ltd, Florida Marlins Baseball, Ltd, and Robbie Stadium Corp., Case No.: 94-1735-CIV-KING* ("PVAF lawsuit"), the Dolphins, the Marlins and RSC were sued for alleged ADA violations which, for all intents and purposes, encompass all of the violations alleged in this action, and then some. *See Schulze Exh. "B" at ¶ 7.*

---

[6]In response to Defendants' interrogatories, Mr. Resnick identified Mr. Major as a potential witness; however, during his deposition, Mr. Resnick admitted that he had no idea who Mr. Major is or what position he holds with SFSC. *See Resnick Exh. "F" at pp. 48, 141-147.*

Specifically, the PVAF complaint alleged the Stadium was in violation of the ADA regarding disabled seating, ticket policies, parking, loading and drop-off areas, public telephones, accessible paths of travel, ramps, curb-cuts, restrooms, concessions, ticket windows, the press box, the picnic area, training, and signage. *See Schulze Exh "B" at tab A (PVAF Complaint).* On April 9, 1997, the Honorable James Lawrence King of this Court approved a settlement of all of the ADA claims in that lawsuit and still retains jurisdiction to enforce its the terms and conditions which were found to be "just and proper." *See Schulze Exh. "B" at tab B (Judge King's Final Order of Dismissal).*

### 2.    ADA Lawsuit by the Defendants' Former ADA Consultant

Notwithstanding the fact that Judge King determined that the Defendants had resolved the alleged ADA violations in a just and proper manner, SFSC was sued yet again for alleged ADA violations by the Defendants' former ADA consultant, Fred Shotz, in 1997. *See Schulze Exh. "B" at ¶7.* Mr. Shotz sued for a temporary restraining order to prevent SFSC from hosting the 'U2' concert at the Stadium. Mr. Shotz's claim was based on allegations that the Stadium's seating configuration for the concert discriminated against the disabled in violation of ADA. *See Schulze Exh. "B" at ¶7.* The Honorable Barry L. Garber rejected Mr. Shotz's arguments for a temporary restraining order and found that SFSC "ha[d] gone beyond its obligations under the ADA and has provided seating for the disabled..." *See Schulze Exh. "B" at tab C (Magistrate Garber's Report and Recommendation).* The Honorable Joan A. Lenard ratified Judge Garber's Report and Recommendation. *See Schulze Exh. "B" at tab C (Judge Lenard's Order adopting Magistrate Garber's Report and Recommendation).*

## ARGUMENT

**A.    PLAINTIFFS HAVE NO STANDING TO BRING THIS LAWSUIT.**

### 1.    Individual Standing

#### i.    *Requirements*

In order to meet the constitutional requirement of standing, individual Plaintiffs bear the burden of establishing three elements: "First, the plaintiff must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560- 61 (1992) (citations and internal quotation marks omitted).*  In the context of a claim for injunctive relief under Title III of the ADA, these standing elements require that the Plaintiffs show more than "past exposure to illegal conduct;" rather, they must show that Defendants' conduct is causing irreparable harm and that there exists a "real and immediate threat of repeated injury."  *City of Los Angeles v. Lyons, 461 U .S. 95, 102 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)); see also Deck v. American Hawaii Cruises, Inc., 121 F.Supp.2d 1292, 1296 (D. Hawaii 2000).*  Additionally, Plaintiffs' showing cannot be satisfied by mere allegations that "Defendant[s] ha[ve] a policy and practice of discriminating against disabled persons generally." *Deck 121 F.Supp.2d at 1297 (citing Lyons, 461 U.S. at 101).*  Moreover, the Supreme Court has held that "actual or imminent" injury is not established by tentative plans to revisit circumstances which lead to a past wrong.  *Lujan 504 U.S. at p. 564.*  Accordingly, Plaintiffs must allege a future

encounter with the Defendants which is likely to lead to a similar violation of some protected right. *See Lyons, 461 U.S. at 105-06.*

           *ii.*      *Dismissal Routine Where No Showing of Immediate Threat of Injury is Made*

                      In *Resnick and Access Now, Inc. v. Magical Cruise Co. Ltd, Case No.: 6:00-cv-898-ORL-28DAB (M.D. Fla. June 25, 2001, Judge John Antoon II),* the Middle District recently found that the very same Plaintiffs in this action had no standing to pursue their Title III ADA claims against Magical Cruise Company because they had not suffered an injury in fact. *Id.; a copy of the Order Dismissing Action for Lack of Standing is attached as Exh. "H".* Instead, the court found that Mr. Resnick's "alleged injury is merely conjectural or hypothetical rather than actual or imminent." *Exh. "H" at p. 6.* Moreover, the court rejected Mr. Resnick argument based on the ADA's "futile gesture" exception to the injury in fact requirement, and granted summary judgment for the defendants. *See Exh. "H".*

        The Middle District's decision is not surprising because Mr. Resnick and Access Now only pursue strike suits and do not actually utilize the services of the companies that they sue. The courts are not fooled by this and have been properly dismissing these cases for lack of standing. Indeed, district courts have routinely dismissed Title III ADA cases for lack of standing where a plaintiff fails to show a real or immediate threat of injury. *See e.g., Bravin v. Mount Sinai Med. Ctr., 186 F.R.D. 293 (S.D.N.Y. 1999), vacated in part on other grounds, 58 F.Supp.2d 269 (S.D.N.Y. 1999)* (denying standing where plaintiffs failed to show that there was a likelihood that they would require the services of defendant hospital in the future); *Martin v. Hyatt Corp., Civ. No. 97-209 (D.Haw. Feb. 26, 1999) (unpublished)* (finding no actual or imminent injury where plaintiff had no plans to return to defendant's hotel); *Proctor v. Prince George's Hosp. Ctr., 32 F.Supp.2d 830 (D.Md. 1998)*

13

(finding no standing for deaf plaintiff who was denied sign language interpreter services in a hospital because any assertion plaintiff would return to hospital based on mere speculation); *Delil v. El Torito Restaurants, Inc., 1997 WL 714866 (N.D.Cal. 1997) (unpublished)* (granting summary judgment for lack of standing where plaintiff did not demonstrate continuing, present adverse effects because she alleged only a single incident of discrimination in a restaurant more than one hundred miles away from where she lived and worked and did not allege that she intended to return to the restaurant, despite the fact that she had since returned once); *Naiman v. New York Univ., 1997 WL 249970 (S.D.N.Y. 1997)* (denying standing where Plaintiff alleged four visits to defendant hospital where defendant failed to provide him with effective sign language communication, as plaintiff did not show a real or immediate threat that he would require the services of defendant in the future); *O'Brien v. Werner Bus Lines, 1996 WL 82484 (E.D.Pa. Feb.27, 1996)* (finding no standing where plaintiffs failed to show "that they are likely to use Werner buses in the near future or, if they do use them, that Werner is likely to violate their rights under the ADA again"); *Hoepfl v. Barlow, 906 F.Supp. 317 (E.D.Va. 1995)* (denying standing where defendant had refused to perform surgery on plaintiff because she was HIV positive and plaintiff had since moved to another state and had the surgery performed by another physician); *Schroedel v. New York Univ. Med. Ctr., 885 F.Supp. 594 (S.D.N.Y. 1995)* (finding no standing where plaintiff "failed to allege anything more than conjecture that the conduct complained of will injure her in the future," as plaintiff did not allege that she regularly uses the services of defendant hospital, and was only a patient on one prior occasion); *Aikins v. St. Helena Hospital, 843 F.Supp. 1329, 1334 (N.D.Cal. 1994)* (denying standing to a deaf plaintiff, where plaintiff had been denied sign language interpreter services at the hospital that was treating her husband, as plaintiff did not show "that defendants' alleged discrimination is ongoing

and that she is likely to be served in the near future"); *Atakpa v. Perimeter OB-GYN Associates, P.C., 912 F.Supp. 1566, 1574 (N.D.Ga. 1994)* (finding no standing to sue the defendant ob-gyn clinic, even though plaintiff was still in childbearing years, because she "has not alleged that she will ever seek services from defendants in the future").

> iii.   *Mr. Resnick Has No Standing Because He Did Not Suffer an "Injury in Fact" and He Cannot Demonstrate an Immediate Threat of Repeated Injury.*

In the present case, Mr. Resnick has not suffered a concrete and particularized invasion of a legally protected interest. Rather, the complaint merely alleges discrimination based on alleged ADA violations at the Stadium. Moreover, Mr. Resnick did not suffer any injury based on these alleged violations. Instead, he testified that he only visually inspected some of the alleged violations and as to the others, he had no personal knowledge at all. As a result, Mr. Resnick by his own admissions did not suffer an injury in fact.

Moreover, Mr. Resnick cannot demonstrate that he is under the threat of immediate repeated injury based on the Stadium's alleged ADA violations. Indeed, he never suffered an injury at all. In reality, he attended one Marlins' game in May, 2000 for the sole purpose of bringing this lawsuit. Even so, he readily admits to having no personal knowledge of the alleged violations because, among other things, he never attempted to (1) buy food at any concession stand; (2) look at any parking spaces; and (3) examine line of sight or other wheelchair locations. As evidenced by the preceding, Mr. Resnick has no standing to bring this lawsuit as he did not suffer an injury in fact, nor can he show the threat of an immediate, repeated injury under the ADA because he has no knowledge of accessibility features that are offered by the Defendants subsequent to the sale of his season tickets in 1994.

2.     **Associational Standing**

     *i.*     *Requirements*

        When an association seeks standing on behalf of its members, it must meet the following three elements: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)*.

        These elements are hard to satisfy. In fact, the first element can only be met if the members of Access Now demonstrate that they are suffering a real or threatened injury as a result of the Stadium's alleged violations. *See Citizens Concerned About Our Children v. School Board of Broward County*, 193 F.3d 1285, 1290 (11th Cir. 1999)(affirming trial court's conclusion that plaintiff organization did not have standing with regard to race-based disadvantages at school board programs and facilities not attended by their individual members); *Doe v. Stincer*, 175 F.3d 879, 887 (11th Cir. 1999) (holding that association's conclusory allegation that many Floridians have been denied access to mental health records without any specific allegation that a member of the advocacy group was in fact denied access to his/her records was insufficient to establish Associational standing).

        Similarly, few plaintiffs can satisfy their burden under the third element which requires proof that individual participation in the lawsuit is not needed. In *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 884 F. Supp. 487, 488-89 (S.D. Fla. 1994) (Ryskamp, J.), the Honorable Judge Ryskamp addressed this standing issue in the context of an alleged ADA violation. Concerned Parents was an association organized to safeguard the access of disabled individuals to

MI660067:3                     16

recreational facilities in the City of West Palm Beach, and it sued the City of West Palm Beach alleging that the City violated the ADA. *Id.* at 489. The City consented to the entry of a judgment as to liability and the only issue left for the trial court was the question of an appropriate remedy. *Id.* at 488. Judge Ryskamp, however, dismissed Concerned Parents from the lawsuit after concluding that it did not have associational standing to pursue the action. Specifically, Judge Ryskamp held that Concerned Parents lacked standing **"because any finding of an ADA violation requires proof as to each individual claimant [and because] the relief afforded to each claimant would require an individualized assessment of what measures the City must take in order to comply with the ADA . . . ."** *Id.* at 488-89 (emphasis added). While noting that the individual members of Concerned Parents could have standing to pursue their own claims, Judge Ryskamp frowned on the association's attempt to "shoehorn an unknown number of supposed, but unknown, victims into their cause of action by the mechanism of associational standing." *Id.* (quoting *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir. 1985)).

        ii.    *Access Now Has No Standing*

        Mr. Resnick has admitted that his experience at the Stadium is the basis for Access Now's standing in this lawsuit. However, for the reasons stated above, Mr. Resnick has no standing, and therefore, he cannot create standing for Access Now. Moreover, Access Now has no standing because Mr. Resnick admits that he cannot identify another member who has raised an ADA issue regarding the Stadium. Furthermore, Access Now also lacks standing because (1) its members would not otherwise have standing to sue in their own right, and (2) the asserted causes of action and related relief require participation of the individual members in the lawsuit.

Standing is not created for Access Now by the conclusory statement in the Complaint which provides: "ACCESS NOW and its members suffer direct and indirect injury as a result of the Defendants' actions or inactions as described herein, and each member would have standing to maintain this action on his or her own." *See Complaint at D.E. #1 ¶3.* Additionally, Plaintiffs have offered no evidence that any members of Access Now have actually suffered discrimination based on the Stadium's alleged ADA violations. Consequently, Access Now has failed to satisfy the first element of associational standing, and their claims must be dismissed.

Additionally, Access Now lacks standing because the asserted causes of action and related relief require participation by its individual members in the lawsuit. Indeed, without the participation of the individual members of Access Now, it is impossible to determine whether there are any ADA violations and, if so, what measures must be undertaken in order to remedy the violations as to these Plaintiffs. Whether the alleged violations at the Stadium will affect a hearing impaired member of Access Now in the same manner as a mobility impaired member requires a different and individualized analysis with respect to each member's particular disability. As a result, the participation of Access Now's members in this lawsuit is an absolute requirement. Access Now is therefore unable to satisfy the first and third elements of associational standing, and as such, must be dismissed from this lawsuit.

### 3.    **Prudential Considerations Limiting Standing**

#### i.    *Requirements*

Even if a plaintiff satisfies the standing requirements, he also must demonstrate that prudential considerations do not weigh against adjudication of the claims at issue. *See Cuban American Bar Ass'n,* 43 F.3d at 1423; *E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979,

18

984 (11th Cir. 1990). The Eleventh Circuit recognizes three instances where a court should restrain itself from adjudicating a claim even if the plaintiff has satisfied the minimum constitutional requirements of standing: (1) the plaintiff is asserting a third party's rights; (2) the plaintiff is alleging a generalized grievance rather than a particular injury; or (3) the injury asserted by the plaintiff is outside the zone of interests of the statute or constitutional provision at issue. *See E.F. Hutton*, 901 F.2d at 984-85. As with the case of an individual plaintiff, a court evaluating an association's standing must also concern itself with the three recognized prudential considerations of judicial restraint. *See Cuban American Bar Ass'n*, 43 F.3d at 1423; *supra*, pp. 4-5.

ii.    *Plaintiffs Have No Standing as Their Allegations are Nothing More Than General Grievances*

Not only do Plaintiffs fail to satisfy the constitutional requirements of standing, their claims should also be dismissed due to prudential considerations of judicial self-government. By requesting that the Court enter a permanent injunction to ensure that the Defendants comply with the ADA, the Plaintiffs are merely asserting a general grievance that every citizen has a right to make -- the right to have the law enforced. The general right to have the law enforced, however, does not confer upon a private citizen standing to sue in federal court. *See Lujan, 504 U.S. at 572, 574.*

Moreover, this Court has rejected similar requests that it enter a permanent injunction to ensure compliance with the ADA. In *Concerned Parents*, this Court refused to grant to the remaining individual plaintiffs a permanent injunction against the City of West Palm Beach compelling its compliance with ADA regulations because the individual plaintiffs were merely espousing a general grievance that the city was not complying with the law. *See 884 F. Supp. 487.*

Plaintiffs' identical request for permanent injunctive relief in this instant matter is improper for the same reason. Thus, prudential considerations compel summary judgment in favor of the Defendants.

**B.   DEFENDANTS ARE NOT LIABLE UNDER TITLE III OF THE ADA AS THEY HAVE SATISFIED THEIR BARRIER REMOVAL OBLIGATIONS UNDER THE READILY ACHIEVABLE STANDARD AND ARE OTHERWISE IN SUBSTANTIAL COMPLIANCE WITH THE ACT**

   **1.   Readily Achievable Standard**

      i.   *Requirements*

Under Title III of the ADA, public accommodations, such as the Stadium, which were designed and constructed prior to the enactment of the ADA ("pre-ADA facilities") are only required to remove architectural barriers where it is "readily achievable" to do so.[7] *See 42 U.S.C. §12182(b)(2)(A)(iv); 28 C.F.R. §36.304.* "Readily achievable" is defined as "easily accomplishable and able to be carried out without much difficulty or expense." *See 42 U.S.C. §12181(9); 28 C.F.R. §36.304.* To establish a prima facie case of disability discrimination based on

---

   [7]Public accommodations designed and constructed for first occupancy 30 months or more after the ADA became effective ("post-ADA facilities") must satisfy a more stringent standard ("readily accessible standard") which requires that the accommodation be readily accessible by and useable to individuals with disabilities. *See* 42 U.S.C. §12183(a)(1). The Department of Justice ("DOJ") -- the Federal Agency empowered to enforce the ADA -- has adopted a set of Americans with Disability Act Accessibility Guidelines for Buildings and Facilities ("ADAAG") which are required under the more stringent standard. *See* 28 C.F.R. Part 36, App. A. However, ADAAG does ***not*** apply to pre-ADA facilities such as the Stadium. *See Hollynn D'Lil v. Anaheim Hotel Partnership, et al., Case No.: CV-99-9286-GAF (Central District of Calif. August 29, 2000) ("ADAAG only applies to newly-constructed buildings or buildings undergoing alterations ... the guidelines are not mandatory on existing buildings" citing Coalition of Montanans Concerned with Disabilities, Inc. v. Gallatin Airport Auth., 957 F.Supp. 1166, 1168 (D. Mon. 1997)); Torcasio v. Murray, 57 F.3d 1340, 1352 (4th Cir. 1995) ("Finally, [the Court] notes that [Plaintiff] is undermining his own claim by invoking the ADAAG, because these guidelines apply only to 'newly designed or newly constructed buildings and facilities and altered portions of existing buildings and facilities'"); 28 C.F.R. §36.406 stating that the ADAAG only applies to "[n]ew construction and alterations" and not to pre-ADA facilities.*

MI660067.3

a defendant's failure to satisfy a readily achievable standard, a plaintiff must prove that (1) the pre-ADA facility presents architectural barriers which are prohibited by the ADA, and (2) the removal of these barriers is readily achievable. *See Parr v. L&L Drive-Inn Restaurant*, 96 F. Supp. 2d 1065, 1085 (D. Haw. 2000) (setting out *prima facie* case in barrier removal cases); *Gilbert v. Eckerd Drugs*, 1998 WL 388567, at *2 (E.D. La. July 8, 1998) (same). Even the DOJ recognizes that ADAAG standards only apply to new construction. *See U.S. Department of Justice, Civil Rights Division, Disability Rights Section, publication on "Accessible Stadiums"*.

      ii.    *Substantial Compliance*

      It has been held that liability under Title III of the ADA can be avoided if a party is in substantial compliance with its obligations under the Act. *See United States v. Ellerbe Becket, Inc., 976 F.Supp. 1262, 1269 (D. Minn. 1997) (citing Paralyzed Veterans of America v. D.C. Arena, L.P., 117 F.3d 579, 589 (D.C. Cir. 1997)) ("substantial compliance with [the relevant ADA] standard ... was sufficient to avoid liability under the ADA.")*. Moreover, mere technical violations of the Act will not support an action for injunctive relief. *See Long et al. v. Coast Resorts, Inc. et al., 32 F.Supp.2d 1203, 1212 (D. Nevada 1999)*. In *Coast Resorts*, the court rejected the plaintiffs' argument for injunctive relief which sought the defendant's compliance with every technical requirement of the ADA regulations. The court reasoned that while the defendant hotel may have been in technical violation of ADA regulations, it nonetheless had substantially complied with its obligations under the Act and had even taken measures to make its property accessible to the disabled in ways that were not required by the regulations. The court also noted that the cost of technical compliance would be "enormous", and based on these reasons, it held that injunctive relief was inappropriate.

iii.    *The Stadium is Subject to the Readily Achievable Standard and is Substantially Compliant with the Act.*

       In this case, it is undisputed that the Stadium need only comply with the readily achievable standard, and Plaintiffs admit as much. *See supra fn5; Resnick Exh. "F" at p. 89.* Even so, Plaintiffs have failed to make a prima facie case with regard to any of their alleged ADA violations. Indeed, at no time do Plaintiffs offer any proof that the alleged violations are barriers and thus, prohibited by the ADA. Moreover, the Plaintiffs also fail to prove that even if there were barriers, that their correction would be readily achievable.

       It should be emphasized that a majority of the alleged violations are not prohibited under the readily achievable standard; rather, they only constitute violations under the more stringent "readily accessible" standard which <u>only</u> applies to post-ADA facilities and not the Stadium. In fact, Plaintiffs' alleged violations for (1) lack of required number of wheelchair seats; (2) failure to integrate unobstructed line of sight into overall seating plan; and (3) failure to provide an appropriate number of accessible parking spaces, are only applicable to post-ADA facilities. Even assuming *arguendo* that the alleged violations were prohibited under the ADA as to pre-ADA facilities, such as the Stadium, at no time have Plaintiffs demonstrated how these violations can be corrected without much difficulty or expense as required by the ADA. As a result, Plaintiffs have completely failed to meet their burden of proof and have not established a prima facie case under the ADA.

       Furthermore, Plaintiffs admit that (1) it is an undue hardship to make the seating modifications specified in their complaint; (2) the Stadium's picnic area is accessible to the disabled; (3) the Stadium's wheelchair seating is integrated, located in various places with various lines of sight and various price categories; and (4) the Stadium has the designated number of disabled

parking spaces required by the ADA. *See supra fn.5.* As such, their alleged ADA violations concerning the foregoing are nonexistent.

The deficiency of Plaintiffs' claims notwithstanding, Defendants have satisfied their obligations under the readily achievable standard and are otherwise in substantial compliance with the Act. In fact, it is undisputed that the Defendants have spent over $19 million dollars on ADA improvements since the passage of the ADA, and as a result, the Stadium has accomplished the following:

* It provides the number of disabled parking spaces required by the ADA;
* It provides accessible bathrooms as required by the ADA;
* It provides accessible concession stands as required by the ADA;
* It provides disbursal of accessible seating throughout the Stadium as required by the ADA;
* Even though not required by the ADA, the Stadium has a full time ADA Coordinator who addresses any problems or concerns raised by or on behalf of guests with disabilities; and
* It has implemented ADA policies intended to enhance the experience for the Stadium's guests with disabilities. These policies include: (i) additional food service options; (ii) access to valet parking; (iii) an access service center, and (iv) access to a wide variety of seating locations at different prices.

Furthermore, SFSC has implemented ticketing policies which ensure that patrons with disabilities always have seating even when the Stadium is sold out. Indeed, all wheelchair seats at the Stadium are held exclusively for purchase by guests with disabilities up to and including the day of the event or game. As a result, over the last two football seasons, a substantial amount of wheelchair seats have been available even during sold out rivalry games like the Dolphins vs. the Jets. In addition, wheelchair seating is always available during baseball games. Accordingly, the Stadium meets and

exceeds its obligations under the ADA, and there are no architectural barriers which would prevent the disabled from attending events at the Stadium.

Moreover, Judge King approved a "just and proper" settlement of the PVAF lawsuit which alleged ADA violations encompassing all of Mr. Resnick's claims and more. Similarly, Judge Lenard rejected a claim for injunctive relief against the Stadium based on alleged ADA violations and adopted Judge Garber's finding that the Stadium "had gone beyond its obligations under the ADA..." The foregoing coupled with the approximately 19 million dollars that Defendants have spent on ADA improvements in the last eight (8) years demonstrates that the Defendants have exceeded their obligations under the readily achievable standard and are otherwise in substantial compliance. Furthermore, many of the Stadium's improvements, such as providing a full-time ADA Coordinator, are not required by the ADA but were nonetheless undertaken because of the Defendants' commitment to providing its disabled patrons with access to the Stadium.

In sum, Plaintiffs' claims are deficient because they are nothing more than technical violations that will not support a claim for injunctive relief. Moreover, Plaintiffs are seeking to impose the more stringent standard upon the Stadium even though they readily admit that it does not apply. Consequently, Plaintiffs' action must be dismissed with prejudice because (1) they have failed to make a prima facie case, and (2) the Defendants have met their obligations under the Act and have otherwise substantially complied with it.

## CONCLUSION

WHEREFORE, Defendants respectfully submit that there are no material issues of fact in dispute with regard to the preceding grounds for dismissal, and therefore, they are entitled to judgment in their favor as a matter of law.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the foregoing was served, via U.S. Mail to Stephen M. Cody, Esq., 16610 SW 82nd Court, Miami, FL 33157-3604 this 28th day of June 2001.

**AKERMAN, SENTERFITT & EIDSON, P.A.**
Attorney for Defendant
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida 33131-1704
Phone: (305) 374-5600
Facsimile: (305) 374-5095

By: _____
    Stanley H. Wakshlag, Esq.
    Florida Bar No.: 266264
    Carol C. Lumpkin, Esq.
    Florida Bar No. 797448
    Devand A. Sukhdeo, Esq.
    Florida Bar No. 0126977

MI660067.3

# EXHIBIT "A"

MI635060;1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

ACCESS NOW, INC. and
EDWARD RESNICK,

        Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

        Defendants.
_____/

## DECLARATION OF JAMES Di LUIGI

Pursuant to 28 U.S.C. §1746, I, James Di Luigi, declare the following:

1.      I am over eighteen year of age and am fully competent to execute this declaration. The facts set forth herein are within my personal knowledge unless otherwise stated.

2.      I am Vice President of Universal Designers & Consultants, Inc. ("UDC"), a corporation with its principal place of business in Tacoma Park, Maryland.  A summary of my qualifications is attached hereto as Exhibit A to this Affidavit.

3.      I have been retained by the Defendants in this action as an expert witness to evaluate Pro Player Stadium (the "Stadium") for compliance with Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*  Moreover, since 1996, I have served as

MI668399;1

an ADA consultant for the Stadium on various projects.

4.      Because the Stadium is a pre-ADA facility, it is not required to comply with the standards for accessibility mandated for new buildings under the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), 28 C.F.R., Part 36, Appendix A, except to the extent it has undergone major alterations. Rather, the Stadium is only subject to the readily achievable standard which requires the removal of architectural barrier where it can be done easily and without much difficulty or expense.

5.      I have reviewed the Plaintiffs' complaint and am familiar with each area of the Stadium that the Plaintiffs allege to be in violation of the ADA. However, Plaintiffs' alleged violations are premised on ADAAG standards which do not apply to the Stadium.

6.      I have conducted my own independent inspection of the Stadium to determine whether it complies with the ADA. In my opinion, the Stadium not only complies with the ADA but exceeds the intent and requirements of accessibility regulations currently applicable to pre-ADA facilities. Moreover, in conducting the inspection, I did not find any architectural barriers that would preclude the plaintiffs from attending an event at the Stadium. In forming this opinion, I considered the complaint, the ADA, ADAAG, relevant Congressional reports, commentary by DOJ and the United States Architectural and Transportation Barriers Compliance Board (the "Access Board") published in the *Federal Register* and elsewhere, Technical Assistance Manuals published by the Department of Justice, the Uniform Federal Accessibility Standards ("UFAS") upon which ADAAG is substantially based, and the UFAS Retrofit Manual.

(SIGNATURE BLOCK FOUND ON THE FOLLOWING PAGE)

MI668399;1                                                2

UNDER PENALTY OF PERJURY, I DECLARE THAT THE FOREGOING IS

TRUE AND CORRECT.

_____

JAMES Di LUIGI

# EXHIBIT "B"

MI635060.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

ACCESS NOW, INC. and
EDWARD RESNICK,

        Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

        Defendants.

_____/

## DECLARATION OF M. BRUCE SCHULZE

Pursuant to 28 U.S.C. §1746, I, M. Bruce Schulze, declare the following:

1.    I am over 18 years of age and a resident of the State of Florida. The

facts stated herein are based upon my personal knowledge unless stated otherwise.

2.    I am the President of the South Florida Stadium Corporation ("SFSC")

which operates Pro Player Stadium ("the Stadium"). I have held that position since

1999 and have been employed by SFSC since 1995. From 1992 until my

MI668470;1

1

employment with SFSC, I was employed by the Florida Marlins Baseball Club, L.L.C. ("Marlins"). Prior to my employment with the Marlins, I was employed as the Director of Events Operations and Security at Civic Center Corp. Managers/Operators of Busch Stadium in St. Louis, MO.

3. The Stadium is where the MIAMI DOLPHINS, LTD. ("Dolphins") and the Marlins play their home games. In addition, the Stadium has been host to numerous SuperBowls, a World Series and countless other events. Although built prior to the enactment of the Americans With Disabilities Act ("ADA"), the Stadium provides numerous wheelchair seating locations for its disabled patrons; however, these seats have historically been under utilized. Currently, the Stadium has a seating capacity of approximately 75,000 when configured for football; however, should this capacity drop below 70,000, the Stadium may not be eligible to host SuperBowls.

4. As President of the Stadium, I am responsible for supervising the overall operation of the building which includes accessibility issues pursuant to the ADA. Similarly, as Director of Events and Operations at Busch Stadium, I was responsible for the analysis, review and implementation of ADA policies. In addition, I am on the Board of the Stadium Manager's Association which is a

2

national organization that addresses issues impacting Stadium such as ADA compliance.

5.   As a result, I have had substantial experience in dealing with ADA issues and their applicability to sports stadiums.   In fact, I was involved with development and implementation of most, if not all, ADA improvements and policies at the Stadium including but not limited to ensuring that the Stadium meets the ADA requirements for (1) disabled parking, (2) accessible bathrooms, (3) accessible paths of travel, (4) disbursal of disabled seating, (5) offering the disabled a variety of seating options at different prices, (6) ticket policies, (7) food service policies, (8) accessability to concession stands, and (9) accessibility to retail stores at the Stadium.

6.   Since the passage of the ADA, approximately $19 million has been spent on ADA improvements at the Stadium.   Moreover, SFSC has always been committed to making the Stadium accessible to the disabled and has taken measures in that regard prior and subsequent to the ADA.   Indeed, accessibility improvements are made to the Stadium on an ongoing basis, and some improvements are not required by the ADA, such as (1) the Stadium has a full-time ADA coordinator who addresses and solves any accessability issues brought to his attention, (2) the Stadium

has held dinners and meetings for the disabled community so that they can address accessability issues concerning the Stadium, and (3) the Stadium provides its patrons with an informative access brochure which sets forth the Stadium's accessibility features. Additionally, the Stadium hired a webpage designer to produce a website that included, among other things, the information regarding the accessible features at the Stadium. However, this webpage is now outdated and is presently being reviewed.

7.     Despite the foregoing improvements to the Stadium, it has been sued twice for alleged ADA violations in the past, and I have been personally involved in those lawsuits. In *Paralyzed Veterans Association of Florida, Inc. et al. v. Miami Dolphins, Ltd, Florida Marlins Baseball, Ltd, and Robbie Stadium Corp., Case No.: 94-1735-CIV-KING* ("PVAF lawsuit"), the Dolphins, the Marlins and Robbie Stadium Corp.[1] ("RSC") were sued for alleged ADA violations which, for all intents and purposes, encompass all of the violations alleged in this action and then some. *A copy of the Complaint is attached as Ex. "A"*. The PVAF lawsuit was resolved by a settlement which was approved by the Honorable James Lawrence King, and

_____

[1]RSC is the predecessor entity to SFSC.

currently, he retains jurisdiction to enforce terms and conditions of the settlement. *A copy of the Order of Dismissal is attached as Ex. "B".*

In addition, the Defendants' former ADA consultant sued for a temporary injunction to prevent the "U2" concert based on alleged ADA violations. However, the Court found that the Stadium had gone beyond its obligations under the ADA and denied all requests for injunctive relief. *A copy of the Court's Order attached as Ex. "C".*

(SIGNATURE AND NOTARY BLOCKS FOUND ON THE FOLLOWING PAGE)

Case No. 00-2261-CIV-Moore

UNDER PENALTY OF PERJURY, I DECLARE THAT THE FOREGOING IS

TRUE AND CORRECT.

M. BRUCE SCHULZE

M! 508470,1

**6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CIVIL ACTION NO.:

**DONALD H. GALLANT, CHRIS LEONE**, both
individual and on behalf of all others similarly
situated, and the **PARALYZED VETERANS
ASSOCIATION OF FLORIDA, INC.**, a Florida
Corporation,

      PLAINTIFFS,

      -vs-

The **MIAMI DOLPHINS, LTD.**, the **FLORIDA
MARLINS BASEBALL, LTD.**, and **ROBBIE
STADIUM CORP.**, d/b/a **JOE ROBBIE STADIUM**,

      DEFENDANTS.

**COMPLAINT**

    Plaintiffs, Don Gallant, Chris Leone, individually and on behalf of all others

similarly situated, and the Paralyzed Veterans Association of Florida, Inc.

("Plaintiffs") bring this "Americans with Disability Act of 1990," complaint against

the Defendants the Miami Dolphins, Ltd., the Florida Marlins Baseball, Ltd., and

Robbie Stadium Corporation, d/b/a Joe Robbie Stadium ("Defendants"), and state

as follows:

## JURISDICTION

    1.    This Court has jurisdiction over this action under: 28 U.S.C. § 1331

for civil actions arising under the laws of the United States; 42 U.S.C.S. §

12188(a)(1), which incorporates the provisions of 42 U.S.C. § 2000a-3(a),

**EXHIBIT**

A

providing for civil actions by any person who is being subjected to discrimination on the basis of disability in violation of Title III of the Americans with Disability Act; and 28 U.S.C. § 1343(3) for actions under laws providing for the protection of civil rights.

## PRELIMINARY STATEMENT

2.    As of January 26, 1992, any person [or class] who is being subjected to discrimination on the basis of their disability in violation of the "ADA" ... may institute a civil action for preventive relief, including an application for a permanent or temporary injunction, a restraining order, or any other order.    Furthermore, Section 12188(a)(2) of the ADA states that injunctive relief shall include an order to alter facilities in order to make them accessible to the extent required by Title III.

3.    As of July 26, 1992, any person [or class] who is being subjected to discrimination on the basis of  their disability in violation of the "ADA" ... may bring a civil action for violations of the new construction and alterations portion of the act.

4.    The purpose of the Americans with Disabilities Act is to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life; to provide enforceable standards addressing discrimination against individuals with disabilities, and to ensure that the Federal government plays a central role in enforcing these standards on behalf of individuals with disabilities.

2

5.      Defendants, the Miami Dolphins, Ltd. [herein referred to as the "Miami Dolphins"], the Florida Marlins, Ltd. [herein referred to as the "Florida Marlins"], and Robbie Stadium Corp., d/b/a Joe Robbie Stadium [herein referred to as "Joe Robbie Stadium"], directly or through contractual or other arrangements, utilize methods of administration that have the effect of discriminating against the Plaintiffs, on the basis of their disability; or perpetuate the discrimination of others by (i) failing to make reasonable modifications in policies, practices, or procedures; (ii) failing to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently; and (iii) failing to remove architectural barriers and communication barriers.

6.      The standards for barrier removal means easily accomplishable and able to be carried out without much difficulty or expense. A number of factors are considered in determining whether a barrier removal is readily achievable [§ 42 USC 12181(9); 28 CFR 36.104; 28 CFR 36.304]. Factors include:

   ▢ the nature and cost of the action;

   ▢ the overall financial resources of the site, the number of persons employed at the site, the effect on the expenses and resources, legitimate safety requirements necessary for safe operation, and the type of business;

   ▢ the geographic separateness, and the administrative or fiscal relationship of the site in question to any parent corporation or entity;

   ▢ the overall financial resources of any parent corporation or entity,

3

Lastly, if a barrier cannot be easily removed, the goods or services are to be made available through alternative methods, where doing so is readily achievable.

7.     This action seeks preliminary and permanent injunctive and declaratory relief against the Defendants, the Miami Dolphins, the Florida Marlins, and Joe Robbie Stadium, based on their discriminatory conduct against persons with disabilities.  Plaintiffs are requesting that Defendants make reasonable accommodations so that disabled patrons can come to, attend, and enjoy Miami Dolphin football games, Marlin baseball games, and other events at Joe Robbie Stadium.

8.     This Complaint specifically requests that the following violations be remedied:

a) the lack of adequate seats for persons with disabilities.

b) the policy of segregated seating for persons with disabilities.

c) the lack of comparable lines-of-sight for persons with disabilities verses those offered to the general public.

d) discriminatory policies and practices in the selling and pricing of tickets to persons with disabilities compared to the general public.

e) the policy of not allowing companion seating to be adjacent to a person with a disability, and forcing a companion/spouse/family member to sit behind the person with a disability.

f) unsafe and inadequate ramps, elevators and aisles, which present hazards and safety issues for wheelchair patrons and other persons with disabilities.

g) the policies in the use or non-use of the elevators and the ability to access these elevators prior, during and after a game or event at the stadium.

h) inadequate public health and safety provisions or lack thereof regarding people with disabilities, for both emergency egress and in equal participation.

4

i) inaccessible or lack of sidewalks and curb cuts around and leading to the mass transportation and tailgate events in and around the stadium.

j the lack of adequate disabled parking spaces.

k) the policies and practices in the use of disabled parking spaces.

l) the lack of disabled parking on the closets path-of-travel for persons with disabilities.

m) communication barriers respecting the absence of signage on facilities regarding disability services, programs, activities, or accommodations.

n) ticket pricing policies in the disabled seating sections.

o) ticket pricing and other options regarding other events held at Joe Robbie Stadium.

p) inaccessible ticket counters and/or windows.

q) the lack of or absence of a contact person and/or committee regarding issues, complaints and suggests regarding disability accommodations at Joe Robbie Stadium.

r) the unequal menus and amenities regarding concessions at Joe Robbie Stadium for people with a disability.

s) the lack of sensitivity training by some stadium personnel regarding persons with disabilities.

t) the lack of or absence of opportunities for persons with disabilities in employment opportunities.

u) the access and other problems that arise regarding club seating and the executive suites for people with disabilities.

v) the policies, procedures and practices that the Defendants put disabled patrons thru when attempting to purchase post-season tickets (i.e., wild-card, play-off, conference championships, superbowl).

w) the policies, procedures and practices that the Defendants utilize when determining press credentials and accommodations.

5

x) the access and accommodations in the press box and its surrounding areas regarding individuals who are members of the working press and have a disability.

y) the policies, practices and procedures the Defendants utilize in their contracts and all financial and administrative matters with the National Football League.

z) the policies, practices and procedures the Defendants utilize in their contracts and all financial and administrative matters with Major league Baseball.

aa) other miscellaneous violations of the Americans with Disability Act, and regulations promulgated pursuant thereto.

## **PARTIES**

9.     Plaintiff, Donald H. Gallant is a resident of Broward County, Florida and a citizen of the United States, and is an occasional purchaser of tickets to Miami Dolphin football games, Florida Marlins baseball games, and other events held or played a Joe Robbie Stadium.  Mr. Gallant is a member and officer of the Paralyzed Veterans Association of Florida.  Mr. Gallant suffered a [C-6] spinal-cord injury fourty-four years ago and as a result has a mobility impairment that necessitates in his use of a electric wheelchair for mobility.  Mr. Gallant's disability substantially limits many of his life activities, and qualifies as a person covered under the Americans with Disabilities Act.

10.     Plaintiff, Chris Leone is a resident of Key Largo, Florida and a citizen of the United States, and is a season ticket holder for the Miami Dolphin football games, Florida Marlins baseball games, and on other occasions attends some events held or played at Joe Robbie Stadium.  Mr. Leone is also a member of the working press.  Mr. Leone has for twenty-four years suffered from muscular

6

dystrophy, and as a result, has a mobility impairment that necessitates his use of an electric wheelchair for mobility. Mr. Leone's disability substantially limits many of his life activities and requires a nurse attendant twenty-four (24) hours a day. Mr. Leone's disability substantially limits many of his life activities, and qualifies as a person covered under the Americans with Disabilities Act.

11.    Plaintiff, the Paralyzed Veterans Association of Florida, a non-profit corporation in, and under the laws of the State of Florida [herein referred to as "PVAF"]. PVAF is a member Chapter of Paralyzed Veterans of America ["PVA"], a federally chartered national organization. PVAF represents persons with disabilities who desire to gain access to commercial businesses. One of the purposes of PVAF is to aid and assist in guaranteeing that businesses are accessible to, and usable by, persons with disabilities. PVAF suffers direct and indirect injury as a result of Defendant's actions or lack thereof. PVAF's organizational purpose, its members, and potential members, are injured when commercial businesses refuse to comply with the ADA, but continue to discriminate, and perpetuate discrimination against persons with disabilities and especially with mobility impairments.  In this action, PVAF members, veterans of the Armed Forces of the United States of America are advocating their rights as guaranteed by law. The Offices of PVAF are located at 6200 North Andrews Avenue, Fort Lauderdale, Florida.

12.    Defendant, the Miami Dolphins, Ltd., is, and at all times mentioned herein, an entity duly formed and authorized as such under the laws of the State of

Florida, and is the owner, lessor, lessee, user and/or operator of Joe Robbie Stadium, located in Miami, Florida.

13.    Defendant, the Florida Marlins Baseball, Ltd., is, and at all times mentioned herein, an entity duly formed and authorized as such under the laws of the State of Florida, and is the owner, lessor, lessee, user and/or operator of Joe Robbie Stadium, located in Miami, Florida.

14.    Defendant, Robbie Stadium Corporation, d/b/a Joe Robbie Stadium, is a private entity located in Dade County, Florida, duly formed and authorized as such under the laws of the State of Florida, is now and was at all times relevant this complaint the owner, lessor, lessee, user, and/or operator of Joe Robbie Stadium located at  2269 Northwest 199th Street, in Miami, Florida.

15.    Joe Robbie Stadium is a place of public gathering, located at 2269 N.W. 199th Street, Miami, Florida, which was built in 1987, and has the following history:

- a seating capacity of over 75,000 persons for football.
- a seating capacity of over 47,000 persons for baseball.
- a total seating for 76 wheelchair [row 28] and 76 attendant [row 29] seats for a companion to sit behind the wheelchair seating space.
- six wheelchair seating locations exist for football in sections 103, 125, 128, 131, 153, 156, with all locations in the end-zones on the lower concourse level.
- five wheelchair seating locations exist for baseball in sections 103, 128, 131, 153, 156, with all locations on the lower concourse level.
- two elevators serving the disabled seating areas.
- ten elevators serve the entire stadium.
- there is parking for approximately 20,000 vehicles [includes 5,000 additional spaces that were added in the spring of 1994].
- was modified and altered in 1993 to accommodate major league Baseball.
- a seating capacity of 162 persons for football press personnel.
- a seating capacity of 84 persons for baseball press personnel.

8

- stadium costs $115 million to build.
- January 28, 1991 seats were removed on the north side of the stadium to begin renovating the stadium for baseball.
- in July of 1991 South Florida was awarded a franchise.
- on April 5, 1993, the new look stadium was used for the first time.
- renovations to accommodate baseball included the installation of retractable seating on the north side; construction of Founder's club boxes the construction of baseball press boxes; the building of the dugouts and pitcher's mound; additional lighting; and clubhouse facilities were constructed.
- $5 million was added to the stadium after ownership by H. Wayne Huizenga was finalized in spring of 1994.
- only one companion seat can be bought with a disabled seating section seat. Seats in the disabled areas are sold front and back with companion chair behind the wheelchair space.
- elevator call buttons are turned off on the lower concourse level prior to, during and after events held in the stadium.

## THE FACTS

16.    Upon information and belief, at all times relevant to this complaint, Defendants owner, lessor, lessee, user, and/or operator of Joe Robbie Stadium located at 2269 Northwest 199th Street, in Miami, Florida.

17.    Upon information and belief, at all times relevant to this complaint, all Defendants employ more than 50 persons, and fall within the mean and definitions of public accommodations under Title III of the ADA.

18.    Defendants failure to bring Joe Robbie Stadium into ADA compliance, and after being told about these violations, precludes the attainment of the ADA's purposes and subjects Plaintiffs to discrimination based on their disability.

19.    Plaintiffs, on or about August 6, 1994, attended a Miami Dolphins football game played at Joe Robbie Stadium.

20.    Plaintiffs, on or about August 10, 1994, attended a Florida Marlins

baseball game played at Joe Robbie Stadium.

21.   Plaintiffs, on both occasions referenced above, were discriminated against in their ability to come to, enjoy, and participate and benefit from the amenities at these events.  The listing of specific programs, practices, and policies in violation of the rights guaranteed them under the ADA are listed in paragraph 8.

22.   Plaintiffs have been damaged by all Defendants' failure to bring the facility, Joe Robbie Stadium into compliance with the ADA.

## STATEMENT OF CLAIMS

23.   Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, acting individually, and/or in concert with each other discriminate against persons with disabilities through the following policies, practices, actions and/or conduct:

## COUNT I
## DENIAL OF PARTICIPATION

24.   The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

25.   Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates the above subjected individuals and/or class of individuals with disabilities on the basis of a disability or disabilities of such individual(s) or class, directly, or through contractual, licensing, or other arrangements, in the denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations at Joe Robbie Stadium when coming to, attending and leaving an event at Joe Robbie

10

Stadium.

26.    Defendant, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, impose or implements eligibility criteria that screen out or tend to screen out individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations at Joe Robbie Stadium when coming to, attending and leaving an event at Joe Robbie Stadium.

## COUNT II
## DENIAL OF PARTICIPATION AND BENEFIT EQUALLY

27.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

28.    Defendant, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates in participation in and equally benefiting from, to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other patrons and/or individuals.

## COUNT III
## DENIAL OF PARTICIPATION AND BENEFIT EQUALLY
## IN AN INTEGRATED SETTING

29.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

30.    Defendant, the Miami Dolphins, Florida Marlins and Joe Robbie

11

Stadium, discriminates by not providing persons with disabilities the goods, services, facilities, privileges, advantages, and accommodations of the Joe Robbie Stadium in the most integrated setting appropriate to the needs of the individual.

## COUNT IV
## DISCRIMINATORY POLICIES, PRACTICES, OR PROCEDURES

31.   The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

32.   Defendant, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates by failing to make reasonable modifications in their policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, as listed in paragraph 8.

## COUNT V
## FAILURE TO PROVIDE AUXILIARY AIDS

33.   The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

34.   Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates by failing to provide auxiliary aids as required by the ADA.

## COUNT VI
## FAILURE TO REMOVE COMMUNICATION BARRIERS

35.   The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

36.   Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates by failing to remove communication barriers that are

12

structural in nature, in existing facilities, where such removal is readily achievable.

37.    Defendants, Miami Dolphins, Florida Marlins and Joe Robbie Stadium, where the removal of a barrier is not readily achievable, has failed to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods or usable in an effective manner.

## COUNT VII
## VIOLATIONS UNDER THE CIVIL RIGHTS ACT OF 1991

38.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

39.    Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates by engaging in the following practices, in violation of 42 U.S.C. § 12182 and § 12183:

(a)    Defendants' do not receive equally and/or are not given the opportunity to receive the benefits (or services) of Joe Robbie Stadium's goods, services, and/or facilities;

(b)    Defendants' patrons and/or potential patrons are required to receive its goods and/or services in a manner that is separate and/or different from the average patron;

(c)    Defendants  applied differential treatment on the basis of physical handicap [disability];

(d)    Defendants utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability;

13

(e)     Defendants have all failed to make a good faith and reasonable effort to provide its goods and/or services in the most integrated setting possible;

(f)     Defendants' employees use standards or criterion or methods that discriminate on the basis of disability;

(g)     Defendants has established eligibility requirements that screen-out or tend to screen-out individuals with disabilities;

(h)     Defendants' contracts, licenses and/or other relationships with third parties discriminate on the basis of disability;

(i)     Defendants have engaged in a practice or pattern of discrimination on the basis of disability;

(j)     Defendants' existing facilities are not readily accessible to and usable by potential patrons and/or patrons with disabilities;

(k)     Defendants' altered facilities are not readily accessible to and usable by the Plaintiffs and/or other potential patrons with disabilities;

(l)     Persons under Defendants' administrative control perpetuate discrimination on the basis of disability.

40.  Defendants intentionally omitted compliance with federal and state disability laws, having full knowledge of their duties and responsibilities under these laws and/or wilfully and blindly ignored resources or information giving them access to requirements of these laws.

41.  Defendants' above acts of discrimination has caused Plaintiffs to suffer in their mind, heart and soul from the indica, badge, indignity, stigma of

14

discrimination. Also, due to Defendants' above acts of discrimination, Plaintiffs have, and continue to suffer from inconveniences, embarrassment, humiliation, emotional distress, pain, fright, nervousness, grief, worry, mortification, shock, apprehension, terror and ordeal.

### COUNT VIII
### NEGLIGENT INFLICTION OF MENTAL DISTRESS

42.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

43.    Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, discriminates by failing to remove architectural barriers, and communication barriers as listed in paragraph 39.

44.    Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, where the removal of a barrier is not readily achievable, have failed to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods and as a result Defendants' therefore wilfully and recklessly disregarded the probability that Plaintiffs would suffer severe and extreme emotional distress.

45.  Defendants did therefore, without privilege, intentionally and outrageously deny the Plaintiffs and/or class the ability to become a member of the economic and social mainstream of American life.  Thereby actually and proximately causing Plaintiffs and/or class to suffer extreme and severe emotional distress, mental anguish, mortification, humiliation, embarrassment, shame, consequential, continuing, and irreparable damages.

15

## COUNT IX
## PROPER OR LACK OF SIGNAGE

46.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

47.    There is an absence of signage regarding disability programs, goods, services, facilities, and/or accommodations [i.e. parking spaces, passenger loading zones, entrance ways, ramps, stairs, elevators, drinking fountains, restroom facilities, concessions, elevators, accessible pathways, emergency warnings, telephones, ATMs, assembly areas, athletic areas, medical care facilities, wheelchair club seating, press-box entrances, etc.] at Joe Robbie Stadium.

## COUNT X
## EQUAL PROTECTION

48.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

49.    Where Defendants act as private entities, each assumes a public function or is so closely connected to or interrelated with the government in a symbiotic relationship that actions by the Defendants, either individually or in concert with, are to be deemed as having a governmental action, and whenever rights are provided by the government or governmental action must be provided on equal terms.

50.    The purpose of the Americans with Disabilities Act is to provide a mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of the American

16

lifestyle. Defendants, by segregating and only providing disabled seating, and the amenities with them, in the end-zones at JRS, discriminate against individuals with disabilities.

## COUNT XI
## MISCELLANEOUS VIOLATIONS
## OR ENFORCEMENT OF PROMISES OR CONTRACTS

51.    The allegations contained in paragraphs one through twenty-three are repeated and reallege as if set forth fully herein.

52.    Any and all other policies, practices, actions, and conduct of Defendants as owners, lessors, and/or lessees or operators of the programs and facilities at Joe Robbie Stadium, that otherwise discriminate against Plaintiffs on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations offered therein [42 U.S.C. § 12182 (1990)], and/or under the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et. seq. and the regulations promulgated pursuant thereto.

53.    Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, as well as the previous owners, tenants of Joe Robbie Stadium [the Robbies'], have breached promises made to disabled individuals, disabled organizations, and others in guaranteeing that Joe Robbie Stadium, and all the amenities that flow from it, would bring the Stadium into ADA compliance. These promises were made over the last four years. As of the filing of this action, no concrete actions [except further promises], have been done so that a person with a disability can come to, attends, and enjoy an event at Miami Dolphin games,

17

Florida Marlin games, cr for any other event at Joe Robbie Stadium that would allow a person with a disability to participate in the economic and social mainstream of the American lifestyle.

## DEFENSE AND MEDIATION NOTICES

54.   Plaintiffs have filed this suit in the good faith belief that the Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium has legal liability under the Americans with Disabilities Act in connection with the above counts.  If any or all of the Defendants have a good faith belief that it has no liability, Plaintiffs will agree in advance that if said Defendant, each individually, through their counsel will send Plaintiff's counsel a letter setting out in detail the reasons for such belief, that said Defendant need not file (i) an answer in this case, or (ii) response to any discovery served with the Complaint, until ten (10) days after said Defendant's counsel receives Plaintiff's written response to such letter; any such letter sent to Plaintiff's counsel must be received by Plaintiff's counsel before the date on which an answer is due.

55.   Plaintiffs are willing to agree to mediate by the filing of a formal agreement with the Court, memorializing this agreement, but only if a good faith effort is forthcoming, and concrete remedies are begun [from all Defendants]. Lastly, the Plaintiff's goal in this litigation is to bring Joe Robbie Stadium into ADA compliance and if all Defendants agree that the ADA applies to them, and immediate changes begin to remedy the above violations, the Plaintiffs are willing to enter into negotiations and/or mediation in an attempt to achieve the desired

18

ADA compliance, without the need for extensive pretrial discovery and further litigation.

## RELIEF REQUESTED

WHEREFORE, PLAINTIFFS, on behalf of themselves and all others similarly situated, pray this Court:

1.     Issue a temporary restraining order directing the Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, until reasonable accommodations have been made and modifications in current facilities, services, procedures, policies, and practices, and the effects thereof, are brought into compliance with the Americans with Disabilities Act and the regulations promulgated thereunder, from staging any events at Joe Robbie Stadium until such time as plaintiffs' request for preliminary relief contained herein can be heard and determined by this Court.

2.     Issue a preliminary injunction:  Directing the Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium to evaluate and neutralize their policies, practices, and procedures toward persons with disabilities, for a period of time reasonably calculated to permit defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium to correct the violations of the ADA as listed in Paragraph 8.

3.     Enter a judgement mandating that Defendants, the Miami Dolphins, Florida Marlins and Joe Robbie Stadium, without delay, remove architectural and communication barriers, make reasonable modifications in their policies, practices,

and procedures, provide effective and proper signage, and take steps necessary to ensure that no person with a disability is excluded, denied services, segregated or otherwise treated differently, to the extent required by law, at Joe Robbie Stadium.

    4.    Award monetary damages to Plaintiffs and other similarly situated persons who have been discriminated against by Defendants, Miami Dolphins, Florida Marlins and Joe Robbie Stadium to compensate them for injuries resulting from such discrimination.

    5.    Award reasonable attorneys' fees, costs and expenses of suit incurred and such other and further relief as this court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

The Plaintiffs and the class of persons they represent, hereby request a jury trial on all facts raised in this Complaint.

DATED:    August 22, 1994               wpwin\jrs\complant.fni

Respectfully Submitted,

MICHAEL F. LANHAM, Esquire
MICHAEL F. LANHAM, P. A.
Biscayne Building, Suite #1102
19 West Flagler Street
Miami, Florida  33130
(305) 358-7646

_____
    MICHAEL F. LANHAM
    FL BAR NO.: 935824

20



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 94-1735-CIV-KING
Magistrate Brown

DONALD H. GALLANT, CHRIS LEONE, both
individual and on behalf of all others
similarly situated, and the PARALYZED
VETERANS ASSOCIATION OF FLORIDA, INC.,
a Florida Corporation,

       Plaintiffs,

v.

The MIAMI DOLPHINS, LTD., the FLORIDA
MARLINS BASEBALL, LTD., and ROBBIE
STADIUM CORP., d/b/a JOE ROBBIE
STADIUM,

       Defendants.

_____/

FILED by _____ D.C.
APR   9 1997
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## FINAL ORDER OF DISMISSAL AS TO ALL CLAIMS

THIS CAUSE having come before the Court, pursuant to Federal Rule of Civil

Procedure 70, on a MOTION TO ENFORCE THE TERMS AND CONDITIONS OF

SETTLEMENT AGREEMENTS, filed November 7, 1996, by, Plaintiffs' DONALD

GALLANT, CHRIS LEONE and the PARALYZED VETERANS ASSOCIATION OF

FLORIDA, INC., against the Defendants, the MIAMI DOLPHINS, LTD., the FLORIDA

MARLINS BASEBALL, LTD., and ROBBIE STADIUM CORP., f/k/a JOE ROBBIE

STADIUM, and upon the Court's approval of the SECOND AMENDMENT TO

SETTLEMENT AGREEMENT (the "Agreement"), filed simultaneously with this Motion, and

after careful review of the record by this Court, and being fully advised in the premises, finds



EXHIBIT
B

CASE NO. 94-1735-CIV-KING

that the terms and conditions as contained in said Agreement are just and proper.

Accordingly, it is hereby

ORDERED AND ADJUDGED that:

1.      That the Second Amendment to Settlement Agreement of the parties shall be and the same is hereby approved and incorporated by reference into this Order.

2.      This Court retains jurisdiction to enforce the terms and conditions of said Agreement.

3.      Defendants, upon signing of this Order, agree to pay Plaintiffs' attorney fees incurred in this action in the amount set forth in a separate Letter of Agreement Between the Parties.

4.      Pursuant to Federal Rule of Civil Procedure, Rule 41(a)(2), This action is hereby dismissed, with prejudice.


DONE AND ORDERED in chambers at the United States Courthouse, Federal Justice Building, Miami, Florida this __9__ day of **April, 1997**.

JAMES LAWRENCE KING
_____
JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA


cc:     Michael F. Lanham, Esq.
        Edward Ristaino, Esq.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-2911-CIV-LENARD
MAGISTRATE JUDGE GARBER

FREDERICK ARTHUR SHOTZ,

     Plaintiff,

v.

SOUTH FLORIDA STADIUM COR-
PORATION (a/k/a Pro Player Stadium),
TNA INTERNATIONAL LTD., and
CELLAR DOOR CONCERTS, INC.
(individually and as U.S. agents for
TNA INTERNATIONAL, LTD.),

     Defendants.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court by Order of Reference dated October 29, 1997 from United

States District Judge Joan A. Lenard. Pursuant to such reference the Court has received the

plaintiff's Motion for Temporary Restraining Order and defendants' opposition thereto. The Court

held an evidentiary hearing on the Motion for Temporary Restraining Order on November 6, 1997.

Pursuant to the Order of Reference the following Report and Recommendation is hereby submitted.

## BACKGROUND

Plaintiff, a disabled male and former employee of Pro Player Stadium, purchased tickets for

a concert performance of the musical group "U2" to be held on November 14, 1997 at Pro Player

Stadium, a facility owned and/or operated by the defendant South Florida Stadium Corporation. The

concert was announced in March of 1997 and plaintiff purchased his tickets on the first day that they

EXHIBIT
C

went on sale. Plaintiff's tickets were located on the field level to the right of the stage. After purchasing his tickets plaintiff was not satisfied with their location and sought seats in an area directly in front of the stage. Having been denied such seats plaintiff instituted this action claiming, in effect, that the defendant's facility, Pro Player Stadium, is operated in non-compliance with the Americans with Disabilities Act of 1990 (42 U.S.C. §12101 *et. seq.*), hereafter referred to as ADA, and the Americans With Disabilities Act Accessibility Guidelines, hereafter referred to as ADAAG. By this action plaintiff asks this Court to enter a Temporary Restraining Order barring the performance of "U2" at Pro Player Stadium on November 14, 1997.

Plaintiff appeared *pro se* and the Court allowed him great latitude in the presentation of his case. Essentially, plaintiff claims that there exists no valid reason for the defendant Pro Player's refusal to make seats in the area directly in front of the stage available to the disabled. He further testified that, based on his experience when employed by Pro Player Stadium as an advisor regarding compliance with the requirements of ADA, that the seating area for the concert did not have sufficient available seating on the ground level area on the grass portion of the stadium.

Defendants offered, *inter alia,* the testimony of James A. DiLuigi and Kevin G. McGuire, both of whom were qualified as and deemed to be experts by the Court as to compliance with ADA and/or ADAAG. Both witnesses testified that the configuration of Pro Player Stadium for the "U2" concert on November 14, 1997, was in full compliance with the ADA and/or ADAAG. Further testimony was offered from said witnesses that the seating area on the field level does not constitute a "fixed" seating area and as such is not controlled by the numerical requirements of the ADA. See Caruso v. Blockbuster-Sony Music Entertainment Centre, *et al.*, 968 F.Supp. 210, 217 (D.N.J.

2

1997). The evidence showed that the defendant has gone beyond its obligations under ADA and has provided seating for the disabled in the field area.

## DISCUSSION

The Court, at the completion of the hearing on the Motion for Temporary Restraining Order, announced its findings in the record. Accordingly, only a brief recitation of same is set forth herein.

The Court finds that the plaintiff has failed to satisfy the requirements for a temporary restraining order as set forth in Haitian Refugee Center, Inc. v. Nelson, 872 F.2d 1555, 1561 (11th Cir. 1989), aff'd. 498 U.S. 479, 111 S.Ct. 888 (1991). Such requirements are (1) a substantial likelihood that the plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the threat and harm the injunction may cause defendant; and (4) that granting the preliminary injunction will not cause a disservice to the public interest. Plaintiff's moving papers, as well as proof offered at the hearing, fail to satisfy any of such requirements. It is hard to envision any harm befalling the plaintiff if his relief is not granted; he has excellent seats for the concert although not in an area that he prefers.

Based upon the evidence offered by the defendants it is inconceivable that plaintiff is likely to prevail on the merits. Furthermore, the harm likely to be suffered by the defendants if injunctive relief is granted against them is enormous: defendants have sold over 40,000 tickets for the performance which would require refunds; a loss of good will; loss of substantial revenue by Pro Player Stadium, the promoter, performers, and the State of Florida from loss of sales tax.

Failure to satisfy any of the four requirements mandates a denial of the injunctive relief sought. Here, plaintiff has not satisfied any of such requirements.

3

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing and for reasons set forth therein, the undersigned

RECOMMENDS that the plaintiff's Motion for Temporary Restraining Order be DENIED.

The parties have ten (10) days from the date of this Report and Recommendation within which to file written objections, if any, with United States District Judge Joan A. Lenard. See 28 U.S.C. §636 (1991). Failure to file timely objections may bar the parties from attacking on appeal the factual findings contained herein. Lucent v. Dagger, 847 F.2d 745, 750 (11th Cir.), cert. denied, 488 U.S. 958 (1988).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this 7th day of November, 1997.

BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
U.S. District Judge Lenard
Counsel of record
Frederick A. Shotz, *pro se*
  5451 Woodland Lane, SW
  Fort Lauderdale, FL 33312

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-2911-CIV-LENARD

FREDERICK ARTHUR SHOTZ,

    Plaintiff,

vs.

SOUTH FLORIDA STADIUM
CORPORATION (a/k/a Pro
Player Stadium),
TNA INTERNATIONAL LTD.,
and CELLAR DOOR CONCERTS,
INC. (individually and as
U.S. agents for TNA
INTERNATIONAL, LTD.),

    Defendants.
_____/



### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION OF NOVEMBER 10, 1997

    **THIS CAUSE** came before the Court upon the Plaintiff's Motion for Temporary Restraining Order (DE2), filed October 21, 1997. On October 29, 1997, the Court referred the motion to United States Magistrate Judge Barry L. Garber pursuant to 28 U.S.C.A. § 636(b)(1)(B). Magistrate Judge Garber held an evidentiary hearing on the motion on November 6, 1997, and on November 10, 1997 issued his Report and Recommendation. In the Report, Magistrate Judge Garber recommended that the Plaintiff's Motion for Temporary Restraining Order be denied. The Plaintiff did not object to the Report within ten (10) days of its issuance as required by 28 U.S.C.A. § 636(b)(1). Therefore, the Court having considered the Report and otherwise advised in the premises, it is hereby

    **ORDERED AND ADJUDGED** that the Report is **ADOPTED IN FULL** and the Plaintiff's Motion for Temporary Restraining Order is **DENIED.**

    **DONE AND ORDERED** in Chambers at Miami, Florida, this ___8___ day of December, 1997.

**JOAN A. LENARD**
_____
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

cc:  Frederick A. Shotz, Pro se
      Stanley Wakshlag, Esq.

# EXHIBIT "C"

MI635060;1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

ACCESS NOW, INC. and
EDWARD RESNICK,

      Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

      Defendants.

_____/

## DECLARATION OF KEVIN G. McGUIRE

Pursuant to 28 U.S.C. §1746, I, Kevin G. McGuire, declare the following:

1.    My name is Kevin G. McGuire, and I am over 18 years of age and a resident of the State of New York. The facts stated herein are based upon my personal knowledge unless otherwise stated. A true and correct copy of my curriculum vitae is attached hereto as Exhibit "A".

2.    Due to a childhood injury, I am a paraplegic, and I am required to use a wheelchair.

3.    Although I have a law degree, I do not practice law at this time. Instead, since 1991, I have specialized in assisting a variety of clients on a national basis with issues regarding the Americans with Disabilities Act ("ADA").

MI666421;1

4.     In particular, I specialize in ADA compliance issues within assembly areas such as stadiums, arenas, theaters, etc.

5.     My assembly area clients include seventeen (17) arenas, fifteen (15) stadiums and twenty-one (21) performing arts/symphony centers.

6.     In 1996, I was retained as the ADA consultant for Pro Player Stadium (the "Stadium") and have been personally responsible for coordinating the Stadium's efforts to retrofit and upgrade compliance with ADA.

7.     Since my engagement as the Stadium's ADA consultant, the Stadium has done the following:

a.     **As to Parking**:  Additional designating parking areas have been relocated and completed for guests with disabilities that are located in various areas;

b.     **Access Service Center**:  The Access Service Center is located at the guest services area and is fully staffed with trained personnel to assist guests with disabilities.  The Center dispenses assistive listening receivers and headsets, alternate format materials as well as other medical-related equipment;

c.     **As to Concessions Stands**:  Food concession stands have been modified pursuant to ADA requirements for existing facilities;

d.     **As to Telephones**:  Additional accessible telephones have been located on various levels of the stadium along with public TDDs/TTYs located in various sections of the stadium;

e.     **As to Signage**:  The signage of the stadium is being upgraded, with further signage to be installed upon the creation of new accessible seating for guests with disabilities;

f.     **As to Restrooms**:  All public restrooms at the stadium including restrooms on the 200 and 300 levels have been retrofitted so that they will be more accessible to our guests with disabilities.  Additionally, accessible unisex bathrooms have been constructed on the 100 and 400 levels of the stadium;

g.     **As to Seating**:  For both football and baseball, there are numerous locations of accessible seating at various prices throughout the stadium.  Seats in the disabled sections are sold with a wheelchair and a companion side-by-side.  Additionally, there are some accessible seating areas which provide additional companion seats directly behind the wheelchair space, and the first companion seat;

h.     Water fountains have been upgraded in various locations at the Stadium;

i.     Electric doors have been installed at various gates and disabled suites;

j.     Installed and upgraded code complaint handrails;

k.     Upgraded the assistive listening system to include several types of headphones to deal with various disabilities;

8.    Additionally, I assisted the Stadium in creating an Access Brochure for use by persons with disabilities and their families.  This brochure has been offered in alternate formats. (e.g., braille, enlarged print and computer disk).  A true copy is attached as Exhibit "B" to this Affidavit.  This Access Brochure is now being updated.

9.    Moreover, I have conducted ADA sensitivity training for front line employees at the Stadium.

10.    In September 1997, I assisted the Stadium in becoming a member of the network of the State of Florida Rehabilitative Vocational Agency to create job opportunities for individuals with disabilities.  The Stadium continues to work with various local groups in offering job opportunities to individuals with disabilities.  I also organized a dinner meeting at the Stadium for over 60 members of the disabled community to discuss access issues at the Stadium.  Furthermore, I developed the Stadium's interpreting policy for the deaf and hearing impaired which is beneficial during concerts and other events.  Moreover, I helped ensure that the Stadium's retail areas had greater accessibility to the disabled.

11.    In assisting the Stadium with its efforts to retrofit and upgrade its ADA compliance, I applied my own substantial experience as a wheelchair user and as a consultant.

12.    It is my belief that the Stadium as a pre-ADA facility is in substantial compliance with the ADA.

(SIGNATURE BLOCK FOUND ON THE FOLLOWING PAGE)

UNDER PENALTY OF PERJURY, I DECLARE THAT THE FOREGOING IS TRUE AND CORRECT.

_____

KEVIN McGUIRE



McGuire
Associates ❖

McGuire Associates, Inc. has assembled a group of associates that is second to none in terms of knowledge, awareness, and insight as to the overall challenges faced by individuals with disabilities. Our group has more than 40 cumulative years of disability-related experience, and over 50 years of training expertise. We are confident that we can assist your organization in effectively meeting the standards as prescribed in ADA regulations and continuing case law.

## Kevin G. McGuire

Kevin's professional training and diversified experiences have provided him with a wide range of knowledge and skills. A graduate of Boston University and the Georgetown University Law Center, he holds a Bachelor of Arts in Political Science and History, and a Juris Doctorate.

Kevin has developed his skills through hands-on experience in government and disability law. He has supervised construction projects with total budgets in excess of one billion dollars, conducted over 200 ADA program audits, trained more than 2,500 corporate staff, participated in several national ADA conventions, and continues to appear on CNBC to discuss disability issues. Kevin has compiled an impressive resume through working with corporations, legislative offices, and state agencies, including:

- Financial analyst, IBM Corporation
- Staff Assistant for Senator Edward Kennedy
- National Director of the Tuition Advance Fund Information Center, Boston University
- Staff Assistant for U.S. Congressman, Hamilton Fish, Jr.
- Assistant District Attorney for the District Attorney's Office, Bronx, New York
- Written/produced public service announcements for the Governor's Office, State of California
- Summer Legal Associate, Massachusetts Rehabilitation Commission
- Summer Legal Associate, Boston Center for Independent Living

## Dr. William T. O'Hara

Bill O'Hara is Executive Director of the Institute for Family Enterprise at Bryant College. At Bryant, he also serves as President Emeritus and holds the Henry Loeb Jacobs Trustee Professorship.

In addition to his collegiate experiences, Dr. O'Hara has worked in the area of conflict resolution, serving as a mediator and arbitrator for the American Arbitration Association. He also lectures on managing conflict within U.S. businesses.

Dr. O'Hara is a graduate of Trinity College and holds law degrees from Georgetown University and New York University.



EXHIBIT
A

# Kevin G. McGuire                                  Chairman & CEO

## PROFESSIONAL EXPERIENCE

### Business & Legal Experience

- **Chairman & CEO**                                          **McGuire Associates, Inc.**
  **1991 to present**                                         **Newburgh, NY and Waltham, MA**
  Founder of McGuire Associates, Inc. a consulting firm specializing in issues of compliance with federal & state disability-related laws.

- **Assistant District Attorney**                             **District Attorney's Office**
  **1987 to 1991**                                            **Bronx County, New York**
  Responsible for disposition of criminal cases for arraignment, preparation of cases for Grand Jury presentation including subpoena of evidence, filing of motions, witness review, and trial strategy; liaison between District Attorney's office and New York State Police for undercover surveillance; trial prosecutor.

- **Legal Intern**                                            **Massachusetts Rehabilitation Commission**
  **Summer, 1986**                                            **Boston, Massachusetts**
  Appointed by State Commissioner Elmer Bartels, responsible for drafting and implementing state regulations resulting in the creation of an agency for independent living.

- **Staff Assistant**                                         **U.S. Congressman Hamilton Fish, Jr.**
  **1984 through 1985**                                       **House of Representatives, Washington, D.C.**
  Responsible for researching and drafting congressional federal voting legislation.

- **Personnel Evaluator**                                     **United States Military Academy**
  **Summer, 1983**                                            **West Point, New York**
  Responsible for establishing standards and guidelines to be used in civilian personnel evaluations and reviews.

- **National Director**                                       **Tuition Advance Fund Information Center**
  **Summer, 1982**                                            **Boston, Massachusetts**
  Special project for the President of Boston University, responsibilities included structuring new student loan eligibility procedures and developing legislative framework for use as national federal guidelines.

- **Financial Analyst**                                       **IBM Corporation**
  **Summer, 1981**                                            **Poughkeepsie, New York**
  Responsible for analyzing and preparing recommendations for vendor bid review process; investigated and resolved outstanding accounts payable/receivable invoices.

- **Staff Assistant**                                         **U.S. Senator Edward M. Kennedy**
  **1979 through 1981**                                       **Boston, Massachusetts**
  Responsible for coordinating and scheduling incoming visitors and communications at Senator Kennedy's Boston office; acted as the Senator's representative at various Massachusetts town government meetings; prepared summaries and follow-up recommendations for the Senator's review.

### Related Experience

- Prepared and sold public service announcements for the Governor's Office of Employment of Disabled Persons, State of California.

- Motion picture and television experience including collaborative/technical advisor and onscreen featured role both for Oliver Stone in Universal Pictures' "Born On The Fourth of July" and for daytime television drama series. Recently retained by Columbia Pictures as technical advisor for the feature film, "Gattica."

- National Essay Winner, President's Commission on Employment of People with Disabilities; selected as winner over 1,000 participants, and received national recognition and publication of essay.

## EDUCATION

- **Juris Doctorate**                                         **Georgetown University**
  **May 1987**                                                **Washington, D.C.**
  Served as Staff Assistant to Congressman Hamilton Fish, Jr.; taught Urban, Housing, Family, and Criminal Law to high school seniors in Washington D.C. public school system; trained class for city-wide mock trial competition.

- **Bachelor of Arts in History and Political Science**      **Boston University**
  **May, 1983**                                               **Boston, Massachusetts**
  Student Body President representing 13,500 undergraduate students; administered a one million dollar annual budget; responsible for drafting and implementation of a new student government constitution, and restructuring of the student government organization; ex-officio member on the Boston University Board of Trustees, 1982-1983.

# McGuire Associates, Inc. - Project List

## ARENAS

| | | |
|---|---|---|
| Rose Garden | Portland, OR | $250 million |
| Staples Center | Los Angeles, CA | $220 million |
| American Airlines Center | Dallas, TX | $200 million |
| SBC Center | San Antonio, TX | $200 million |
| Omaha Convention Center & Arena | Omaha, NE | $200 million |
| National Car Rental Center | Sunrise, FL | $195 million |
| Xcel Energy Center | St. Paul, MN | $195 million |
| First Union Center | Philadelphia, PA | $180 million |
| FleetCenter | Boston, MA | $175 million |
| Conesco Fieldhouse | Indianapolis, IN | $175 million |
| Ice Palace | Tampa, FL | $150 million |
| The Raleigh Entertainment and Sports Arena | Raleigh, NC | $140 million |
| The Apollo at Temple University | Philadelphia, PA | $70 million |
| Rupp Arena | Lexington, KY | |
| San Jose State | San Jose, CA | |

## STADIUMS/BALL PARKS

| | | |
|---|---|---|
| Seattle Stadium & Exhibit Center | Seattle, WA | $420 million |
| San Diego Padres New Ballpark | San Diego, CA | $400 million |
| San Francisco 49ers Stadium | San Francisco, CA | $325 million |
| Philadelphia Eagles New Stadium | Philadelphia, PA | $325 million |
| Foxboro Stadium/CMGI Field | Foxboro, MA | $325 million |
| Lambeau Field (Ellerbe Becket) | Green Bay, WI | $295 million |
| Pro Player Stadium | Miami, FL | $150 million |
| Tropicana Field (Retrofit) | St. Petersburg, FL | $75 million |
| Dodger Stadium (Renovation) | Los Angeles, CA | $55 million |
| Dodgertown | Vero Beach, FL | |
| Kingdome (Seattle Seahawks) | Seattle, WA | |
| Texas Stadium | Irving, TX | |

## OTHER CLIENTS

| | | |
|---|---|---|
| Seattle Civic Center | Seattle, WA | $260 million |
| The Experience Music Project (EMP) | Seattle, WA | $240 million |
| Grand Rapids Convention Center Expansion | Grand Rapids, MI | $220 million |
| Seattle Public Central Library | Seattle, WA | $195 million |
| The Gwinnett Civic & Cultural Center | Duluth, GA | $65 million |
| Bard College Performing Arts Center | Annandale, NY | $55 million |
| The Bushnell Theatre (Existing & New) | Hartford, CT | $35 million |
| World Fishing Center | Dania, FL | $30 million |
| The Wang Center for the Performing Arts | Boston, MA | $10 million |
| The Shubert Theatre | Boston, MA | $8 million |
| Cinerama Theatre | Seattle, WA | $5 million |
| Twentieth Century Fox Film Corporation | Los Angeles, CA | |
| General Cinema Companies | Boston, MA | |
| Boston University | Boston, MA | |
| The Shubert Organization | New York, NY | |
| TeleCharge | New York, NY | |
| Symphony Hall/Tanglewood | Boston/Lenox, MA | |
| ARCO Chemical | Newtown Square, PA | |
| Catellus Development Corporation | Los Angeles, CA | |

# ❖ McGuire Associates, Inc. – Seminars ❖

## Associations

| | | |
|---|---|---|
| MLB (*Major League Baseball*) | Naples, FL | November 1998 |
| | Seattle, WA | November 1999 |
| IAAM (*International Association of Auditorium Managers*) | Philadelphia, PA | July 1996 |
| | Dallas, TX | July 1997 |
| Arena Management Conference | Las Vegas, NV | August 1998 |
| | Denver, CO | September 2000 |
| ACA (*American Convention Association*) | San Diego, CA | October 1998 |
| INTIX (*The International Ticketing Association*) | Nashville, TN | January 1999 |
| | Albuquerque, NM | January 2000 |
| ALSD (*American Luxury Suite Directors*) | Anaheim, CA | July 1998 |
| FFMA (*Florida Facility Managers Association*) | Orlando, FL | July 1996 & 1997 |
| TAC (*Texas Accessibility Conference*) | Dallas, TX | March 1998 |
| AASA (*The American Association of School Administrators*) | New Orleans, LA | February 1995 |
| AAAM (*American Association of Auxiliary Managers*) | Boston, MA | October 1997 |
| President's Committee on Employment of People with Disabilities | Seattle, WA | October 2000 |

## Organizations

| | | |
|---|---|---|
| SMG (*Spector Management Group*) | New Orleans, LA | April 1997 |
| LMI (*Leisure Management International*) | Fort Lauderdale, FL | September 1998 |
| HOK (*Helmuth Obata & Kassabaum*) | Kansas City, MO | June 1998 |
| Ellerbe Becket | Kansas City, MO | February 1998 |
| NBBJ Sports & Entertainment | Los Angeles, CA | January 1998 |
| Boora Architects | Portland, OR | August 1998 |

# PRO PLAYER STADIUM

# Access Guide

## FOR GUESTS WITH DISABILITIES



PRO PLAYER Stadium

EXHIBIT

B

## A WORLD CLASS SPORTS AND ENTERTAINMENT DESTINATION

      



# Welcome to Pro Player Stadium...

The Miami Dolphins, Florida Marlins, and Pro Player Stadium staff would like to welcome members of our disabled community to Pro Player Stadium, a state-of-the-art world class sports and entertainment destination. The stadium has nearly 200 executive suites, 10,000 club seats, as well as the new Legends Club Suite and the Hall of Champions.

Pro Player Stadium is accessible to all guests with disabilities. The stadium features wheelchair accessible seating, disabled parking spaces, electric door openers at various designated disabled entrances, public and private TDDs/TTYs, ATMs, and a multi-channel Assistive Listening System (ALS). The stadium also is continuing to upgrade wheelchair seating areas, public bathrooms, water fountains, concession stands, and ramp handrails. Assistive listening receivers and other materials are available at our Access Service Center located at the Guest Services Booth at Section 150.

It is our hope that this brochure, which explains our services, programs and policies, will make your visit to our ever-improving stadium a truly enjoyable and memorable experience.

The Dolphins, Marlins, and stadium personnel thank you for your participation and support.

Bob Kramm
President
Pro Player Stadium

M. Bruce Schulze
Vice President/General Manager
Pro Player Stadium





# Accessible Services

Our stadium has been designed to provide easy access for our guests with disabilities. Pro Player Stadium recognizes the needs of persons with disabilities, as defined by the Americans with Disabilities Act (ADA) of 1990 and continues to make every effort to comply with both ADA and state accessibility mandates. In addition, Pro Player Stadium strives to further accommodate the individual needs of guests with disabilities. All disability access inquiries should be directed to:

Pro Player Stadium
Attn: Andy Major, ADA Coordinator
Access Service Center
2269 NW 199th Street
Miami, Florida 33056
VOICE  (305) 623-6100
TDD/TTY (305) 623-6266
        FAX  (305) 624-6403



Access Service Center
The Pro Player Stadium Access Service Center is located at the Guest Services Center on the 100 level main concourse. The Center dispenses assistive listening receivers and headsets, alternate format materials, as well as other medical-related equipment. The Access Service Center is professionally staffed to assist our guests with disabilities.

Telephones
Accessible telephones are located on various levels of Pro Player Stadium. Public TDDs/TTYs are located on the 100 (Section 150) and 400 (Section 450) Levels.  A complimentary portable TDD/TTY phone is located at the Concierge Desk on the 200 Level.



Elevators
Public elevators are available in Pro Player Stadium. There are four elevators located at the Gate "G" entrance and two elevators located at the Gate "C" entrance. There also is one elevator located at the Gate "E" entrance. These elevators are strictly designated as preferred use for guests with disabilities during all events held at Pro Player Stadium.



Restrooms
All public bathrooms continue to be retro-fitted to be accessible to our guests with disabilities. Accessible unisex bathrooms also are being constructed on the 100 and 400 Levels. Guests will find accessible features such as stalls, sinks, mirrors, and paper towel dispensers in the designated bathrooms.



### Assistive Listening Devices

Headsets and receivers for our multi-channel LPB Radio-Aide are available for no charge at the Access Service Center located on the 100 Level (Section 150). Either a driver's license or credit card will be required as a deposit. Guests who choose to bring their own headset and receiver may access the system on the standard FM broadcast band (88-108MHz/FM Channel 89.1).



### Concession Stands

Accessible concession stands are available on all Pro Player Stadium levels. If guests with disabilities require assistance at any of the food service areas, please notify the nearest Pro Player Stadium employee.



### Alternate Format Materials

Specific brochures, programs, and other literature will be available at the Access Service Center in Braille, large print, and on audio cassette, or computer disk.



### Emergency Evacuation Procedures

Designated Pro Player Stadium ushers and other personnel have been trained in proper procedures for emergency preparedness. These designated employees have the primary duty of assisting guests with disabilities to specific locations.



### Service Animals

Although animals are not allowed in Pro Player Stadium, an exception is made regarding service animals for guests with disabilities. Please contact Pro Player Stadium's ADA Coordinator if any accommodations are required.



### Interpreting Services

Guests who require interpreting services for a stadium concert should contact the stadium ADA Coordinator within three weeks of the announced concert ticket sale.



### Smoking

Smoking is prohibited in the seating bowl of the stadium and most other stadium areas except as designated by appropriate signage.



### Chemical Sensitivity

Pro Player Stadium understands that many guests are allergic or sensitive to chemicals in aftershaves, colognes, and perfumes. Pro Player Stadium requests that guests refrain from wearing artificial scents of any kind when attending events.



### ATMs

Automatic Teller Machines (ATMs) are located on the 100 Level (Section 150), the 200 Level (Section 242), and the 400 Level (Section 442).




### Group Tours

Tour guests who require interpreting services should contact the Stadium ADA Coordinator three weeks prior to the anticipated tour date.



### Comments, Questions, and Suggestions

Access for our guests with disabilities at Pro Player Stadium is an ongoing commitment. In our desire to continually improve stadium access, we request that you contact us with your comments, questions and/or suggestions at:

Pro Player Stadium
Attn: Andy Major, ADA Coordinator
Access Service Center
2269 NW 199th Street
Miami, Florida 33056

VOICE (305) 623-6100
TDD/TTY (305) 623-6269
FAX (305) 624-6403

# Pro Player Stadium Information

For information on upcoming Pro Player Stadium events, call VOICE (305) 623-6100 or TDD/TTY (305) 623-6266.

Tickets:
Tickets to Pro Player Stadium events can be purchased by visiting the Pro Player Stadium Box Office, Monday through Friday, 8:30 am until 6:00 pm. We are also open on Saturdays, 8:30 am until 4:00 pm during the football and baseball season. For the convenience of our guests with disabilities and for the concern of their medical equipment, wheelchair ticket purchases may be transacted at an interior accessible ticket counter at Gate G. Tickets are also available at Ticketmaster Outlets or by calling Ticketmaster at:

BROWARD        (954) 523-3309
DADE           (305) 358-5885
PALM BEACH (561) 966-3309
TDD/TTY        (800) 755-6244

Questions regarding disabled seating and wheelchair accessibility can be directed to the Ticket Office at VOICE (305) 626-7426, TDD/TTY (305) 623-6269.

Seats in disabled sections are sold with the wheelchair in row 28 of each particular section and the companion side by side. Additional companion seats are available directly behind the wheelchair space, and the first companion seat, with a limit of two (2) per wheelchair, thus allowing for a total of three companions per wheelchair user. All seats are sold on a first come, first serve basis.



# Accessible Wheelchair Seating

Football
Lower West End Zone, Lower East End Zone, Executive Suite Level-End Zone, Executive Suite Level-Sidelines, Lower Field Sidelines, Lower Corner, Lower Sidelines

Baseball
Infield Box, Terrace Box, Outfield Reserve, Executive Suite Level-Right Field, Executive Suite Level-Left Field, Club Level Infield

# Group Sales

For groups of 50 to 270, the Hall of Champions is an exciting new way to enjoy the game. In addition, tickets for groups of 25 or more can be purchased for Dolphins' games and special events by calling VOICE (305) 620-2578, TDD/TTY (305) 623-6269. Marlins group sales can be purchased by calling VOICE (305) 930-HITS, TDD/TTY (305) 623-6269. When purchasing group tickets, please specify your interest in accessible seating.

# Pro Player Stadium Facts

| | | | |
|---|---|---|---|
| Overall Size: | 648 feet x 736 feet | Gates: | 8 |
| Playing Surface: | Prescription Athletic Turf (PAT), Natural Grass | Escalators: | 8 |
| | | Elevators: | 13 |
| Football Seating: | 73,459 | Restrooms: | 40 Women 40 Men |
| Baseball Seating: | 41,855 | Locker Rooms: | 4 |
| Parking: | 24,137 Cars 171 Buses 90 RVs 84 Limousines 1 Helipad | Future Events: | 1999 Super Bowl 2000 MLB All-Star Game FedEx Orange Bowl Carquest Bowl Various Concerts and Events |



● = Wheelchair Seating

 = Wheelchair Accessible Ticket Counter

= Wheelchair Accessible Elevator

= Disabled Parking

# How to Get to Pro Player Stadium

Pro Player Stadium is located at 2269 NW 199th Street in Miami, only one mile south of the Dade-Broward County Line at the Florida Turnpike Stadium Exit 2X. Disabled entrance at Gate 4.

▸ From the North...

I-95 south to Ives Dairy Road. Make a right turn and proceed west for five miles. The stadium will be on the right. Disabled entrance at Gate 4.

The Florida Turnpike south to Exit 2X, which is the NW 199th Street and stadium exit. Upon exiting the turnpike, the stadium is immediately on the right. Disabled entrance at Gate 4.

University Drive which becomes NW 27th Avenue in Dade County, to NW 199th Street. Make a left and the stadium is on the left. Disabled entrance at Gate 4.

▸ From the South...

The Florida Turnpike Extension north to the Miramar exit at NW 27th Avenue. Make a right turn and proceed south two miles to NW 199th Street. Turn left and the stadium is on the left. Disabled entrance at Gate 4.

I-95 north to Ives Dairy Road. Turn Left and proceed west for five miles. The stadium will be on the right. Disabled entrance at Gate 4.

The Palmetto Expressway north to the NW 27th Avenue exit. Turn left, and proceed two miles north to NW 199th Street. Make a right and the stadium is on the left. Disabled entrance at Gate 4.

▶ From the West...

I-75 to eastbound I-595. Continue east to the Florida Turnpike interchange. Take the turnpike south to Exit 2X, which is the NW 199th Street and stadium exit. Upon exiting the turnpike, the stadium is immediately on the right. Disabled entrance at Gate 4.

US Highway 41 to State Road 826 north. Exit at NW 27th Avenue and turn left. Proceed two miles to NW 199th Street and turn right. The stadium is on the left. Disabled entrance at Gate 4.

▶ From Hollywood/Fort Lauderdale Airport...

Take 595 west to the Florida Turnpike interchange. Take the turnpike south to Exit 2X, which is the NW 199th Street and stadium exit. Upon exiting the turnpike, the stadium is immediately on the right. Disabled entrance at Gate 4.

▶ From Miami International Airport...

Take Route 112 east to I-95. Take I-95 north to Ives Dairy Road. Turn left and proceed west for five miles. The stadium will be on the right. Disabled entrance at Gate 4.

▶ By Public Transportation...

Football
Broward Bus Transit with Accessible Seating: Customer Service

VOICE          (954) 357-0840
TDD/TTY        (954) 357-8302

Dade Bus Transit with Accessible Seating: Customer Service

VOICE          (305) 638-6700
TDD/TTY        (305) 654-6530

▶ The Ride...

STS: Special Transportation Service can be used throughout most of Dade County and some parts of southern Broward County. It provides door-to-door transportation for people with disabilities who are unable to use Metrobus, Metrorail, or Metromover. STS carriers use mini-vans, sedans, lift-equipped vans, and small buses to transport clients. A wheelchair rider who can safely and independently transfer to a sedan or taxi may be scheduled to ride as an ambulatory passenger.

Limited STS service into Broward County also is available. Call for more information.

▶ Telephone Numbers County for STS:

STS Certification/Enrollment Office and Information. (M-F, 8 am to 5 pm)

VOICE          (305) 263-5406
TDD/TTY        (305) 263-5459

Late Vehicle Assistance (24 Hrs)

VOICE          (305) 267-6305
TDD/TTY        (305) 263-5475

STS Project Office and Administrative (M-F, 8 am to 5 pm)

VOICE          (305) 263-5400



**Home of the Miami Dolphins and Florida Marlins**

# EXHIBIT "D"

MI635060;1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

ACCESS NOW, INC. AND
EDWARD RESNICK,

        Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

        Defendants,

_____/

## DECLARATION OF THOMAS A. GRAY

Pursuant to 28 U.S.C. Para. 1746, I Thomas A. Gray, declare the following:

1.     I am over eighteen years of age and am fully competent to execute this Declaration. The facts set forth herein are within my personal knowledge unless otherwise stated.

2.     I am President of the Center for Small Business Studies located in Washington D.C. I consult on regulatory issues affecting businesses including the affects of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. Para. 12101 *et seq.* A summary of my qualifications is attached hereto as Exhibit A to this Affidavit.

3.     I have been retained by the Defendants in this action as an expert witness to evaluate the usage of wheelchair locations at Pro Player Stadium (the "Stadium") during Dolphins Football games and Marlin' Baseball games and the economic effect on revenue that will occur should the Defendants be required to install up to 1% of total accessible seating based on the new construction ADAAG requirement as demanded by the plaintiffs. The Stadium was opened in 1986, many years prior to the passage of the Americans with Disabilities Act.

1

4.    It is my opinion that the available wheelchair seating at the Stadium for both football and baseball games far exceed current and anticipated usage. During Marlins Baseball games, the odds are 2500 to 1 that 95 or more wheelchair accessible seats would be demanded. The Marlins play approximately 80 games per year at Pro Player Stadium. On average, more than 95 seats would be used only once in 21+ years. The odds against all 190 available accessible seats being used by patrons in wheelchairs are overwhelming.[1]

5.    During Dolphins Football games the odds that patrons in wheelchairs would use more than the 171 available accessible seats are greater than 3000 to 1 against the proposition. Given that the Dolphins play approximately 10 games per year (including two pre-season games) at Pro Player Stadium, there would be an excess demand for accessible seating only once in approximately 300 years. As a result, it is also my opinion that the Stadium complies with the ADA's readily achievable standard with regard to wheelchair and companion seating for both Dolphins and Marlins games. My opinions are based on:

A.    The probabilities and odds are calculated on the assumption that the Stadium is sold out for all Dolphins and Marlins games, since this represents the highest demand scenario.

B.    All persons in wheelchairs are accounted for, but not all people in wheelchairs are subject to the ADA. Some portion of the people in wheelchairs at each game have a short-term impairment such as a broken leg, strained ankle or knee, etc. Approximately 10 percent of the accessible seats used for patrons who have been relocated from general seating.

C.    The calculations are based on the actual probability that the next person entering the Stadium will be in a wheelchair. Based on 1999 and 2000 experience at Dolphins games there were a total of 2016 persons who requested accessible seating or who were relocated to accessible seating after purchasing a general ticket. A total of 1,260,171 patrons attended Dolphins games during this period. Dividing the first number by the second, the probability that the next person entering the stadium would be in a wheelchair was 0.00159978. Another way of saying this is that if 10,000 people entered the Stadium, 16 of them would be in wheelchairs. Note this is not an anecdotal observation. The probability is based on an experiment that was run more than 1.2 million times. Given

---

[1] There is less than one chance in 10,000,000 that more than 140 patrons using wheelchairs would attend a Marlins game. There is virtually no chance that more than the available 190 accessible seats would ever be used.

this probability, the Binomial Distribution can be used to calculate the odds presented above.

D.   Similar analysis was done for Marlins baseball games, based on attendance data for the first three months of the 2001 baseball season that showed that the probability of a patron using a wheelchair was 0.0018357.

6.   In order to address plaintiff's demanded modifications in regard to seating, we have considered the unrealistic proposal for the addition of 156 wheelchair accessible seats and 156 additional companion seats on the 100 level of the Stadium as configured for Miami Dolphins football games, plus an additional 216 wheelchair accessible and 216 companion seats throughout the 400 level of the Stadium.[2]  These additions would bring total accessible seating up to 543 seats supplemented by 727 companion seats.  These additional seats would be unreasonable not only because of the impact as discussed below, but also because:

- the existing supply of accessible seats greatly exceeds the demand for accessible seats.
- The relatively large number of season ticket holders and general admission seats that would be lost in order to make necessary modifications to add the new accessible and companion seats.

7.   The modifications necessary to make changes in each of the 26 sections on the 100 level would cost approximately $380,000 per section or a total of $9,880,000.  The modifications each of the 36 sections on the 400 level of the Stadium would cost approximately $350,000 per section or a total of $12,600,000.  The cost for all necessary modifications would, therefore, be $9,880,000 plus $12,600,000 or a total of $22,480,000.

8.   For each 6 additional accessible seats and 6 additional companion seats added to a section of the 100 level, a net of 106 general seats are lost (118 general seats lost per section offset by 12 additional accessible and companion seats).  For the 26 sections on the 100 level there is a net loss of 2,756 seats.  Similar calculations for the 36 sections on the 400 level show a loss of 70 general admission seats per section offset by a gain of 6 accessible seats and 6 companion seats per section, or a net loss of 58 seats per section and 2,088 seats total on the 400 level.  Taken together, the addition of 372 accessible seats and 372 companion seats produces a net loss of 4,844 seats.  Total seating capacity for the stadium falls from 72,342 as presently configured to 68,166 under the proposed configuration.  Note that despite the rather Herculean program outlined here, the Stadium does not reach the one percent set aside requested by plaintiff.  The new configuration provides for 0.00797 of seats (rounded to 0.08 percent) to be accessible.

---

[2] The costs and benefits associated with these additional seats are discussed below in terms of the effects measured during Miami Dolphins games.  Adding these seats would have virtually no effect on the Marlin's games since available accessible seating for the Marlins far exceeds potential usage.  Therefore, no attempt is made to measure either costs or benefits as they affect Marlins activities.

9.     Based on the simple assumption that the Stadium (including all accessible and companion seating) is sold out, the net loss of 4,844 seats produces a flow of real losses to the Stadium. Based on the attendance numbers for the Dolphins games played at the Stadium in 1999 and 2000, average attendance per game (not including two pre-season games) was 71,457. If the 4,484 seats lost under the proposed configuration were available and sold, they would produce an income per game of $43.00 per ticket plus an average of $12.03 in concession sales per patron or a total of $55.03 per seat. For 4,484 seats this lost income is equal to (4,484)(55.03) or minus $265,565 per game. An additional $8,477 per game is lost in parking revenues (assuming four patrons per car), for a total loss of $275,043 per game. Assuming that there is no inflation in ticket prices, concession prices or parking fees, and assuming 10 Dolphins games are played per year, there would be a yearly loss of $2,750,430 per year. If we further assume a useful life of 30 years for Pro Player Stadium, and an annual interest rate of 7 percent, then we can discount the 30-year stream of annual losses to a present value of minus $34,130,199.[3]

10.    The total cost of adding 372 new accessible seats is equal to the construction cost to add the seats plus the present value of the stream of income losses associated with the net loss of 4484 general admission seats, or $22,480,000 plus $34,130,199, which equals $56,610,199.[4] To put this number in context, the cost per additional accessible seat is $152,178.

11.    The high cost of adding additional seats must be compared to the benefits produced in the way of additional accessibility produced through these seats. But usage of accessible seats is already considerably less than the present capacity available at Pro Player Stadium. There are 171 accessible seats currently available at the Stadium. On average 110 of these seats are occupied by patrons in wheelchairs. The probability of more than 171 seats being used by patrons in wheelchairs is approximately 0.0003. This would occur in only 3 games in 10,000, or once every 300 plus years. In all likelihood, all of the newly accessible seats will remain unused by patrons in wheelchairs almost all the time. Although patrons in wheelchairs will have more choice of seats, 4,484 former

---

[3] Note that the loss stream is calculated on the assumption that all of the 4,484 lost seats would be sold at each game. The use of this assumption is based on average regular season attendance of 71,457 per game during 1999 and 2000. Subtracting the new Stadium capacity (after adding the new accessible and companion seats) from the average attendance confirms that, on average, 3,291 of the 4,484 seats would have been sold. During the cost calculations, we are also assuming that all of the available accessible and companion seats are sold out. Based on past experience, however, of the 1270 accessible and companion seats available in the new configuration only 276 would be sold at a typical game. This implies that 994 accessible and companion seats would remain empty at a typical game. To fully calculate losses, therefore, we would have to calculate revenues lost from the 3,291 seats that have disappeared, plus the losses from the 994 wheelchair and companion seats left unused. Since 3,291 plus 994 equals 4,285 which is close to 4,484, we have used the simplifying assumption that the stadium is sold out and all losses are related to the 4,484 seats lost during the renovation. If the more complex calculation of losses is made, then the $34,130,199 loss calculated under the simpler assumption of a sold out stadium can be adjusted downward to $32,628,470.
[4] Note that these calculations do not include any charges for goodwill lost by the Dolphins, nor do they include any estimates of the welfare loss to patrons or potential patrons who can no longer attend games because of the lost seating.

patrons in general admission seats will no longer have any choice of seats.  A very slight (almost vanishingly small) increase in welfare for patrons in wheelchairs is offset by very large losses in welfare to former patrons in general admission seating.

12.   All of the cost and lost revenue calculations reinforce the conclusion that the addition of additional accessible seating would produce almost no benefits, since the additional seats are very unlikely to be used by patrons needing accessible seating.  At the same time, the addition of additional (unused) accessible seating would eliminate 4,484 seats used by general admission patrons, thus eliminating this  potential patronage.  The loss of 4,484 seats plus the costs of revamping the Stadium would bring the owners of Pro Player Stadium a wealth loss in the area of  $56,000,000—a loss that could be increased by an additional $7,000,000 if the new accessible seats were not used by any more than the current number of patrons with disabilities and were not released for general usage.

I declare the foregoing to be true and correct, under penalty of perjury.


Signed:  _____          Dated: _____

# EXHIBIT "E"

MI635060:1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

ACCESS NOW, INC. and
EDWARD RESNICK,

      Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

      Defendants.

_____/

## DECLARATION OF ANDREW C. MAJOR

Pursuant to 28 U.S.C. §1746, I, Andrew C. Major, declare the following:

1.      I am over eighteen years of age and am fully competent to execute this declaration. The facts set forth herein are within my personal knowledge unless otherwise stated.

2.      In 1993, I began my employment with South Florida Stadium Corporation ("SFSC"), and in or about 1995, I was promoted to the position of Americans with Disabilities Act ("ADA") Coordinator for Pro Player Stadium (the "Stadium"). My responsibilities as the Stadium's ADA Coordinator include among other things (1) addressing and resolving any and all disability issues, concerns or problems brought to my attention by the disabled community; and (2) developing and implementing policies which increase accessibility to the Stadium by our guests with disabilities.

3.      To provide more access to the Stadium, SFSC has developed and implemented various policies which cover a host of different areas from food service to ticketing. Some examples of the

ticketing policies follow:

   a.   All wheelchair seats are held exclusively
        for purchase by guests with disabilities up
        to and including the day of the event or
        game.

   b.   Guests with disabilities are permitted to
        purchase seats in the executive suites on
        the club level at the same price that the
        general public pays for less expensive seats
        located on the Stadium's lower level.

   4.   These policies are effective in ensuring that the our guests with disabilities always have

seating even when the Stadium is sold out. In fact, over the last two football seasons,[1] a substantial

amount of wheelchair seats have been available even during sold out rivalry games like the Dolphins

vs. the Jets.

   5.   Indeed, SFSC has been collecting data on the usage of disabled seating locations at the

Stadium over the last several years, and the data has shown that these locations are substantially under

utilized during both football and baseball games.

   Under penalty of perjury, I declare the foregoing to be true and correct.

                                        _Andrew C. Major_
                                        **ANDREW C. MAJOR**

---

[1]There is always wheelchair seating available during baseball games.

M1872861.1                                  2

# EXHIBIT "F"

MI635060:1

1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2                    MIAMI DIVISION

3           CASE NO.   00-02261-CIV-MOORE
           Magistrate Judge O'Sullivan

4

5  ACCESS NOW, INC., and EDWARD     )
    RESNICK,                      )
6                            )
               Plaintiff,     )
7                          )
    vs.                       )   **ORIGINAL**
8                          )
    SOUTH FLORIDA STADIUM CORPORATION,)
9    a Florida corporation, MIAMI    )
    DOLPHINS, LTD., a Florida limited )
10  partnership, and FLORIDA MARLINS  )
    BASEBALL CLUB, L.L.C., a Florida  )
11  limited liability company,      )
                            )
12              Defendants.    )
    _____)
13

14                          Suite 2800
                         One S.E. Third Avenue
15                       Miami, Florida
                         Tuesday
16                        February 20, 2001
                         10:21 a.m. - 4:30 p.m.
17

18

19             D E P O S I T I O N

20                   of

21          EDWARD S. RESNICK

22

23       Taken on behalf of the Defendants
      Pursuant to a Notice of Taking Deposition
24

25           -   -   -

1      A.    I'm a member, and I'm the president.

2      Q.    Okay.   What are your responsibilities as the

3   president of Access Now?

4      A.    We have a very strong presidency.   The

5   organization is run by an executive committee, of

6   which I'm one.   I basically -- I basically decide

7   which actions we're going to bring, subject to the

8   approval of the executive board, and I make the

9   judgments on settlements in regard to compliance with

10   the ADA and deviations therefrom.   Basically, I have

11   full authority, and I'm overseen by the executive

12   committee.

13      Q.    Okay.   I'd like to ask you some follow-up

14   questions on Access Now.   About how many hours a week

15   do you devote to your job responsibilities as

16   president of Access Now?

17      A.    I would say six days a week, from -- Well, on

18   average, from about ten to six.

19      Q.    Don't you wish you were practicing law now?

20      A.    I work harder now.

21      Q.    Exactly, that was my point.

22            Okay.   You had mentioned an executive

23   committee?

24      A.    Yes.

25      Q.    Could you please tell me who the members of

1    Q.   Let's see.  I'm going to go back for a

2    second, and then we're going to move forward.

3         How long have you held this position at

4    Access Now?

5    A.   Well, my wife and I were the moving force in

6    creating Access Now.  It was created, I believe,

7    sometime during the fall of 1997, and I would say we

8    commenced our mission in April of '98.

9    Q.   Could you please tell me what your mission

10   is?

11   A.   Our mission is to create access in public

12   accommodations.  We, in a sense, prioritize certain

13   kinds of businesses.  I mean, a very high priority is

14   hospitals, movie theaters, stadiums.

15   Q.   What a surprise.

16   A.   Hotels, motels, cities.

17   Q.   Okay.  Do you have like a -- Does Access Now

18   have like a mission statement or a purpose statement?

19   A.   Yes.

20   Q.   Is that printed material available to the

21   public?

22   A.   Yes.

23        MR. SUKHDEO:  Can I request that?  Is there

24   any problem?

25        MR. CODY:  Sure.  I think it's on the Web

```
 1    site.
 2              MR. SUKHDEO:  It's on the Web site?  Very
 3    well.
 4              MR. CODY:  It's ADAAccessNow.org.
 5    BY MR. SUKHDEO:
 6         Q.   Who prepared that Web site?
 7         A.   My wife, I contributed a little bit, and our
 8    computer consultant.
 9         Q.   All right.  And the content came from you
10    two?  You two meaning you and your wife, for the
11    record?
12         A.   Yes, yes.  Guilty as charged.
13              It's a difficult Web site to have, because --
14    I know I'm not supposed to do this.  We have a mixture
15    of people who we have settled with, and some insist on
16    confidentiality and some do not.  And so, we try to
17    blow our own horn, but we can't sometimes name names,
18    so it creates a problem.
19         Q.   I got you.  Could you -- I know I asked you
20    this before, but please humor me.  You say you've been
21    doing this since 1997, working with Access Now?
22         A.   We started Access Now in 1997.
23         Q.   All right.  Prior to that, what was your
24    employment?  Who were you employed by?
25         A.   I wasn't employed.
```

1     Q.   You weren't employed?

2     A.   I did an activity.

3     Q.   And what was that?

4     A.   I have to admit it?  I was president of the

5 Association of Disabled Americans.

6     Q.   Can you give me the dates that you held that

7 position?

8     A.   Let's see.  I resigned in the summer of '97,

9 and I was involved in the incorporation, which I think

10 is around '95, something like that.

11     Q.   Why did you resign?

12     A.   I resigned because a different policy --

13 attitude in policy.  I didn't like what was happening.

14     Q.   First question:  What didn't you like about

15 what the Association for Disabled Americans -- what

16 didn't you like that they were doing?

17     A.   Well, I have to stop and tell you that, at

18 the time, I was very involved in city political

19 matters, and I was the chairman of two city

20 committees, and I was also appointed by the city to

21 negotiate what was then called the Kramer Land Swap,

22 and this was a very contentious matter involving a lot

23 of time.  And I began to see that this organization

24 was being totally driven, run, et cetera, by a lawyer

25 and by an expert, and I didn't like the theory.  I

1    one that could come in and create some kind of feeling

2    between both sides and usually work out a settlement.

3    But that was kind of a desperation thing, and that

4    wasn't that many cases.  So, generally speaking, I

5    wasn't.

6         Q.   Okay.  Being that you're an attorney -- Well,

7    sorry.  Let's strike that.

8              Are you licensed in the State of Florida?

9         A.   Yes.

10        Q.   Okay.  When I say licensed, I mean licensed

11   to practice law.

12        A.   I maintain my license.

13        Q.   Do you actively participate in the

14   litigations, the strategy of litigation -- sorry --

15   the strategy of the litigation that you are involved

16   in when you were the president of the Association of

17   Disabled Americans?

18        A.   No.

19        Q.   Okay.

20        A.   Except for those cases that I'm telling you

21   about, that sort of got out of hand.

22        Q.   How about, are you actively involved in the

23   strategy of the litigations that Access Now pursues?

24             MR. CODY:  I'm going to object to that

25   question on the basis that it may entreat onto areas

```
 1    of attorney-client privilege.

 2              MR. SUKHDEO:  Okay.  Are you going to

 3    instruct Mr. Resnick not to answer, or are you just

 4    going to note the objection?

 5              MR. CODY:  Well, I'll let him -- I'm going to

 6    note the objection and not instruct him at this point,

 7    but it depends upon what your next question is.

 8              MR. SUKHDEO:  Okay.  Very good.

 9    BY MR. SUKHDEO:

10         Q.   Will you answer the question?

11         A.   I need a little clarification.  You have to

12    be more specific for me.

13         Q.   Okay, I'll do that.  You said that there's an

14    executive committee?

15         A.   Yeah.

16         Q.   Of which you're the highest ranking officer,

17    correct?

18         A.   Correct.  But my vote counts as one.

19         Q.   One?

20         A.   Right.

21         Q.   Tell me this.  Who makes the decision to

22    bring a lawsuit?

23         A.   I do.

24         Q.   You do?

25         A.   Yes.
```

15

```
 1        Q.   Do you do that independent of the votes of

 2   the executive committee?

 3        A.   No, it's based on an overall policy of -- We

 4   meet every six months, or less, and report what we've

 5   done and create what we're trying to do and, frankly,

 6   identify who we're looking at.  And so there's a

 7   go-ahead.  There's a consensus amongst the board.

 8        Q.   But is the --

 9        A.   In other words, I'm not a loose cannon who

10   just decides we're going to go after dog tracks as

11   opposed to football stadiums.

12        Q.   Okay, I understand.  Tell me this.  Do you

13   have veto power if the other members of the executive

14   committee board decide to bring -- that a lawsuit

15   should be brought?  Can you veto that?

16        A.   No.

17        Q.   Okay.  Is there a formal process to Access

18   Now bringing a lawsuit?

19        A.   Well, other than what I've described, no.

20        Q.   Okay.  Would it be accurate to say, then -- I

21   don't want to put words in your mouth and I don't want

22   to mischaracterize what you've said.

23        A.   Okay.

24        Q.   But would it be accurate to say that what you

25   described to me is this.  You meet every several
```

```
 1        A.   And show that we have a broad base of

 2   support.   And that's not just a support because we're

 3   an organization of handicapped people, but the way we

 4   do business.   That's our primary point to the people

 5   that you see there, because you'll see there are lots

 6   of business people, some of whom we've even sued.

 7             MRS. RESNICK:   Can we go off the record?

 8             MR. SUKHDEO:   I have no objection.

 9             (Discussion off the record.)

10   BY MR. SUKHDEO:

11        Q.   Just let me ask you one follow-up question.

12   So who is the core group in the executive committee

13   that is making the day-to-day decisions?

14        A.   Day-to-day decisions are made by me, with my

15   wife, Phyllis.

16        Q.   And with respect to litigation, what members

17   of the -- what members of the executive committee are

18   making the decisions?

19        A.   Day-to-day as opposed to every three months?

20        Q.   Yes.

21        A.   Day-to-day would be my wife and I.

22             MRS. RESNICK:   Let me go off the record for a

23   second.

24             (Discussion off the record.)

25   BY MR. SUKHDEO:
```

30

1          Now ask me football.

2      Q.    Well, we're getting there.  I'm going to take

3  a break from the baseball for a moment, and then we're

4  going to get back to it.  My next question is this --

5          MR. SUKHDEO:  Can I go off the record for a

6  second?

7          (Discussion off the record.)

8  BY MR. SUKHDEO:

9      Q.    Mr. Resnick, are you disabled as defined by

10  the ADA?

11      A.    Yes.

12      Q.    Have you always been disabled?

13      A.    No.  At the age of 28, I contracted polio.

14      Q.    Okay.

15      A.    And I am -- No, that's not a true statement.

16  I was going to say I am today, as you see me, that's

17  how I've been since Christmas of 1954, but that's not

18  true.  I'm worse.  I wish I was.

19          MR. SUKHDEO:  For purposes of the record, Mr.

20  Resnick, as he sits before me, is sitting in a

21  wheelchair.

22          THE WITNESS:  And I'm classified as a

23  quadriplegic.

24  BY MR. SUKHDEO:

25      Q.    Okay.  Let's get back to baseball.  You said

1    you've attended approximately 20 to 30 major league

2    games during the course of your lifetime, correct?

3         A.    And that includes training games.

4         Q.    Okay.

5         A.    Because most of the games I've seen have been

6    in the two years that I had tickets for the Marlins.

7         Q.    How many of those games -- Strike that.  Let

8    me clarify this.

9              When I say how many games, major league

10   baseball games have you seen, what I mean is, how many

11   major league baseball games have you actually

12   attended, not seen on the television?

13        A.    That's what I was answering.

14        Q.    Okay, good.  How many of those games have you

15   attended while you were disabled?

16        A.    I think all.

17        Q.    Okay.  How many of those games have been --

18   I'm sorry.  Strike that.  Let me make the sentence

19   clearer.

20             How many major league baseball games, either

21   regular season or training, have you attended at Pro

22   Player Stadium or as it was called, the predecessor

23   entity, Joe Robbie Stadium?

24        A.    It would just be the first two years of the

25   Marlins at Pro Player Stadium, and I'm working off

```
 1    memory.  We bought season tickets both years, and I
 2    can't remember if I divided them up by three or four.
 3    But if my end of the season tickets was a third of it
 4    or a fourth of it, that's the number of games I went
 5    to.
 6         Q.   I'm sorry.  I'm going to need to ask you to
 7    clarify.  When you said you divided them into thirds
 8    or fourths --
 9         A.   Yeah.
10         Q.   -- could you explain that to me?
11         A.   I had two other guys, or three.  I can't
12    remember.  Two other guys or three other guys, and we
13    split the tickets.
14         Q.   Okay.  Now, was it one season ticket to the
15    Marlins, or was it two?
16         A.   Two.
17         Q.   And is it correct for me to say that, then,
18    you took about a quarter or a third of those tickets
19    for your personal use?
20         A.   Correct.
21         Q.   That meaning two tickets, two?
22         A.   Yes.
23         Q.   Okay.
24         A.   Every partner two took tickets.  In other
25    words, I bought two -- We bought two season tickets.
```

1    Q.   Okay.  Do you remember what years the first

2    two seasons were that you had the season tickets,

3    taking that I'm not a baseball fan?

4    A.   I think something like '91, '92 to '92, '93.

5    Q.   Okay.  Did you purchase the tickets, or did

6    somebody else purchase the tickets?

7    A.   No, I purchased the tickets.  I have to

8    answer you this way.  We had club seats, which I

9    believe started in '87, and you had to sign a ten-year

10   contract, and this was for football.  And as a result

11   of that, you got first priority on baseball.  You

12   could retain your seats.  And so the first two years

13   that we were there, we did that.  Except in the

14   football, we always went to the games.  But, of

15   course, you're only talking about eight or ten games

16   then.  Whereas in baseball, I guess half a season is

17   something like 60 games.

18   Q.   Okay.  So the tickets were purchased in your

19   name?

20   A.   Yes.

21   Q.   Both tickets, both season tickets?

22   A.   Yes.

23   Q.   Okay.  Do you have any kind of -- Strike

24   that.

25        Are you in the possession or custody or

1    control of any documentary evidence of those season

2    tickets, by which I mean, by way of example, credit

3    card receipts to purchase those tickets, the ticket

4    stubs, game programs?

5         A.   I think -- Did we keep the first game

6    tickets?  I think I have the first game, Marlin game,

7    tickets.

8         Q.   Okay.

9         A.   Other than that, no.  But I'm sure that the

10   Dolphin records would show it.

11        Q.   We'll get to the Dolphins in a second.

12             MR. SUKHDEO:  Subject to any objections that

13   Mr. Cody may have, I'd like to call for production the

14   copy of the tickets or any relevant documentary

15   evidence on Mr. Resnick's attendance at the Marlin

16   baseball games.

17   BY MR. SUKHDEO:

18        Q.   Is there any -- Can you -- Strike that.

19             You've told me that you attended about 20 to

20   30 major league baseball games in your lifetime, all

21   of which you attended while you were disabled, as

22   defined by the ADA.  You've also told me that you had

23   season tickets -- two season tickets to the Marlins

24   for the first two seasons and that you retained, for

25   your own personal use, approximately a quarter or a

```
 1    third of those tickets.  How many games, Marlin

 2    baseball games, did you actually attend during those

 3    two seasons?

 4         A.   I don't believe that we missed a game.  And

 5    again, whatever -- I would think something like ten a

 6    season.

 7         Q.   And seeing that you've only been to 20 or 30

 8    major league baseball games in your life, you haven't

 9    attended one since, correct?

10         A.   Correct.

11         Q.   Tell me this.  Where were the seats located

12    at Pro Player or Joe Robbie Stadium?

13              MR. CODY:  Talking about the baseball seats?

14              THE WITNESS:  Well, the baseball seats were

15    the same as the football.

16    BY MR. SUKHDEO:

17         Q.   Let me clarify.

18         A.   It's the same seats.

19         Q.   Let me clarify.  That will make the record

20    neat.

21              Where were the seats located for your season

22    tickets for the Marlins?

23         A.   Okay.  If you were taking my wife's

24    deposition, she's going to remember the seat numbers

25    and the section, okay, but you are not.  You're taking
```

1     Q.   Let's go back on the record.  I think we were

2   discussing, among other things, your license, your

3   ten-year license to have tickets at Pro Player

4   Stadium.

5     A.   Yeah.

6     Q.   When was the commencement date of that

7   license?

8     A.   The first game -- The first game that the

9   Dolphins played in Pro Player Stadium, which I think

10  was -- Well, it was an exhibition game.  It was

11  obviously in August, and I think it was in 1987 that

12  the move was made from the Orange Bowl.

13     Q.   Okay.  I think you were discussing -- Sorry.

14  You were describing that when you were attending

15  baseball games at Pro Player Stadium, that you had to

16  convince other fans to help you to your seat?

17     A.   Correct.  I had a letter signed by Joe Robbie

18  that I had to give to the security people to tell them

19  that I was allowed to do this, and I had signed an

20  agreement to hold the Dolphins harmless.

21     Q.   All right.

22     A.   In other words, if a spectator dropped me, I

23  had agreed that the Dolphins weren't responsible.

24  They wouldn't help me, but if I didn't have that

25  letter, the security was going to stop me from having

1    people pick me up and put me down in the seat.

2         Q.   All right.   I'm going to need some

3    clarification on this.   I think what we were

4    discussing prior was baseball games, and you were

5    telling me that you had patrons help you to your seat

6    during baseball games.

7         A.   I got into the seat the same way, whether it

8    was baseball or football.   Made no difference.   I was

9    in the same seats.   And that's how I got in, and

10   that's how I got out, until '99, when I went to the

11   Atlanta Braves game, which I wasn't in club seats

12   because you couldn't get club seats, and I bought a

13   ticket on the sideline, which was just -- If you are

14   looking down on the field, to the right of home plate,

15   and there was a wheelchair space.

16        Q.   Okay.   You purchased your season tickets

17   under the ten-year license agreement approximately in

18   1987, correct?

19        A.   Uh-huh.

20        Q.   1987 was prior to the enactment of the ADA,

21   correct?

22        A.   Correct.

23        Q.   Okay.   So you were attending games, baseball

24   and football games, at Joe Robbie or Pro Player

25   Stadium for a number of years prior to the enactment

1    of the ADA?

2        A.    Yes.   Not baseball, because there wasn't

3    baseball.

4        Q.    Okay.   So you were attending football games,

5    professional football games, at Pro Player or Joe

6    Robbie Stadium for a number of years prior to the

7    enactment of the ADA, correct?

8        A.    Yes, and after.

9        Q.    And after.   Did you renew your ten-year

10   license?

11       A.    No.   I sold it before the ten years was up.

12       Q.    What year did you sell it?

13       A.    I think I sold it in '93 or '94.   Probably in

14   '94.

15       Q.    Which is -- 1993 is subsequent to the

16   enactment of the ADA, correct?

17       A.    Oh, yes.

18       Q.    Why did you sell your license?

19       A.    You want the short answer or the long

20   answer?

21       Q.    I'll go for the long answer.

22       A.    I got tired and frustrated with the hassle of

23   having to be picked up, with people shoving all

24   around, and getting in the seat, and then trying to

25   get people to get me out of the seat, and I just -- I

1   didn't want to be in the end zone, because I had

2   spent, since 1972, going to the Orange Bowl for

3   football games, and I didn't want to be in the end

4   zone.  I didn't want to watch games from the end zone,

5   and I didn't -- I wanted a choice of where I went, and

6   I wanted it where I can go with my wheelchair, and I

7   just gave up.  I said I've had enough of this.  I'm

8   just not doing this anymore.

9       Q.   You have been -- Strike that.

10      A.   And the man behind me had been trying to buy

11  my tickets for three years.

12      Q.   Would you say it's accurate, to paraphrase

13  you, that you've been active in ADA compliance or

14  accessibility matters for a number of years?

15      A.   Yes.

16      Q.   Indeed, you are the president of Access Now.

17  Prior to that, you were the president of the

18  Association of Disabled Americans, correct?

19      A.   Correct.

20      Q.   Okay.  Prior to that, you were retired, but

21  were actively involved in these issues, correct?

22      A.   Correct.

23      Q.   Okay.  You've had your license at Pro Player

24  Stadium since 1987, correct?

25      A.   Correct.

1      Q.   Were you aware of the accessibility services

2   offered by Pro Player Stadium?

3      A.   You're talking back then or now?

4      Q.   Yes, back then.

5      A.   Back then?  The only place where wheelchairs

6   sat, to my knowledge, was in the end zone.  There was

7   a wheelchair ramp.

8      Q.   And what was the extent of your knowledge

9   that that was the only location for wheelchair

10  seating?

11     A.   I was told that when I went to see for the

12  club seats, where can I sit, because I was tired of

13  sitting in the end zone in the Orange Bowl.

14     Q.   When did you make that request to find out

15  where you could sit?

16     A.   Joe Robbie's office was renting, I think, it

17  was a floor in the office building on Biscayne

18  Boulevard that's north of 36th Street, in that stretch

19  between 36th and, I don't know, 50th, I guess, on the

20  west side of the street.  You had to go there.  They

21  showed me the plans of the stadium.  They showed me

22  where wheelchairs went, and we had a discussion, and I

23  wanted a club seat.  And, of course, there was no way

24  that a wheelchair could get to a club seat.  And so

25  they positioned me where they thought it was best that

1    I minimize how much I was carried, and that it was

2    their suggestion, the man that was working with me,

3    that I go in the second row as opposed to the top row,

4    and frankly, I don't remember even why.  But he

5    convinced me.

6         Q.   I've got several questions, follow-up

7    questions, on this conversation.  Who did you have

8    that conversation with?

9         A.   The person working for the Dolphins that was

10   in charge of -- or one of the people that was handling

11   requests for club seats.

12        Q.   Do you remember that person's name?

13        A.   No.

14        Q.   Do you remember the date of that

15   conversation?

16        A.   It's probably six months to a year before the

17   stadium opened up.

18        Q.   So an approximate date would be -- the year

19   would be 1987 or '88?

20        A.   No, '86.

21        Q.   '86?

22        A.   Yeah.

23        Q.   '86?

24        A.   Uh-huh.

25        Q.   There's no dispute that that's prior to the

1   enactment of the ADA?

2       A.   No dispute, no.  And no dispute about my

3   having to go through kitchens to get into restaurants.

4   I'm not talking about that.  I'm in no dispute.

5       Q.   My question is this:  What -- You've been

6   very active in accessibility issues and matters for a

7   number of years.  You had a conversation in 1986 or

8   '87, prior to the ADA, about the location of your seat

9   at the stadium if you're going to get this ten-year

10   license, correct?

11       A.   Correct.

12       Q.   All right.  You also stated that you

13   eventually sold your license, I think it was to the

14   gentleman behind you --

15       A.   Yes.

16       Q.   -- in 1994, because, to paraphrase, you were

17   frustrated with the hassle of trying to sit at the

18   stadium?

19       A.   Correct.

20       Q.   Excluding the conversation that -- the

21   initial conversation that you had in 1986 with the

22   person at Joe Robbie Stadium about your seating, did

23   you have any conversation subsequent to that with

24   anyone, any stadium personnel, about seating at the

25   stadium for yourself or other accessibility issues?

1    A.   I don't believe so.  Because from what I

2    could see, the only place wheelchairs could sit was in

3    the north end zone.

4    Q.   Okay.  Did you ever make any inquiries

5    about -- Strike that.

6    A.   I really wasn't an activist at all until

7    about 1997, '96.  I mean, when I was president of this

8    other organization, I was trying to help out some

9    people.  I wasn't -- It hadn't been my passport to

10   heaven, okay?  Now it is.

11   Q.   Well, I just find it interesting -- Strike

12   that.  That's not a question.

13        You said you had no other conversations after

14   that 1986 conversation about seating at the stadium.

15   The ADA was enacted.  The stadium is taking steps to

16   become accessible.

17        MR. CODY:  Objection, lack of predicate.

18        MR. SUKHDEO:  Okay, noted.

19   BY MR. SUKHDEO:

20   Q.   Are you aware of any steps or measures taken

21   by the stadium to make it more accessible subsequent

22   to the enactment of the ADA?

23   A.   None that I saw when I was actively going

24   there.

25        MR. SUKHDEO:  Off the record one second.  I'd

```
 1        A.    Yes.  I believe so, yes.

 2        Q.    Who did you have those conversations with?

 3        A.    The same man I spoke to who sold me the club

 4   seats in the Dolphin office -- what I considered the

 5   Dolphin/Joe Robbie office on Biscayne Boulevard.  If

 6   you're asking me at the stadium itself, did I ever

 7   discuss with any employee accessibility in terms of

 8   seating and so forth, I did not.

 9             MR. SUKHDEO:  Can you read the last part of

10   his response, please?

11             (Thereupon, the requested portion was read

12   back by the court reporter.)

13   BY MR. SUKHDEO:

14        Q.    Do you know who Andy Major is?

15        A.    I now know who Andy Major is.

16        Q.    Who is Andy Major?

17        A.    I don't remember, but I was looking through

18   the file and I saw his name as one of the people

19   involved with either the stadium corporation or the

20   Dolphins or the baseball team.  I'm not sure.  I know

21   Wayne Huizenga's name.  There's interrogatories in the

22   file with a list of names, and I've scanned that a

23   couple of times, and that's the only reason I know

24   that.  I don't know who is who.

25        Q.    Okay.  So you don't know what position he
```

1    holds or who he works for?

2       A.   Not really.

3       Q.   Are you aware of the accessibility policies

4    at Pro Player Stadium prior to your sale of your

5    ten-year license?

6       A.   Again, I'm not sure what you're asking me.

7       Q.   All right.  You said you sold your license

8    because of the hassles involved with getting access to

9    your seats at Pro Player Stadium.

10      A.   Correct.

11      Q.   Okay.  You also said that you had a

12   conversation in 1986, approximately, with someone

13   either from Joe Robbie or the Dolphins with respect to

14   the seating location --

15      A.   Uh-huh.

16      Q.   -- in the stadium concerning your season

17   tickets, correct?

18      A.   Correct.

19      Q.   Did you have any other discussions regarding

20   access to the stadium subsequent to that discussion?

21      A.   No.

22      Q.   So you had no discussions about access issues

23   with anyone from the stadium, the Dolphins or the

24   Marlins, subsequent to that 1986 conversation?

25      A.   Correct.

1    Q.   Okay.  Did you ever make any inquiries,

2    excluding the 1986 conversation, about accessibility

3    policies at the stadium, accessibility policies by the

4    Dolphins, accessibility policies by the Marlins?

5    A.   Yes.

6    Q.   Who did you make those inquiries to?

7    A.   Friends of mine who went to the stadium.

8    Q.   Did you direct those inquiries to any

9    personnel -- Excluding, of course, the 1986

10   conversation, did you direct any of those inquiries

11   towards personnel at the stadium, personnel at the

12   Dolphins or personnel at the Marlins?

13   A.   No.

14        MR. SUKHDEO:  I want to take a break one

15   second and get a couple of exhibits.

16        (Thereupon, a lunch recess was taken.)

17        MR. SUKHDEO:  Let's go back on the record.

18   We have just concluded our lunch break.  We've just

19   finished lunch, and I would like to get back to my

20   line of questioning.  I'd like to introduce

21   Defendants' first exhibit, which is a copy of the

22   complaint.

23        (Thereupon, Defendants' Exhibit 1 was marked

24   for Identification.)

25   BY MR. SUKHDEO:

51

```
 1        Q.   I would like to direct your attention to
 2   Paragraph 4 of the complaint, which has been marked as
 3   Defendants' Exhibit 1.  Would you please take a moment
 4   and read Paragraph 4?
 5        MR. CODY:  You mean out loud?
 6   BY MR. SUKHDEO:
 7        Q.   No, no, read it to yourself.
 8        A.   I read it yesterday.
 9        Q.   Okay.  Would you please describe in detail
10   the incident of alleged discrimination in May 2000
11   when you attempted to access a public accommodation at
12   Pro Player Stadium while attending a Marlins game?
13        A.   From the beginning?
14        Q.   From the beginning.
15        A.   Got to the stadium, knew where the gate was,
16   so I had no trouble there.  And there was, as I
17   recall, no handicapped parking places available, and I
18   had to give the van to the valet.  Met friends, went
19   inside, took the elevator up, got to the level that
20   our seats were on.  My wife -- I had people with me,
21   but we could not get seats all together.  So my seat
22   was a seat for two handicapped seating.  Again, if
23   you -- if you spot where the home plate was, I was
24   probably two yards up towards the first base line.
25        Very difficult to sit there.  It was not a
```

1    compliant seating area.  I had great difficulty

2    getting into it because of my power chair and the

3    turning radius.  When I got there and the game was on,

4    either I had to sit where my feet were off the

5    platform in front, to let people get behind me, who

6    wanted to go in the row, or I would pull back so that

7    my feet were, if they fell off my pedal, would be on

8    the platform, and then the people behind me --

9              MRS. RESNICK:  No, in front.

10             THE WITNESS:  In front of me couldn't get

11   in.  In other words, I spent the whole game -- No, not

12   the whole game.  I left in the seventh inning.  I

13   spent that part of the game doing nothing more than

14   constant going forward and going backward because it

15   wasn't deep enough.

16   BY MR. SUKHDEO:

17       Q.   Correct me if I'm wrong, but didn't you say

18   earlier that you had no formal training in ADA

19   compliance?

20       A.   Yes, I'm keying off the word "formal."  I

21   have no formal training.

22       Q.   So what is the basis for your statement that

23   the seating was not compliant?

24       A.   My basis is my knowledge of a requirement of

25   30 by 48 for wheelchair seating, and that was no 30 by

1        Q.   Do you know if the person who purchased the

2   tickets made any inquiries about other available

3   disabled seating?

4        A.   No.  I had said, when we were discussing

5   going to the game, that I liked to sit along the first

6   base line, and I had been told by some other people

7   that there were now some handicapped seating on what,

8   again, what I call sidelines as opposed to the end

9   zone.  The end zone would have been third base.  I

10  preferred to be on the first base.  I was told there

11  was some seating, and these are the tickets that were

12  purchased.

13       Q.   So it's correct to say that it was your

14  preference to sit in that location?

15       A.   I like to sit closer to first base, but yeah,

16  as opposed to the third base side, definitely my

17  preference.

18       Q.   You had mentioned that you had discussed with

19  certain people about your preference for seating

20  location.  Who did you have that discussion with?

21       A.   I told Steve.  I told Fred.  In conversations

22  with friends, I've always discussed that, when we

23  talked, where we like to sit if it's baseball or where

24  we like to sit if it's football.

25       Q.   Did you have any discussion about seating

1  this current lawsuit against South Florida Stadium
2  Corp., the Dolphins or the Marlins?
3      A.   I don't believe so, no.
4      Q.   Did you use any testers with respect to the
5  lawsuit that's been brought against the South Florida
6  Stadium Corp.?
7      A.   I was the tester.
8          If I can just say something?  I have fallen
9  in the pattern of using your word, "tester," which I
10  don't agree with, but I use it -- I say it to keep our
11  conversation going.  But in every instance, at least
12  in the last year now, there's got to be standing,
13  obviously, and discrimination has to be against
14  someone.  And usually, if it's -- For instance, if
15  it's a hotel that doesn't have any handicapped
16  accessible rooms and I want to go there, I don't
17  physically have to go there, because they're telling
18  me.  But in terms of a place that you have to
19  physically go to, as would be the stadium and lots of
20  other places, or a hotel that says, "Yes, we have
21  handicapped rooms," there's got to be standing
22  created, and I'm generally the person that creates the
23  standing.
24      Q.   Tell me this.  Do you know if Mr. Cody or Mr.
25  Shotz purchased the tickets for that May 2000 Marlins

1      game referenced in Paragraph 4 of the complaint?

2          A.   I believe one of them did.

3          Q.   Okay.  Do you have -- Or are you in the

4      possession of any documentary evidence, such as credit

5      card receipts or ticket stubs, that indicates who

6      actually purchased those tickets?

7          A.   I think I gave my tickets to Steve, Steve

8      Cody.  I think he has my tickets to the Marlins

9      against the Braves.

10             MR. SUKHDEO:  Okay.  Subject to whatever

11     objections that you may have, I would like to request

12     those ticket stubs or whatever the documentary

13     evidence is for attending.

14             MR. CODY:  I'll get you a copy of the ticket

15     stubs.

16     BY MR. SUKHDEO:

17         Q.   Okay.  I'd like to -- No, before we get

18     there.  To the best of your recollection, the person

19     who purchased the tickets would either be Mr. Cody or

20     Mr. Shotz?

21         A.   Correct.

22         Q.   Okay.  Do you know if either of those

23     gentlemen made any inquiries with respect to available

24     locations or choice of seating for the disabled when

25     purchasing those tickets?

1      Q.   Have you attended any other Marlins games or

2   major league baseball games at Pro Player Stadium in

3   addition to this game and the games you attended in

4   the first two seasons while you had season tickets?

5      A.   No.

6      Q.   Was it a 19 -- Sorry.  Strike that.  The

7   Marlins game referenced in Paragraph 4 of the

8   complaint, was that in the 1999 season or the 2000

9   season?

10     A.   2000.

11     Q.   Do you know the exact date of that game?

12     A.   No.  It will be on the ticket stubs.

13     Q.   Okay.

14     A.   It's in May, I know.

15     Q.   Do you know if -- Well, strike that.

16          Did you apprise Mr. Cody, Mr. Shotz, your

17   wife, or anyone -- Sorry.  Strike that.

18          Please refresh my recollection.  Who attended

19   that game with you?

20     A.   My wife, Steve Cody, Fred Shotz.

21     Q.   Did you inform any of those people of your

22   alleged disability discrimination?

23     A.   You mean after it?

24     Q.   Yes.

25     A.   Yes.

1    remember.

2        Q.   Was it the Dolphins versus the Jets?

3        A.   I don't think so.

4        Q.   Do you know if that game --

5        A.   If the Dolphins played Kansas City that

6    month, there's a thought in my mind that that was the

7    game.

8        Q.   Do you know if that game was sold out?

9        A.   That's what we were told, sold out in terms

10   of wheelchair seats.  And I would think, in the

11   technical way that you're using, that it probably was,

12   because I think the games through November were on

13   television, which meant that they were sold out, but

14   I'm not positive.

15       Q.   Who attempted to purchase the tickets

16   referenced in Paragraph 4 of the complaint?

17       A.   Again, it's either Steve or Fred.

18       Q.   So you don't actually know what their attempt

19   consisted of?

20       A.   No.

21       Q.   You don't know whether they asked if there

22   were other available disabled seating?

23       A.   No.  They clearly told us that all the

24   handicapped seating was sold out.

25       Q.   Do you know if they had -- if they had found

```
 1    out if there was available nondisabled seating?
 2         A.    No, I do not know that.
 3         Q.    Do you know who made the attempt?  Steve
 4    Cody --
 5         A.    That, I don't know.
 6         Q.    -- or Fred Shotz?
 7         A.    I don't remember.
 8         Q.    Did you contact anyone in personnel of the
 9    stadium, or of the Dolphins, with respect to getting
10    seating for that game?
11         A.    No.  Did I try to pull strings?  No.
12         Q.    No, that wasn't my question.  My question
13    was, did you take any affirmative steps to get tickets
14    for that game, as referenced in Paragraph 4 of the
15    complaint?
16         A.    They were taking affirmative steps for me, as
17    far as I was concerned.
18         Q.    They being Steve Cody or Fred Shotz?
19         A.    Or Fred Shotz.  I will pass off every
20    telephone call I don't have to make.  I hate the
21    telephone, and if I can get somebody else to call for
22    me, I'm going to do it every time.
23         Q.    What is the -- So what I want to know is,
24    what is the basis of your allegation of discrimination
25    referenced here in Paragraph 4 of the complaint?
```

1          Q.    Do you know how many disabled seats there are

2     at Pro Player Stadium?

3          A.    Well, let's put it this way:   No, I don't.

4     But I do know that under the code, for football, it

5     would be something like 750, and there's nowhere near

6     that.   And for baseball, there would be something

7     close to 500 or 400 and something, and there's nothing

8     near that.

9          Q.    How do you know that?

10         A.    Eyes, my eyes.

11         Q.    But you haven't spoken with anyone at Pro

12    Player Stadium, or any members of the Dolphins or the

13    Marlins, correct?

14         A.    Correct.

15         Q.    So the basis for your statement is your

16    visual --

17         A.    My --

18         Q.    -- accuracy -- Let me finish my statement.

19         A.    Sorry.

20         Q.    The basis of your statement is just your

21    visual perusal while you were a patron at a game in

22    Pro Player Stadium, correct?

23         A.    Not totally.

24         Q.    What else does it consist of?

25         A.    It consists of my knowledge that the person

1   they're required to do something as a matter of law.

2   You never get their attention in a meaningful way

3   until that happens.

4       Q.   Do you know the last time that Julie Shaw

5   inspected Pro Player Stadium?

6       A.   I have no idea.

7       Q.   Okay.  How do you know -- How many disabled

8   parking spots are at Pro Player Stadium?

9       A.   Not enough for use.  I don't -- Other than

10  the complaint, I never knew how many they might be

11  short of compliance.  Because, frankly, the ADA code

12  is a national code, and it really doesn't apply to

13  South Florida.  It's too low.

14      Q.   Let me ask you another question.  Do you know

15  where this location for wheelchair seatings are at Pro

16  Player Stadium?

17      A.   Well, again, if we're talking football, it's

18  the end zone, and there's some of these seats that I

19  was in for the Marlins game along the sidelines.

20      Q.   Let me rephrase the question.  Do you know

21  where all of the locations for wheelchair seating are

22  at Pro Player Stadium?

23      A.   No, I do not.

24      Q.   So how do you know that it's not in

25  compliance?  How do you know that Pro Player is not in

1    working to become an ADA expert, but I don't -- He

2    knows what he needs to know to give you a

3    pre-inspection, prelitigation inspection.

4        Q.    Prior to filing this lawsuit, did you bring

5    any of these allegations or any of these alleged

6    problems with accessibility to the attention of

7    anybody at Pro Player Stadium, the Dolphins or the

8    Marlins?

9        A.    No.

10       Q.    Why not?

11       A.    Number one, I legally don't need to.  Number

12   two, I never do anymore.  It a senseless, useless

13   act.  I mean, I don't want people to pat me on the

14   shoulder and pat me on the head and tell me they're

15   going to take care of this.  They're not.  They're

16   never going to take care of what they should take care

17   of out there, as a lot of places should, until they're

18   in court.  And then there comes a moment when they

19   realize I am an exceedingly reasonable person, and

20   there can be an understanding and agreement under

21   readily achievable, and that's why most of our --

22   almost all our cases resolve themselves in agreements

23   between the parties with stipulations.

24       Q.    Is it accurate to say that you have no

25   personal experience to suggest -- Let me rephrase.

```
 1        A.    Right.
 2        Q.    In addition to those, I'd like you to
 3   describe in detail what you allege to be disability
 4   discrimination you suffered at Pro Player Stadium with
 5   respect to any other events attended there.  So say if
 6   you had gone to a concert and you suffered, tell me
 7   about it.
 8        A.    I got it.  Every football game I went to and
 9   every baseball game I went to, from whenever you want
10   to decide the ADA kicked in until I sold my club
11   seats, I was discriminated against every single time.
12        Q.    Okay.  So you sold your tickets in 1996,
13   correct -- '94?
14        A.    I think so, yeah.
15        Q.    In '94, after you sold the tickets, when is
16   the next event that you attended at Pro Player
17   Stadium?
18        A.    Not until May of whatever is in the
19   complaint.  I always get confused.  '99 -- 2000.
20        Q.    I think we've already, correct me if I'm
21   wrong --
22        A.    No, there's a time period -- When I sold my
23   club seats, I never went back there until when I'm
24   telling you, the times that I went back, and I told
25   you why I went back.
```

```
 1        Q.    Okay.  What I'm getting at is this.  It's

 2   accurate to say that you've been involved in ADA and

 3   accessible issues for a number of years.  You are

 4   currently the president of Access Now.  You were the

 5   president of the Association for the Disabled, and

 6   prior to that, when you were retired, you were

 7   involved in those issues, correct?

 8        A.    Yes.

 9        Q.    You said that you sold your seats in 1994?

10        A.    Yes.

11        Q.    And you suffered discrimination during the

12   whole period that you had the seats, correct?

13        A.    Yes.

14        Q.    Why did you bring the lawsuit in 2000?

15        A.    Didn't get to it until then.  It wasn't until

16   sometime in '98 or '99 that I was told that certain

17   things were done, that there was some seating

18   available, as I said before, along the sidelines.

19            And this is straying off, but I'm not capable

20   of doing everything I'm told about.  Even if I wanted

21   to, I don't have the time.  We don't have enough

22   people.  We don't have enough money.

23            We are -- It has nothing to do with your

24   case, but Access Now now is involved in and settled

25   with over 700 hospitals in the United States of
```

1    is, does the ADAAG standards apply to a pre-'88 public

2    accommodation, such as Pro Player Stadium?

3         MR. CODY:  Same objection.

4         THE WITNESS:  And now you're going to get a

5    lawyer's answer, okay?  Technically, no, because they

6    are a new construction standard or new construction

7    alteration.  However, anything built prior to the ADA

8    comes under readily achievable, and they are supposed

9    to where it's readily achievable, and that doesn't end

10   because they do it once.  It's supposed to be

11   year-by-year items to achieve, if it's readily

12   achievable, in my mind, to what is as close to the new

13   construction standard as you can get.

14        For instance, we just had a settlement on a

15   class action with Carnival Cruise Lines.  They have

16   ships that were built prior to the ADA and after the

17   ADA.  Is there an ADAAG that applies clearly?  No.

18   That didn't stop us from approaching it by breaking it

19   down and seeing what's a hotel room supposed to look

20   like.  So the real discussion is readily achievable

21   barrier removal, and that's what I'm applying here.

22   BY MR. SUKHDEO:

23        Q.   Are you aware of the barrier removal --

24   Strike that.

25        Are you aware of the efforts that Pro Player

```
 1    Stadium has taken to barrier removal at the stadium?
 2        A.    Only what I can see.  Obviously, there may be
 3    things I don't see.
 4        Q.    Okay.  Let's -- I'd like to move on.
 5        A.    I mean, I never had anyone give us a report
 6    of, since it went into effect, what's been done and
 7    how much money has been spent.
 8        Q.    Is a report required --
 9        A.    No.
10        Q.    -- by the statute?
11        A.    No.  But nobody has ever tried to make an
12    attempt -- has made an attempt to try to show me your
13    client, in good faith and goodwill, is complying with
14    this law.
15        Q.    Isn't it true, though, that you have never
16    contacted our clients?  You've never contacted --
17        A.    I got your clients' attention the day we
18    filed the lawsuit.
19        Q.    I understand.  Can I finish my question for
20    purposes of the record?
21        A.    Yes.
22        Q.    Isn't it true, though, that you have never
23    contacted our clients, Pro Player Stadium, the
24    Dolphins or the Marlins, with respect to any issues or
25    concerns that you may have had regarding
```

```
 1    something exciting happens, people stand up.  People
 2    start going in and out when they drink a lot of beer
 3    or get a lot of things, a lot of movement.
 4        Q.   What are the line-of-sight requirements --
 5    The Marlins game that your referenced, is that the
 6    Marlins game in Paragraph 4 of the complaint?
 7        A.   Yes.
 8        Q.   When you sold your tickets, your season
 9    tickets --
10        A.   Yes.
11        Q.   -- was it in 1994?
12        A.   Yes.
13        Q.   How many events or games at the stadium have
14    you attended since then?
15        A.   Since then?
16        Q.   Since the sale, since the sale of your season
17    tickets in 1994, how many games or events have you
18    attended at Pro Player Stadium?
19        A.   Only one.  I went to the Marlins baseball
20    game.
21        Q.   Are you telling me, then, that your statement
22    that the stadium is not compliant with the ADA's
23    accessibility requirements is based on your visual
24    inspection of the stadium while you were a patron at
25    that game?
```

1     A.    Primarily, yes.

2     Q.    Okay.  When you attended the game in May of

3   2000, referenced in Paragraph 4 of the complaint, did

4   you go to the picnic area?

5     A.    I don't believe so.

6     Q.    Did you go to the -- Strike that.  One

7   second.

8           When you attended the game referenced in

9   Paragraph 4 of the complaint, did you go to the food

10   service areas at club seating, as described in

11   Paragraph 21, Subsection (i) of the complaint?

12     A.    No.

13     Q.    Okay.  When you attended the game, as

14   described in Paragraph 4 of the complaint, did you

15   visit or dine at the food service area at the sky box

16   areas of the stadium, as described in Paragraph 21,

17   Subsection (i) of the complaint?

18     A.    No.

19     Q.    When you were at the game described in

20   Paragraph 4 of the complaint, did you go to any of the

21   public rest rooms?

22     A.    Yes.

23     Q.    All right.  Were the allegations in Paragraph

24   21, Subsection (iii) of the complaint based on your

25   visit of the rest rooms during the game that you

1      Q.   But prior to you selling your tickets in

2   1994, you only had one seating location, correct?

3      A.   Correct.

4      Q.   All right.  And the other seating location

5   you had at the game in May 2000?

6      A.   Right.

7      Q.   So you've had only two vantage points --

8      A.   Correct.

9      Q.   -- from which you've done a visual inspection

10  of what you're making -- from which you're basing this

11  allegation, correct?

12     A.   Yes.

13     Q.   Okay.  Let me take you to Paragraph 14,

14  please.

15     A.   Okay.

16     Q.   What is the basis for your allegations in

17  Paragraph 14 of the complaint?

18     A.   Well, the exact numbers are not mine.  I know

19  the stadium contains approximately 75,000 seats in

20  football, and the numbers for baseball.  The others

21  are not -- Those are -- Well, those are based on

22  running the code, basically.

23     Q.   Where did you get the numbers from, if

24  they're not from you?  Strike that.

25          The numbers alleged in Paragraph 14 of the

108

1   A.   It's easier to check a football or baseball

2   stadium than it is to check the Marriott Dadeland, for

3   instance.

4   Q.   So tell me this.  With respect to football,

5   since you mentioned football, you haven't attended a

6   football game at Pro Player Stadium since 1994 when

7   you sold your season tickets?

8   A.   Correct.

9   Q.   Okay.  How do you know that there are

10   line-of-sight problems at Pro Player Stadium with

11   respect to wheelchair seating during Dolphin games?

12   A.   The seating has got to be basically the same

13   as it's always been, with the exception that the

14   stadium has added some seats along, again, what I call

15   the sidelines.

16   Q.   But --

17   A.   And if they're the way -- They got to be.  I

18   mean, it's a concrete thing.  And it was what I saw

19   when I went to the Marlin game.

20   Q.   Isn't the configuration of the field

21   different during a football game as opposed to a

22   baseball game?

23   A.   Absolutely.

24   Q.   So the line of sight would necessarily be

25   different at a football game as opposed to a baseball

```
 1    game?

 2        A.    Absolutely.

 3        Q.    So you haven't attended a football game at

 4    Pro Player Stadium since 1994?

 5        A.    Correct.

 6        Q.    So you have no basis, really, to know if

 7    there are line-of-sight problems at a football game at

 8    Pro Player Stadium currently?

 9        A.    All right.  Let me answer it this way.  I

10    believe there are.  Sure, it's an allegation.  It's

11    subject to proof.

12        Q.    Do you know if Bill Cody did his

13    prelitigation investigation during a baseball game,

14    football game, or some other event at Pro Player

15    Stadium?

16        A.    I'm not sure.

17        Q.    So it's possible that he didn't do it at

18    either a baseball or a football game?

19        A.    I don't think he would get access to the

20    stadium if there wasn't an event going on.

21        Q.    No, but it could have been like a concert.

22    It didn't have to be a football or baseball game?

23            MR. CODY:  Objection, calls for speculation.

24    BY MR. SUKHDEO:

25        Q.    It's okay.  You can answer the question.
```

```
 1        A.    I don't know.  I don't know.

 2        Q.    Okay.  Is there any way to be certain that

 3   Bill Cody did not speak with Fred Shotz?

 4        A.    I can't be certain.

 5        Q.    Where do you think that Bill Cody obtained

 6   the number for total seats, as referenced in the

 7   complaint?

 8        A.    I have no idea.

 9             MR. CODY:  Off the record.

10             (Discussion off the record.)

11             MR. SUKHDEO:  We can go back on the record.

12   BY MR. SUKHDEO:

13        Q.    Have you ever made any inquiries about the

14   different seating locations available to the disabled

15   at Pro Player Stadium?

16        A.    No.  I've been told by people I know, but I

17   haven't made any inquiries to anybody that works at

18   these three entities.

19        Q.    Have you ever made a request for information

20   from Pro Player Stadium, or the Dolphins or the

21   Marlins, with respect to the steps they've taken to

22   make the stadium more accessible?

23        A.    No.

24        Q.    Why not?

25        A.    Because from what I see, I'm not satisfied.
```

```
 1    BY MR. SUKHDEO:
 2        Q.    With the concession stands.
 3        A.    I think there were one or two.  But overall,
 4    it was compliant, and I'll even say it looked very
 5    good.
 6        Q.    And also, just to clarify, you didn't try or
 7    attempt to buy anything at those concession stands,
 8    correct?
 9        A.    No.  I had my servants with me.
10        Q.    That's good.  Let me direct your attention to
11    Paragraph 20 of the complaint, on Page 6.
12        A.    6?
13        Q.    Uh-huh.  Take a moment and just familiarize
14    yourself with it.
15        A.    Okay.
16        Q.    What is the basis for your allegations in
17    Paragraph 20 of the complaint?
18        A.    Bill Cody.
19        Q.    You never actually counted any parking
20    spaces, did you?
21        A.    No, no.
22        Q.    And I think you told me that when you
23    attended that game in May 2000, while you didn't have
24    parking, you were able to give it to the valet?
25        A.    Yes.
```

1    were there, I believe.

2         Q.    Okay.  I'd like to direct your attention to

3    Paragraph 21, Subsection Roman numeral (iii).  If you

4    can take a look at that and tell me what the basis is

5    for your allegations?

6              MR. CODY:  Asked and answered.

7              MR. SUKHDEO:  I understand.  I'm just doing

8    it for uniformity sake.

9              THE WITNESS:  You want me to do it again?

10   BY MR. SUKHDEO:

11        Q.    Yes, please.

12        A.    When I say yes, it means I observed.  I

13   observed A.  I don't know about B.  I observed C.  I

14   don't know about D.  I don't know about E, in the

15   sense that I don't remember.  I don't know about F.

16   And I don't know about G.

17        Q.    Okay.  With respect to C, the one that you

18   observed --

19        A.    Yes.

20        Q.    -- did you observe that at the time that you

21   visited the rest room, the public rest room, at the

22   game you attended in May 2000?

23        A.    Yes.

24        Q.    Do you know where that rest room is located?

25        A.    Yeah.  All the rest rooms, to my knowledge,

1     Q.   All right.  Let me get that clear for the

2  record.

3     A.   Okay.

4     Q.   So when you attended the Marlins game in May

5  2000, as referenced in Paragraph 4 of the complaint,

6  you only visited one rest room?

7     A.   Correct.

8     Q.   That was the rest room we have just talked

9  about?

10     A.   Correct.

11     Q.   The other rest rooms that you're basing

12  allegations on were rest rooms that you visited at Pro

13  Player Stadium in 1993 or earlier?

14     A.   Only on the club level.  Anything else

15  identified was done by Bill Cody.

16     Q.   Okay.  During the May 2000 game that you

17  attended for the Marlins, I think you stated that you

18  sent your wife to the club level to check on the

19  accessibility of the food service areas, correct?

20     A.   Yes.

21     Q.   How did your wife get access if she did not

22  have a ticket for that area?

23     A.   I don't know.

24     Q.   Did she tell you?

25     A.   I don't know that she did.  I just seem to

1     A.    If I was able to really go back like this,
2  yeah, but I would see it, you know, down at the --
3  more like the other end.  I'm not going to see it
4  behind me.
5     Q.    Okay.  All right.
6     A.    And where I was, I really wasn't in a
7  position to turn around.
8     Q.    Okay.  I understand.  All right.  Let me ask
9  you, is it your testimony that when you were in that
10  seat for the May 2000 Marlins game referenced in
11  Paragraph 4 of the complaint, that you had a
12  line-of-sight problem?
13     A.    I only had a line-of-sight problem when
14  people would stand up from that seat.
15     Q.    Okay.  We'll get through this section
16  quickly.
17        How many ADA or disability access compliance
18  lawsuits has Access Now filed or has been filed on its
19  behalf since its inception in 1997?
20     A.    Are we talking about anywhere?
21     Q.    Anywhere.
22     A.    I would guess over 300.  Nobody has made me,
23  lately, in the last year, run a total.
24     Q.    Okay.  Good enough.  How many ADA or
25  disability access lawsuits has Access Now been a party

1   to since its inception?

2       A.   Same number.

3       Q.   Same number, okay.  How many ADA or

4   disability access lawsuits have you personally filed

5   or been filed on your behalf?

6       A.   Well, you want me to go before Access Now?

7       Q.   Sure.

8       A.   Well, almost every Access Now case.  Maybe 10

9   I wasn't, or 20 I wasn't.  And prior to that, I don't

10  know.  Fifty, I'm guessing.

11      Q.   Okay.  Let me ask you this last question.

12  How many ADA or disability access compliance lawsuits

13  have you been a party to?

14      A.   Well, the total of those numbers.

15      Q.   Okay.

16      A.   Which is probably -- Well, the total is close

17  to 300.

18      Q.   Okay.  Do you have any personal knowledge

19  that Pro Player Stadium is not in compliance with ADA

20  requirements for a pre-ADA public facility with regard

21  to dispersal of wheelchair seating?

22      A.   Wait.  You're asking me pre-1988?

23      Q.   No.  Let me read the question again.  Do you

24  have any personal knowledge that Pro Player Stadium is

25  not in compliance with the ADA requirements for a

```
 1    pre-ADA public accommodation regarding the dispersal

 2    of wheelchair seating?

 3            MR. CODY:  Objection on the basis that it

 4    asks for a legal conclusion, but go ahead.

 5            THE WITNESS:  I wouldn't know.  I wouldn't

 6    know.

 7    BY MR. SUKHDEO:

 8        Q.   Okay.  All right.  Based on your experience

 9    with ADA, what do you believe the dispersal of seating

10    means?

11        A.   Are we talking about something that was built

12    before or during?

13        Q.   Something built prior -- public accommodation

14    built prior to the ADA.  I'll make it more specific.

15    A stadium built prior to the ADA.

16        A.   Right.  Let me put it this way.  If it was

17    built during the ADA, I would think there should be,

18    in a stadium, total dispersal, so that I have access

19    to buy tickets in virtually every section of the

20    stadium where I want to be.  That's what I think.

21            Now, in a prior -- in a building built

22    prior -- this is a nonanswer -- I would say as many

23    choices of areas as is readily achievable, and I can

24    only do that by going from case to case.

25        Q.   Okay.
```

1      A.   Which has a lot to do with technical

2   feasibility, money available, is it a money-making and

3   how much money does it make, or is it failing, like

4   Hialeah Race Track.  I mean, my standard for Hialeah

5   Race Track is different than my standard, let's say,

6   for Gulfstream Race Track.  And that's the only way I

7   can answer.

8      Q.   Okay.  Let me ask you this question.  Did Mr.

9   Shotz ever give you or show you any documents relating

10  to Pro Player Stadium?

11     A.   Absolutely not.

12     Q.   You said that Fred Shotz had general

13  discussions with you after the May 2000 baseball

14  game --

15     A.   Uh-huh.

16     Q.   -- about your alleged access problems --

17     A.   Uh-huh.

18     Q.   -- at the stadium?  How soon after that May

19  2000 game did you have those discussions with Mr.

20  Shotz?

21     A.   Oh, within the next couple of months.  It's

22  hard to remember, because he's in and out of town so

23  much, for long periods of time.

24     Q.   Okay.  How long after those conversations was

25  this lawsuit filed?

```
 1        A.    I'm cheating on you.  I don't even know when

 2   the lawsuit was filed.  Well, the conversation would

 3   have taken place within a few months, and the lawsuit

 4   is dated June of 2000.

 5        Q.    So pretty soon thereafter?

 6        A.    Uh-huh.

 7        Q.    Okay.  Did those conversations in any way

 8   prompt you to bring this lawsuit?

 9        A.    Not in the least.

10        Q.    I think that, and correct me if I'm wrong,

11   that you stated that Mr. Shotz had said that -- Strike

12   that.

13             Do you know where the disabled parking spaces

14   are located at Pro Player Stadium?

15        A.    Yes.

16        Q.    Where are they located?

17        A.    Well, again, it's on the south side of the

18   stadium, and it's that rather -- that area that I

19   would say the middle of which sort of lines up with

20   the entrance gate where disabled people are supposed

21   to go.

22        Q.    Are you saying that's the only area for

23   disabled parking?

24        A.    I've never really been on the other side of

25   the stadium.
```

1      Q.    Do you know how many areas there are for
2   disabled parking at the stadium?
3      A.    No, I don't.
4      Q.    Okay.  The Marlins game that you attended in
5   May 2000, as referenced in Paragraph 4 of the
6   complaint, you stated that you couldn't find parking,
7   so you gave your van to the valet?
8      A.    Yes.
9      Q.    Did you notice if nondisabled patrons were
10  also giving their vehicles to the valet for parking?
11     A.    Sure.
12     Q.    Did we discuss this?  Do you know if the
13  game, the May 2000 Marlins game, was sold out?
14     A.    It was not.
15     Q.    It was not sold out?
16     A.    No.
17     Q.    And who were they playing?  The Braves?
18     A.    The Braves.
19     Q.    Are you sure that it wasn't sold out?
20     A.    I'm sure.  Lots of empty seats, even for the
21  Braves.
22     Q.    But you didn't purchase the tickets, though?
23     A.    No.
24     Q.    It was either Steve Cody or Fred Shotz?
25     A.    Correct.

```
 1        Q.   And do you know if the seats that you got

 2   were the only available -- Strike that.

 3            Do you know that the seats that you sat in at

 4   the game, the May 2000 game between the Marlins and

 5   the Braves, were those the only available disabled

 6   seating for that game?

 7        A.   No.  I had made a specific request that if

 8   there was a seat on the first base line, down the

 9   first base line, that I would like to sit as -- I

10   think I said as close to the first base as I could,

11   but I would -- My preference was to sit between home

12   plate and first base.

13        Q.   Okay.  So there very well could have been

14   other choices for you?

15        A.   Yes.

16            MR. CODY:  Objection, calls for speculation.

17            MR. SUKHDEO:  Okay.  He answered.

18   BY MR. SUKHDEO:

19        Q.   Do you know how many disabled parking spaces

20   there were at the gate you entered at in May 2000?

21        A.   No.

22        Q.   Were Fred Shotz and Steve Cody sitting

23   together at the May 2000 game?

24        A.   Yes.

25        Q.   I think you testified that there was no
```

136

```
 1   Now with a disability, as defined by the ADA, who has
 2   attended or attempted to attend a professional
 3   football game at Pro Player Stadium.
 4        A.   Same answer.  I'm not able to answer that.
 5        Q.   Excluding yourself, please identify each and
 6   every member, employee, officer, agent, shareholder,
 7   director, trustee of Access Now with a disability, as
 8   defined by the ADA, who is a season ticket holder for
 9   the Dolphins.
10        A.   I'm not able to answer that.
11        Q.   Okay.  Are you aware of any member or
12   director or officer or employee of Access Now that has
13   attended an event at Pro Player Stadium and suffered
14   disability discrimination, other than yourself?
15        A.   I have to answer you this way.  The reason I
16   am the plaintiff in so many cases is that, generally
17   speaking, most disabled people do not want to be in
18   front of people like you or judges or have
19   interrogatories, and they give me their information
20   based on my promise of anonymity, and I'm not going to
21   break that.  And so if all of this ends up just on me,
22   so be it.
23        Q.   Okay.  I just would like to say for the
24   record, there are a lot of people who don't want to be
25   before me.
```

1       Q.    I only have a few more questions.

2       A.    Okay.

3       Q.    I direct you to Paragraph 39 of the

4   complaint, which is on Page 10.

5       A.    Okay.

6       Q.    What's the basis for that allegation?

7       A.    The basis for that allegation is I believe

8   they're readily achievable and technically feasible.

9   And if they aren't technically feasible, we will find

10   out during the course of this litigation.

11       Q.    All right.  But it's based, then, on your

12   subjective belief?

13       A.    Yes.

14            MR. SUKHDEO:   Okay.  I'd like to introduce

15   Defendants' Exhibit 2, which is your responses to our

16   first set of interrogatories.

17            (Thereupon, Defendants' Exhibit 2 was marked

18   for Identification.)

19   BY MR. SUKHDEO:

20       Q.    I'd like to ask you first, is that your

21   signature on the last page?

22       A.    Yes, sir.

23       Q.    Okay.  So then you read these responses and

24   answered, correct?

25       A.    Yes.

```
 1        Q.    Okay.  I think earlier I had asked you if you

 2   knew who Andy Major was?

 3        A.    Uh-huh.

 4        Q.    And your response was that you became aware

 5   of him to the extent that you saw his name in your

 6   responses to interrogatories, correct?

 7        A.    Correct.

 8        Q.    All right.  How did you become aware of Andy

 9   Major?

10        A.    Last night.

11        Q.    Last night?

12        A.    When I read this.

13        Q.    Okay.  Take a look at Page Number 3, the last

14   bullet point on that page right before Paragraph 3.

15   Can you read that into the record?

16        A.    Are you talking about, "Representatives of

17   Miami Dolphins"?

18        Q.    No.  I'm on Page 4.  I'm sorry.  Page 4, the

19   last bullet point.

20        A.    On mine -- Okay.

21        Q.    Is that the same?

22        A.    These pages are not numbered.

23        Q.    Yes, they are not numbered.

24        A.    "Andy Major is expected to testify concerning

25   services provided to persons with disabilities at Pro
```

1    Player Stadium."

2        Q.    You read these responses before you signed

3    them, correct?

4        A.    Yes.

5        Q.    Okay.  But you're unaware of what Mr. Major's

6    job is?

7        A.    I didn't remember --

8        Q.    Okay.

9        A.    -- from last night.

10       Q.    Okay.  Did you prepare these responses, or

11   were these responses prepared by your attorney?

12       A.    My attorney.

13       Q.    Did you review these responses before you

14   signed the interrogatories?

15       A.    Yes.

16       Q.    Okay.  When did you review them?

17       A.    Sometime prior to -- Well, probably the day I

18   signed them.

19       Q.    Exactly.  Was the first time that you

20   actually read these interrogatory responses yesterday,

21   in preparation of this deposition?

22       A.    No, no.  I read it back when I signed it.

23   And frankly, when I looked at it last night, it's

24   almost as though I'm reading it for the first time,

25   because I've read too many of these, and I don't

```
1    remember them.

2        Q.   Do you know who Andy Major works for?

3        A.   I know now.

4        Q.   Who does he work for?

5        A.   That's a good question.  I think the Dolphins

6    or the stadium.  Let me see.  I don't see it.  Well, I

7    assume he's in charge of ADA compliance and

8    accessibility compliance in the stadium.

9        Q.   Do you have any personal knowledge with

10   respect to the responses that you signed here?

11       A.   What do you mean by personal knowledge?

12       Q.   Do you --

13       A.   Do I, in and of myself, know that they're

14   accurate and true?

15       Q.   No, do you have any personal knowledge, for

16   instance, why Mr. Andy Major was listed as a witness

17   in response to Interrogatory Number 1?

18       A.   Obviously, these are the people that my

19   attorney listed as to whom -- to who would be called.

20       Q.   Do you have any knowledge that these

21   responses are true and correct?

22       A.   My knowledge is my reliance on my lawyer.

23       Q.   Okay.  Would you be surprised to know that

24   Mr. Major is in charge of ADA compliance at the

25   stadium?
```

```
 1         A.    No, I wouldn't be surprised.

 2         Q.    Would you be surprised that Mr. Major takes

 3    inquiries from members of the public regarding issues

 4    on accessibility at the stadium?

 5         A.    I would assume that's his job.

 6         Q.    Do you think that if -- Do you think it would

 7    be appropriate if you had a -- No, strike that.

 8               A person having -- A person with a disability

 9    having issues of concerns about accessibility at a

10    public accommodation -- Strike that.

11               You think it's reasonable for a public

12    accommodation to have a person designated to address

13    the public's concerns about accessibility issues and

14    concerns?

15         A.    Depending upon the size of that public

16    accommodation.

17         Q.    Well, a public accommodation the size of Pro

18    Player Stadium?

19         A.    Absolutely.

20         Q.    Don't you think it's reasonable that somebody

21    with disability concerns would address those concerns

22    to the person designated to handle those concerns?

23               MR. CODY:  Objection, argumentative.

24    BY MR. SUKHDEO:

25         Q.    Answer, please.  Objection is noted.
```

1      A.   My experience tells me if you're talking

2    about simple things that cost very little money to

3    make an adjustment, the answer would be yes.  If

4    you're really talking about an expenditure of funds, I

5    find that a total waste of time, because whoever is in

6    charge of ADA in any hotel or hospital or group is the

7    low person on the totum pole.  They don't make the

8    decisions.  They make recommendations.  And I'm sure

9    this man knows his business.  I'm assuming he knows

10   his business, but he's not the person that decides

11   what kind of monies are going to be spent.

12      Q.   How do you know that?  How do you know that

13   Mr. Major isn't the person who decides what kind of

14   money will be spent on the stadium regarding

15   accessibility?

16      A.   Because he wouldn't have this job if he was

17   the person that had this authority.

18      Q.   Isn't it true that you don't even know what

19   his job is?  Isn't it true that you don't know what

20   his job responsibilities include?

21      A.   It is my experience that I've never had, in

22   all the lawsuits that we have filed and dealt with,

23   the person who makes the judgment on the expenditure

24   of money present at a deposition, and I only go by

25   what I know.

1    Q.   Isn't it true that you do not know what Mr.

2    Major's job responsibilities are?

3    A.   I have no idea.

4    Q.   Okay.  Have you ever spoken to Mr. Andy

5    Major?

6    A.   No.

7         MR. SUKHDEO:  I would like to take a short

8    recess and hopefully conclude this deposition.

9         THE WITNESS:  All right.

10        (Thereupon, a recess was taken.)

11   BY MR. SUKHDEO:

12   Q.   Okay.  I just have a few more questions, and

13   we're going to wrap this thing up.  All right, Mr.

14   Resnick?

15   A.   Yes.

16   Q.   Is it correct that you are a licensed

17   attorney in the State of Florida?

18   A.   Correct.

19   Q.   What kind of law did you practice before you

20   retired?

21   A.   I was on the other side.  I represented

22   banks, savings and loans.  I represented developers,

23   primarily in condominium developments, Century

24   Village, things like that.

25   Q.   Did you do litigation?

# EXHIBIT "G"

MI635060:1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 00-2261-CIV-MOORE
Magistrate Judge O'Sullivan

ACCESS NOW, INC. and
EDWARD RESNICK,

      Plaintiffs,

v.

SOUTH FLORIDA STADIUM
CORPORATION, a Florida corporation,
MIAMI DOLPHINS, LTD., a Florida
limited partnership, and FLORIDA
MARLINS BASEBALL CLUB, L.L.C.,
a Florida limited liability company,

      Defendants.

_____/

## DEFENDANTS' FIRST REQUEST FOR ADMISSIONS

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, the Defendants requests that the

Plaintiffs admit to the truth of the statements or application of law to facts which follow:

*PLEASE RESPOND BY ANSWERING ON THIS DOCUMENT*

*(IF ANY ANSWER NEEDS TO BE QUALIFIED, PLEASE LIST THE NUMBER OF*

*THE REQUEST AND SET FORTH ANY QUALIFICATION TO YOUR ANSWER)*

MI526657:1

| | **SOURCE** | **SUBJECT OF REQUEST** | **ADMIT** | **DENY** |
|---|---|---|---|---|
| 1. | | Admit that the property identified in paragraph 4 of the Complaint is not governed by the new construction guidelines as set forth in the Americans with Disabilities Act Accessibility Guidelines (ADAAG). | [  ] | [  ] |
| 2. | | Admit that the property identified in paragraph 4 of the Complaint was built prior to 1992. | [  ] | [  ] |
| 3. | | Admit that the appropriate standard for determining whether any modifications will be made to the property identified in paragraph 4 of the Complaint is the readily achievable standard, i.e., easily accomplishable and able to be carried out without much difficulty or expense. | [  ] | [  ] |
| 4. | | Admit there are no definitive regulations under the ADA that govern properties built prior to 1992. | [  ] | [  ] |
| 5. | | Admit that the Plaintiff made no effort to contact the owner, operator or ADA Coordinator of the property identified in paragraph 4 of the Complaint regarding the alleged ADA noncompliance prior to filing this lawsuit. | [  ] | [  ] |
| 6. | | Admit that it is an undue hardship to make the seating modifications specified in the Complaint. | [  ] | [  ] |
| 7. | | Admit that the Picnic Area at Pro Player Stadium as described in paragraph 21(i) of the Complaint is accessible to individuals with disabilities. | [  ] | [  ] |

MI526657;1

2

| | SOURCE | SUBJECT OF REQUEST | ADMIT | DENY |
|---|---|---|---|---|
| 8. | | Admit that wheelchair accessible seating at Pro Player Stadium is integrated, located in various places with various lines of sight and various price categories. | [  ] | [  ] |
| 9. | | Admit that Pro Player Stadium has an ADA Coordinator who assists disabled patrons with disability related issues and concerns regarding events held at the Stadium. | [  ] | [  ] |
| 10. | | Admit that Mr. Resnick only attended one Florida Marlins baseball game at Pro Player Stadium during the 2000 season. | [  ] | [  ] |
| 11. | | Admit that Mr. Resnick only attended one Dolphins' football game at Pro Player Stadium during the 2000 season. | [  ] | [  ] |
| 12. | | Admit that neither Mr. Resnick nor Access Now, Inc. are now (or ever have been) season ticket holders to either the Florida Marlins or the Miami Dolphins. | [  ] | [  ] |
| 13. | | Admit that Pro Player Stadium has designated the number of disabled parking spaces as required by the ADA. | [  ] | [  ] |
| 14. | | Admit that Pro Player Stadium has entrance(s) accessible to disabled individuals. | [  ] | [  ] |
| 15. | | Admit that Pro Player Stadium offers food service at the seats of patrons with disabilities. | [  ] | [  ] |

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the foregoing Request for Admissions was served, via-U.S. Mail to Stephen M. Cody, Esq., 16610 SW 82nd Court, Miami, FL 33157-3604 this __16__ day of January 2001.

AKERMAN, SENTERFITT & EIDSON, P.A.
Attorney for Defendant
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida 33131-1704
Phone: (305) 374-5600
Facsimile: (305) 374-5095

By: _____
Stanley H. Wakshlag, Esq.
Florida Bar No. 266264
Carol C. Lumpkin, Esq.
Florida Bar No. 797448
Devand A. Sukhdeo, Esq.
Florida Bar No. 0126977

4

# EXHIBIT "H"

MI635060:1

FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

01 JUN 25 AM 8: 59

CLERK
MIDDLE

EDWARD S. RESNICK, an individual,
and ACCESS NOW, INC., a Florida not-
for-profit corporation,

            Plaintiffs,

-vs-                       **Case No. 6:00-cv-898-Orl-28DAB**

MAGICAL CRUISE COMPANY, LIMITED,

            Defendant.

## ORDER

    Plaintiffs Edward Resnick ("Resnick") and Access Now, Inc. ("Access Now") brought

the instant action against Defendant Magical Cruise Company, Limited ("Magical") under

Title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et seq.</u> Plaintiffs

contend that Magical has discriminated against them because Magical's cruise ships, the

*Disney Magic* and the *Disney Wonder*, allegedly are not in compliance with the guidelines

promulgated under the ADA regarding accessibility to persons with disabilities.

    This cause is currently before the Court on Defendant's Motion to Dismiss Amended

Complaint, or in the Alternative, for Summary Judgment and Incorporated Memorandum of

Law (Doc. 17). Plaintiffs have filed a Response to Motion to Dismiss or, In the Alternative,

for Summary Judgment (Doc. 20), and with leave of Court (Doc. 27) Magical has filed

Defendant's Reply to Plaintiffs' Response to Motion to Dismiss or, in the Alternative, for

Summary Judgment (Doc. 28). Upon consideration of these pleadings, the record in this

matter, and applicable law, the Court concludes that Magical's motion must be granted



AO 72A
(Rev. 8/82)

because Plaintiffs lack standing to bring this case. Furthermore, the accessibility guidelines upon which the Plaintiffs base their claims do not apply to cruise ships.

## I. Background

Plaintiff Access Now is a not-for-profit corporation which identifies one of its purposes as "to assure that businesses are accessible to, and usable by, all persons, including those persons with disabilities." (Amended Complaint, Doc. 4, ¶ 5). Plaintiff Resnick is the founding member of Access Now and serves as its president. Resnick identifies himself as a qualified individual with a disability under the ADA and states that he has used a wheelchair since 1954 as a result of polio. (Amended Complaint, Doc. 4, ¶ 6).

Plaintiffs filed their Amended Complaint (Doc. 4) on July 28, 2000. Plaintiff Resnick contends that he "would like to travel one of Magical's vessels, but has reasonable grounds to believe that he was about to be subjected to discrimination in violation of the ADA due to his knowledge of the existence of various barriers to accessibility on Magical's vessels." (Amended Complaint, Doc. 4, ¶ 10). Plaintiff's "reasonable grounds" are allegedly based on his review of Magical's advertising materials posted on Magical's Internet website. (Amended Complaint, Doc. 4, ¶ 10).

Plaintiffs contend that the *Disney Magic* and the *Disney Wonder* ("the ships") are "public accommodations" under the ADA and that therefore Magical must comply with Title III of the ADA (42 U.S.C. §§ 12181-12189) and the regulations contained in 28 C.F.R. Part 36. Plaintiffs allege the following specific violations:

> (a) only 18 of the ships' 875 staterooms are designated as accessible, whereas Plaintiffs contend that under § 9.1.2, 28 C.F.R. 36, part A, each ship should have at least 18 accessible staterooms and an additional 8 staterooms with roll-in showers;

-2-

(b) the accessible staterooms are not distributed among the 12 different classes of accommodations on the ships, allegedly in violation of 42 U.S.C. § 12182(b)(A)(iii)[sic];

(c) the accessible staterooms lack access and accommodations for persons with disabilities, including, for example, lack of appropriate safety devices or electric receptacles at appropriate heights;

(d) the ships lack appropriately sloped ramps, handrails, and landing areas;

(e) the ships lack the appropriate number or type of telecommunications devices for the hearing impaired;

(f) the ships lack doors and doorways of appropriate widths, resistance, and closing delay;

(g) the ships lack signage as to accessible routes;

(h) the ships lack signage on restroom doors and otherwise fail to conform to the requirements of §§ 4.2.3, 4.22.3, 4.30.2, 4.30.4, 4.30.5, and 28 C.F.R. 36, Part A.

(i) the ships lack sufficient restrooms for access to individuals with disabilities;

(j) the ships lack appropriate "signage for disability facilities";

(k) the ships lack adequate visual and audible alarms and notification devices;

(l) the ships lack appropriately positioned and controlled drinking fountains;

(m) the ships lack air conditioning controls, emergency switches, and other mechanisms at appropriate heights and/or with appropriate controls;

(n) the ships lack appropriate service counters;

(o) the ships lack a lift or other accessible means of disembarkation at ports of call;

(p) the ships lack accessible seating throughout each assembly areas.

(Amended Complaint, Doc. 4, ¶ 16).

In its Motion to Dismiss or for Summary Judgment (Doc. 17), Magical raises two arguments. First, Magical contends that Plaintiffs lack standing to bring their claims because they have suffered no injury and because the website on which Plaintiffs base their

-3-

contention that the ADA is being violated does not provide the information necessary to base such claims. Secondly, Magical contends that dismissal or summary judgment is appropriate because there are no promulgated guidelines or regulations under the ADA governing cruise ships and that therefore Magical's ships are not in violation of any guidelines as alleged by Plaintiffs.

## II. Discussion

### A. Standing

First, Magical moves for dismissal or summary judgment on the basis that Plaintiffs lack standing to bring the instant claims because they had not boarded or attempted to board either the *Disney Wonder* or the *Disney Magic* prior to the time that this lawsuit was filed. Magical also contends that Plaintiffs' attempt to invoke the "futile gesture" provision of the ADA in order to attain standing should be rejected.

As the United States Supreme Court explained in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), "the irreducible constitutional minimum of standing contains three elements" – injury in fact, causation, and redressability. Resnick and Access Now – as the parties seeking to invoke federal jurisdiction – bear the burden of establishing each of these elements. Id. at 561. Magical challenges only the injury-in-fact element in its motion (Doc. 17, at 6 n.2). In order to satisfy this element, "the plaintiff must have suffered . . . an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural or hypothetical.""" Lujan, 504 U.S. at 560 (citations omitted). The plaintiff must himself be "among the injured." Id. at 563 (quoting Sierra Club v. Morton, 405 U.S. 727, 734 (1972)). The determination of whether a plaintiff has standing to bring

-4-

suit is made as of the date the lawsuit is commenced. See Lujan, 504 U.S. at 569 n.4; Paul Revere Variable Annuity Ins. Co. v. Zang, 248 F.3d 1, 5 n.2 (1st Cir. 2001); Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000); Steger v. Franco, Inc., 228 F.3d 889, 893 (8th Cir. 2000); Tucker v. Phyfer, 819 F.2d 1030 (11th Cir. 1987).

The ADA allows suit to be brought by "any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1). It is undisputed that Resnick has not been on board or attempted to board either the Disney Magic or the Disney Wonder. Hence, Plaintiffs have not been subjected to discrimination.[1] However, Plaintiffs allege in their amended complaint that they have reasonable grounds to believe that they are about to suffer discrimination based on knowledge they have acquired from Resnick's review of Magical's website and its information regarding the amenities of the ships.

The Court finds that Resnick's review of the website is insufficient to confer standing upon him or Access Now. Resnick alleges that he "would go on cruises on Magical's vessels, if not for the Defendant's lack of accommodation for persons with disabilities." (Amended Complaint, Doc. 4, ¶ 10). The alleged "reasonable belief" based only on review

---

[1]In the Response to Motion to Dismiss or, in the Alternative, for Summary Judgment, Access Now claims standing through Resnick; hence, if Resnick lacks standing so does Access Now. (Doc. 20, at 12-14). See, e.g., Warth v. Seldin, 422 U.S. 490, 511 (1975) (noting that association may have standing as the representative as its members but that association must allege injury or threatened injury to at least one of its members "of the sort that would make out a justiciable case had the members themselves brought suit"); accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right.").

-5-

of Magical's Internet website that Resnick would encounter discrimination if he attempted at some unspecified time in the future to cruise on one of Magical's ships does not constitute "concrete and particularized" injury. Additionally, the alleged injury is merely "conjectural or hypothetical" rather than "actual or imminent." See, e.g., Deck v. Am. Hawaii Cruises, Inc., 121 F. Supp. 2d 1292 (D. Haw. 2000) (finding plaintiff's stated plans to "look into" taking a cruise in the future merely constituted "speculative and conditional intention" which was "insufficient to sustain standing"). Moreover, because standing is determined as of the date of the commencement of the lawsuit, any attempts to achieve standing after the suit was filed are ineffective.[2]

Furthermore, the Court agrees with Magical that Plaintiffs' reliance on the "futile gesture" exception is misplaced. The futile gesture provision of the ADA states as follows:

> (1) Availability of remedies and procedures
>
>     The remedies and procedures set forth in section 2000a-(3)a of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. **Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.**

---

[2]Plaintiffs have filed the statement of an alleged expert, William Cody, which states that he went aboard the *Disney Wonder* as a paying cruise passenger and determined that the ship does not comply with guidelines promulgated under the ADA. (Statement of William B. Cody, Doc. 26). However, it is undisputed that William Cody did not board either of Magical's vessels until January 2001 – six months after the Complaint was filed.

42 U.S.C. § 12188(a)(1) (emphasis added); see also 28 C.F.R. § 36.501(a) (same).  A plaintiff may have "actual notice" under this provision by either having "encountered discrimination or [having] learned of the alleged violations through expert findings or personal observation."  Parr v. L & L Drive-Inn Rest., 96 F. Supp. 2d 1065, 1081 (D. Haw. 2000); see also Steger, 228 F.3d at 892 ("Although plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, they must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers.") (citation omitted); cf. Moreno v. G & M Oil Co., 88 F. Supp. 2d 1116, 1117 n.1 (C.D. Cal. 2000) (noting that the futile gesture provision in the second sentence of section 12188(a)(1) "does no more than clarify the previous sentence's statement that a plaintiff 'about to be subject to discrimination' may sue. It does not eliminate the requirement of actual existing or threatened discrimination.").

In the instant case, Plaintiffs cannot avail themselves of the "futile gesture" exception because they did not have "actual notice" at the time suit was filed that Magical did not intend to comply with the statute. Plaintiffs have not encountered discrimination; rather, they filed suit after merely reviewing Magical's website. A review of this website does not provide Plaintiffs with knowledge of current or imminent discrimination.  The unrefuted affidavit submitted by Magical states that the website does not reveal actual measurements or purport to accurately represent the number or quality of the ships' features. (Aff. of Josef Norsworthy, Doc. 19). That affidavit further provides that the 360-degree panorama views upon which Plaintiffs heavily rely as a basis for their claims were not added to Magical's website until August 29, 2000 – six months after the instant suit was filed on July 14, 2000. (Aff. of Josef Norsworthy, Doc. 19). Accordingly, even if these 360-degree views somehow

bolstered Plaintiffs' "actual knowledge," based on the record before this Court it was impossible for Plaintiffs to have had such knowledge as of the time suit was filed. Therefore, even if Plaintiffs had alleged a concrete intention to cruise on one of Magical's vessels, they would still lack the requisite reasonable grounds for their alleged belief that they would suffer discrimination. In short, there is no record evidence that Plaintiffs had knowledge at the inception of this suit of any alleged violations from personal observation or expert findings.[3] Accordingly, Plaintiffs do not have standing to maintain this action, and summary Judgment will be entered for Defendant Magical.

### B. Guidelines

Assuming arguendo that Plaintiffs have standing to bring the instant action, this Court will address Magical's second argument in support of its motion. Magical's second point is that the new construction and alteration standards relied upon by Plaintiffs in their complaint do not apply to cruise ships. Magical contends that although Title III of the ADA may generally apply to cruise ships, see Stevens v. Premier Cruises, Inc., 215 F.3d 1237 (11th Cir. 2000), no guidelines or regulations have been promulgated under the ADA governing construction or alteration of cruise ships. Hence, Magical argues, there are no guidelines which it could possibly be violating. Magical also contends that applying the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") to cruise ships would violate

---

[3]Again. Plaintiffs did submit the statement of a purported expert, William Cody, as to alleged violations he found when he visited one of Magical's ships. However, it is undisputed that Cody did not board the ship or gain any "knowledge" that he could pass along to Plaintiffs until six months after this lawsuit was filed.

due process. Notably, Plaintiffs do not address this guidelines argument in their Response to Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 20).

In the ADA, Congress directed the Attorney General and the Department of Transportation[4] to issue regulations on or before July 26, 1991 to effectuate the ADA's provisions. 42 U.S.C. § 12186. Plaintiffs base their claims on the public accommodation provisions of the ADA rather than the transportation vehicle provisions, and accordingly the regulations of the Department of Justice rather than the Department of Transportation are at issue here. Final regulations – the ADAAG – relating to public accommodations were adopted by the Department of Justice in 1991 and are contained in Appendix A to 28 C.F.R. Part 36.

However, the Department of Justice has taken the position that the regulations regarding new construction and alterations promulgated under its authority do not apply to

---

[4]As one source explains:

> The Department of Transportation is responsible for issuing regulations to implement the transportation vehicle requirements of title III of the ADA.  42 U.S.C. [§] 12186(a)(1).
>
> . . .
>
> The Department of Justice is responsible for issuing regulations to implement the public accommodation requirements of title III of the ADA.  42 U.S.C. [§] 12186(b). Under the Department of Justice regulations, places of public accommodation on passenger vessels are covered by the public accommodation requirements of title III of the ADA.  28 CFR part 36, appendix B . . . . Thus, some passenger vessels such as cruise ships are subject to both the transportation vehicle and public accommodation requirements of title III of the ADA.

Michael R. Masinter, *Title III of the ADA and Privately Operated Cruise Ships*, 790 PLI/Comm 519, 535 nn.4-5 (Apr. 1999). As noted in the text *infra*, Plaintiffs base their claims on the public accommodation requirements of the ADA, and therefore the regulations at issue in the instant case are those of the Department of Justice.

cruise ships and that subpart D of Title III relating to new construction and alterations will not be extended to cruise ships until requirements appropriate for cruise ships are established. See generally Deck v. Am. Haw. Cruises, Inc., 51 F. Supp. 2d 1057, 1060-1061 (D. Haw. 1999) (discussing the departmental position on the applicability of the ADAAG to cruise ships and concluding that "to the extent Plaintiff's claims fall within subpart D of the ADA regarding new construction and alterations of facilities, these claims are not covered by the ADA"). For example, in the preamble to the Department of Justice Regulations relating to public accommodations, the Department discussed cruise ships in connection with the definition of "facility":

> [C]ommenters raised questions about the applicability of this part to places of public accommodation operated in mobile facilities (such as cruise ships, floating restaurants, or mobile health units). Those places of public accommodation are covered under this part, and would be included in the definition of "facility." Thus the requirements of subparts B and C would apply to those places of public accommodation. For example, a covered entity could not discriminate on the basis of disability in the full and equal enjoyment of the facilities (§ 36.201). Similarly, a cruise line could not apply eligibility criteria to potential passengers in a manner that would screen out individuals with disabilities, unless the criteria are "necessary," as provided in § 36.301.
>
> **However, standards for new construction and alterations of such facilities are not yet included in the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) adopted by § 36.406 and incorporated in Appendix A. The Department therefore will not interpret the new construction and alterations provisions of subpart D to apply to the type of facilities discussed here, pending further development of specific requirements.**

28 C.F.R. Pt. 36, App. B, at 623 (discussion of § 36.104) (emphasis added). Later in the preamble, the Department of Justice reiterated this position, stating that "[a]s explained

-10-

under the discussion of the definition of 'facility,' § 36.104, pending development of specific requirements, the Department will not apply this subpart to places of public accommodation located in mobile units, boats, or other conveyances." 28 C.F.R. Pt. 36, App. B, at 655 (discussion of subpart D).

Moreover, in the ADA Title III Technical Assistance Manual issued by the Department of Justice Civil Rights Division, the Department also states that cruise ships need not meet new construction requirements until specific guidelines are promulgated. The Department explains:

> ILLUSTRATION: A cruise ship is owned and operated by a private entity whose primary business is to operate cruise ships. On the ship are places of lodging, restaurants, bars, a health club, and a nightclub. The private entity is a public accommodation and must comply with the applicable requirements of title III.
>
> Places of public accommodation aboard ships must comply with all of the title III requirements, including removal of barriers to access where readily achievable. **Currently, however, a ship is not required to comply with specific accessibility standards for new construction or alterations, because specific accessibility standards for new construction or alteration o[f] cruise ships have not yet been developed.**

Americans With Disabilities Act Title III Technical Assistance Manual, III-1.2000. In discussing the application of the ADAAG, the Department of Justice states:

> ILLUSTRATION 3: Because of the unique structure of ships, none of the ADAAG technical or scoping standards are appropriate. Until such time as the Architectural and Transportation Barriers Compliance Board issues specific standards applicable to ships, there is no requirement that ships be constructed accessibly. (Cruise ships would still be subject to other title III requirements.)

Americans With Disabilities Act Title III Technical Assistance Manual, III-5.3000.[5]

In the instant case, Plaintiffs' allegations are based on the failure of Magical to comply with the ADAAG which have been promulgated for new construction and alteration of buildings and facilities but which have been deemed by their promulgating body as inapplicable to cruise ships. This Court finds that such claims cannot be maintained. In so ruling, this Court is not unmindful of the Eleventh Circuit's holding in Stevens that the ADA generally applies to cruise ships, nor does this Court now hold that a claim for denial of access to or on a cruise ship cannot be maintained as matter of law even in the absence of regulations. However, the Court sees no basis under the current ADA scheme for a plaintiff to bring a claim that a cruise ship has failed to adhere to guidelines which have been declared inapplicable to cruise ships by the departments charged with promulgation of such guidelines. Magical and other builders, owners, and proprietors of cruise ships have not been afforded notice of the standards with which they are required to comply, and absent such standards may not be subjected to abstract suits such as the instant matter. Cf. Botosan v. Paul McNally Realty, 216 F.3d 827, 836 (9th Cir. 2000) (finding the term "readily achievable" in the ADA not vague because when "[t]aken together with administrative regulations and interpretations, the term, as it is used in Title III, is sufficiently specific to put

---

[5]Similarly, the Department of Transportation has not yet promulgated specific requirements for vessels, but it notes that "ferries and other passenger vessels operated by private entities are subject to" the Department's general rule on nondiscrimination in 49 C.F.R. § 37.5 and to the "applicable requirements of 28 CFR part 36, the DOJ rule under title III of the ADA." 49 C.F.R. Part 37, App. D (discussing section 37.109); see also Transportation for Individuals with Disabilities, 56 Fed. Reg. 45,584, 45,599-600 (Sept. 6, 1991) (noting that "cruise ships are a unique mode of transportation" and that "at the present time, the Department lacks sufficient information to determine what are reasonable accessibility requirements for various kinds of passenger vessels," including cruise ships).

-12-

the owner of a public accommodation on notice of what is required by Title III" and citing United States v. Schneiderman, 968 F.2d 1564, 1568 (1993), for the proposition that "administrative regulations and interpretations may provide sufficient clarification to save an otherwise vague statute").

Therefore, even assuming arguendo that Plaintiffs have standing to bring the instant claims, the Court agrees with Defendant Magical that because the guidelines cited and relied upon by Plaintiffs do not apply to cruise ships, Magical cannot be held in violation of such standards and summary judgment shall be entered for Magical.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion to Dismiss Amended Complaint, or in the Alternative, for Summary Judgment (Doc. 17) is **GRANTED**.

2. All other pending motions are **DENIED as moot.**

3. The Clerk is directed to enter judgment in favor of Defendant Magical Cruise Company, Limited in accordance with this Order and thereafter to close the file.

**DONE and ORDERED** in Chambers, Orlando, Florida this _22_ day of June, 2001

JOHN ANTOON II
United States District Judge



Copies furnished to:
Counsel of Record
Unrepresented Party

-13-